Kristin L. Martin (Nevada Bar No. 7807)
Eric B. Myers (Nevada Bar No. 8588)
McCRACKEN, STEMERMAN &
HOLSBERRY
1630 Commerce Street, Suite A-1
Las Vegas, Nevada 89102
Telephone:   (702) 386-5107
Facsimile:   (702) 386-9848
E-mail:  klm@dcbsf.com

*Attorneys for Defendant Bartenders Union
Local 165*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DAVID STECKBECK, STEVEN ALBA, ROBERT BLEDSOE, all individually, <br><br> Plaintiffs, <br><br> vs. <br><br> BARTENDERS UNION LOCAL 165; a Nevada labor entity; DOES 1-10,. Inclusive; ROE CORPORATIONS 1-10, inclusive, <br><br> Defendants. | CASE NO. 2:14-cv-00323-RFB-CWH <br><br> **AFFIDAVIT OF LANA LOEBIG** |

I, Lana Loebig, declare:

1.    I have personal knowledge of the following facts and if called, could and would testify competently thereto.

2.    I am President of Bartenders Union Local 165 ("Local 165").  I have held this position since approximately 2007.  Prior to being elected President, I was employed as a Business Agent for Local 165.

//

//

1

**AFFIDAVIT OF LANA LOEBIG**

3.      Local 165 has represented a bargaining unit of employees at the Aria Resort and Casino ("Aria") since Aria opened in December 2009. Local 165's bargaining unit includes bartenders who work in the casino at Aria and bartenders who work at the Aria pool.

4.      Local 165 entered into a Collective Bargaining Agreement with Aria initially for the period December 12, 2009 to May 31, 2012 ("the Collective Bargaining Agreement"). A true and correct copy of the Collective Bargaining Agreement is attached hereto as Exhibit A. Local 165 and Aria subsequently agreed to extend the term of the Collective Bargaining Agreement so that it was still in effect as of August 30, 2013.

5.      One of my duties as President of Local 165 is to represent employees of Aria. This includes handling grievances that employees of Aria file with Local 165 and negotiating with Aria over matters that concern bartenders at Aria. I have the authority to decide how to interpret the Collective Bargaining Agreement and to make decisions about how to handle such grievances.

6.      Article 10.03 of the Collective Bargaining Agreement pertains to seasonal pool employees, including Seasonal Pool Bartenders. According to Article 10.03, Seasonal Pool Bartenders' employment ends at the end of the pool season each year. Seasonal Pool Bartenders do not have any right to resume working at the start of the subsequent pool season. Seasonal Pool Bartenders can reapply to work as Seasonal Pool Bartenders in subsequent pool seasons, but Aria is not obligated to rehire them.

7.      Local 165 did not learn until spring of 2013 that Aria had allowed Plaintiffs David Steckbeck, Steven Alba and Robert Bledsoe (collectively "Plaintiffs") to work after the end of the pool season in 2011 and 2012. Until the spring of 2013, Local 165 believed that Aria was complying with the CBA by employing Seasonal Pool Bartenders only during each pool season. Aria's failure to terminate all Seasonal Pool Bartenders at the end of the pool season violated Article 10.03 of the Collective Bargaining Agreement. Aria also violated the Collective Bargaining Agreement by assigning Seasonal Pool Bartenders to work at the pool after the pool season ended. Under Articles 10.01, 10.02 and 20.04 of the Collective Bargaining Agreement, such work should have been assigned to nonseasonal bartenders according to seniority.

**AFFIDAVIT OF LANA LOEBIG**

8.      Local 165 does not interpret the Collective Bargaining Agreement as giving Plaintiffs any additional rights to continue working past the end of the pool season even though Aria allowed them to do so in 2011 and 2012.

9.      Local 165 has, as a long-standing objective, the elimination of the Seasonal Pool Bartender classification in all of the bargaining units that it represents.  Local 165 disfavors the Seasonal Pool Bartender classification because Seasonal Pool Bartenders have no guarantee of continued employment or re-employment from year-to-year and do not receive the same benefits as non-seasonal bartenders.  Non-seasonal bartenders are guaranteed continued employment from year-to-year, accrue seniority in the bartender classification, are entitled to part-time board shifts during the non-pool season, and receive the same benefits as other bargaining unit employees.

10.     Local 165 believes that, as a whole, the interests of the bartenders whom it represents are better served when bartending work is not fragmented into multiple classifications.  This is because fewer classifications creates more opportunities for bartenders to bid for work on their preferred shifts.

11.     In 2009, Local 165 entered into a Memorandum of Agreement with the Luxor that eliminated use of seasonal bartenders at the Luxor's pool.  A true and correct copy of that Memorandum of Agreement is attached hereto as Exhibit B.

12.     In 2011, Local 165 entered into a Memorandum of Agreement with Mandalay Bay that eliminated use of seasonal bartenders at Mandalay Bay's pool, which is called "The Beach." A true and correct copy of that Memorandum of Agreement is attached hereto as Exhibit C.

13.     In 2011, Local 165 entered into a Side Letter Agreement with MGM Grand Hotel that eliminated use of seasonal bartenders at the MGM Grand Hotel's pool.  A true and correct copy of that Memorandum of Agreement is attached hereto as Exhibit D.

14.     In January 2013, Local 165 entered into a Memorandum of Agreement with Monte Carlo Resort & Casino that eliminated use of seasonal bartenders at Monte Carlo's pool. A true and correct copy of that Memorandum of Agreement is attached hereto as Exhibit E.

//

**AFFIDAVIT OF LANA LOEBIG**

15.     In about May 2015, Aria's Employee Relations Director Tamera Lelyk told me and Terry Greenwald (Local 165's Secretary-Treasurer) that Aria intended to use "model bartenders" in two venues that had previously been staffed by regular bartenders.  Mr. Greenwald and I requested that, in exchange, Aria stop using the Seasonal Pool Bartender classification at the pool.  Mr. Greenwald and I had several discussions with Aria management about these proposals.  In the context of these discussions, we learned for the first time that Aria had violated Article 10.03 of the Collective bargaining Agreement by not terminating Plaintiffs' employment at the end of the pool season in 2011 and 2012.

16.     On about May 16, 2013, Local 165 and Aria entered into a Memorandum of Agreement ("the Memorandum of Agreement").  A true and correct copy of that Memorandum of Agreement is attached hereto as Exhibit F.

17.     The Memorandum of Agreement provides, in paragraph 7, that "All current seasonal Pool Bartenders will be separated from employment at the completion of the 2013 'pool season' as designated by the Employer and in accordance with Article 10.03 (Seasonal Pool Food and Beverage Employees) in the CBA."  Paragraph 7 requires Aria to comply with Article 10.03 of the Collective Bargaining Agreement.

18.     The Memorandum of Agreement also provides, in paragraphs 1 to 6, that beginning in the 2014 season, Pool Bartender jobs will be filled by the most senior bartenders who bid for the positons and establishes rules for bartenders to move between pool bartending jobs and other bartending jobs.  These paragraphs of the Memorandum of Agreement eliminated Aria's right to use the Seasonal Pool Bartender classification in pool seasons after the 2013 pool season.

19.     On about August 29 or 30, 2013, I reviewed the grievance that Plaintiffs filed with Local 165 on or about August 29, 2013 and determined that it was facially invalid.  I did not investigate any facts before making that determination because I already knew the relevant facts.  In the context of negotiations that produced the Memorandum of Agreement, I had learned that Plaintiffs were Seasonal Pool Bartenders who had not been laid off at the end of the 2011 and 2012 pool seasons as Article 10.03 of the Collective Bargaining Agreement required.  I also

AFFIDAVIT OF LANA LOEBIG

1   knew that Article 10.03 of the Collective Bargaining Agreement and paragraph 7 of the

2   Memorandum of Agreement required that Plaintiffs be terminated at the end of the 2013 pool

3   season.

4       20.     On about August 30, 2013, I placed a telephone call to each of the Plaintiffs.  I

5   placed the calls on speaker phone.  Terry Greenwald was present with me when I made the calls.

6   I left a voicemail message for Steven Alba and spoke to David Steckbeck and Robert Bledsoe.  I

7   told each of the Plaintiffs that the grievance was invalid.

8       21.     Even if Local 165 had not entered into the Memorandum of Agreement, Local 165

9   would have insisted that Aria terminate Plaintiffs' employment at the end of the 2013 pool

10  season as Article 10.03 requires.  The reason we would have insisted is because, by giving work

11  to Seasonal Pool Bartenders during the non-pool season, Aria violated the seniority rights of

12  non-seasonal bartenders who were entitled to that work.

13      22.     In response to unfair labor practice charges that Plaintiffs filed with the National

14  Labor Relations Board, Local 165's counsel Richard McCracken provided the National Labor

15  Relations Board with a letter explaining the facts and supporting documentation.  A true and

16  correct copy of that letter is attached hereto as Exhibit G.

17      I declare under the penalty of perjury of the laws of the United States and the State of

18  Nevada that this declaration is true and correct.  This declaration was signed by me on this

19  22nd day of September 2015 at Las Vegas, Nevada.

20

21

22  Lana Loebig

23

24

25

26

27

28

---

5

**AFFIDAVIT OF LANA LOEBIG**

Exhibit A

# COLLECTIVE BARGAINING AGREEMENT

between

# ARIA

and

# LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS

## 2009      2012

D 00020

STATEMENT OF INTENT ............................................................................. 2
ARTICLE 1:  RECOGNITION OF THE UNION AND CONTRACT COVERAGES ....... 3
   1.01. RECOGNITION OF THE UNION. .......................................................... 3
   1.02. NON-BARGAINING UNIT EMPLOYEES. ................................................. 4
ARTICLE 2:  HIRING OF EMPLOYEES ............................................................ 4
   2.01. HIRING PROCEDURE. ........................................................................ 4
   2.02. NO INDIVIDUAL CONTRACTS. ........................................................... 4
ARTICLE 3:  UNION SECURITY .................................................................... 4
   3.01. CHECK-OFF. .................................................................................. 4
   3.02. INDEMNIFICATION. ......................................................................... 5
ARTICLE 4:  UNION REPRESENTATIVES ....................................................... 5
   4.01. UNION REPRESENTATIVES VISITS. ...................................................... 5
   4.02. UNION STEWARDS. ........................................................................ 5
   4.03. EMPLOYEE INFORMATION. ............................................................... 6
ARTICLE 5:  SALARIES AND WAGES ............................................................ 7
   5.01. WEEKLY PAYMENT. ....................................................................... 7
   5.02. GRATUITIES. ................................................................................ 7
   5.03. TERMINATED EMPLOYEES. .............................................................. 7
   5.04. DEDUCTIONS AND DONATIONS. ........................................................ 8
   5.05. SUPERIOR WORKMEN. .................................................................... 8
   5.06. COMBINATION JOBS. ..................................................................... 8
   5.07. EQUAL PAY. ................................................................................. 8
   5.08. GRATUITIES FOR LARGE GROUPS. .................................................... 8
   5.09. GUESTROOM ATTENDANT GRATUITIES. .............................................. 9
   5.10. SERVICE CHARGE - PRIVATE COCKTAIL PARTIES. .................................. 9
   5.11. GRATUITIES AND SERVICE CHARGES - ROOM SERVICE DELIVERIES. ............ 9
   5.12. POOLING GRATUITIES. ................................................................... 9
ARTICLE 6:  DISCIPLINE ............................................................................ 10
   6.01. CAUSE FOR DISCHARGE. ............................................................... 10
   6.02. WARNING NOTICES. ..................................................................... 10
   6.03. TIME OF DISCHARGE. .................................................................... 11
   6.04. DISCIPLINARY SUSPENSION. ........................................................... 11
ARTICLE 7:  REPORTING PAY .................................................................... 11
   7.01. REASONS FOR PAYMENT. ............................................................... 11
   7.02. VOLUNTARILY LEAVING WORK. ...................................................... 11
   7.03. NOTICE BY EMPLOYEE. .................................................................. 11
ARTICLE 8:  DISCRIMINATION AND LIE DETECTOR TESTS ........................... 11
   8.01. PROHIBITED DISCRIMINATION. ........................................................ 11
   8.02. LIE DETECTOR TESTS PROHIBITED. ................................................... 12
   8.03. CONFESSIONS OR STATEMENTS. ....................................................... 12
   8.04. BONDABLE STATUS. ...................................................................... 12
ARTICLE 9:  WORK SHIFT, WORK WEEK AND OVERTIME ............................ 12
   9.01. SHIFT AND WEEKLY OVERTIME. ...................................................... 12
   9.02. DAYS OFF. .................................................................................. 13
   9.03. GUARANTEED WORK. .................................................................... 13

D 00021

9.04. SINGLE SHIFT..................................................................................................15
9.05. SPLIT SHIFT. ...............................................................................................15
9.06. POSTING. ...................................................................................................15
**ARTICLE 10: EMPLOYEE CLASSIFICATION...............................................16**
10.01. REGULAR FULL-TIME EMPLOYEES. ......................................................16
10.02. REGULAR PART-TIME EMPLOYEES. ......................................................16
10.03. SEASONAL POOL FOOD AND BEVERAGE EMPLOYEES. ..........................17
**ARTICLE 11: VACATIONS ........................................................................17**
11.01. AMOUNT OF VACATION. ......................................................................17
11.02. BREAK IN EMPLOYMENT.......................................................................18
11.03. TIME OF TAKING VACATION. ................................................................18
11.04. VACATION PAY.....................................................................................18
11.05. PRO-RATED VACATIONS........................................................................19
**ARTICLE 12: HOLIDAYS..........................................................................19**
12.01. RECOGNIZED HOLIDAYS. ......................................................................19
12.02. HOLIDAY PAY. ......................................................................................20
12.03. FAILURE TO REPORT. ............................................................................20
12.04. FLOATING HOLIDAY ELIGIBILITY. .........................................................20
**ARTICLE 13: LEAVES OF ABSENCE ........................................................21**
13.01. REASONS FOR LEAVES OF ABSENCE. ......................................................21
13.02. LEAVES DUE TO INDUSTRIAL ILLNESS OR INJURY. ................................23
13.03. MEDICAL DISABILITY. ..........................................................................23
13.04. RELATIONSHIP TO FAMILY AND MEDICAL LEAVE ACT............................23
13.05. LIGHT DUTY. ........................................................................................25
13.06. MILITARY LEAVE OF ABSENCE...............................................................26
**ARTICLE 14: MEALS...............................................................................26**
14.01. MEALS BY EMPLOYER............................................................................26
14.02. NUMBER OF MEALS. .............................................................................26
**ARTICLE 15: UNIFORMS AND FACILITIES ..............................................26**
15.01. UNIFORMS FURNISHED BY EMPLOYER.....................................................26
15.02. CARE OF UNIFORMS AND CLOTHING.......................................................27
15.03. STORAGE UNITS FOR EMPLOYEES...........................................................28
15.04. THEFT. .................................................................................................28
**ARTICLE 16: MISCELLANEOUS...............................................................28**
16.01. UNION BUTTONS...................................................................................28
16.02. ROTATION OF STATIONS. ......................................................................28
16.03. BREAK PERIODS. ..................................................................................29
16.04. FLOOR COVERINGS. ..............................................................................29
16.05. PRESENTATION OF CHECKS....................................................................29
16.06. KNIFE SHARPENING. .............................................................................30
16.07. RESTROOM ASSIGNMENTS......................................................................30
16.08. DUTIES OF GUEST ROOM ATTENDANTS AND HOUSE PERSONS. ...............30
**ARTICLE 17: BANQUETS ........................................................................32**
17.01. DEFINITION...........................................................................................32
17.02. SERVICE CHARGE. .................................................................................32
17.03. EMPLOYEES WORKING BANQUETS .........................................................32

17.04. REPORTING PAY. ........................................................................................... 33
17.05. DISTRIBUTION OF GRATUITIES. ...................................................................... 34
17.06. COCKTAIL PARTIES/RECEPTIONS. .................................................................. 35
17.07. BANQUET MINIMUMS AND LIMITATIONS. ........................................................ 35
17.08. FULL FUNCTION. ........................................................................................... 36
17.09. BARTENDERS. .............................................................................................. 36
17.10. BANQUET TRAINING AND WORK. ................................................................... 36
17.11. SETUP AND BREAKDOWN. .............................................................................. 36
**ARTICLE 18: PROMOTIONAL EVENTS** ............................................................... 36
18.01. DEFINITION. ................................................................................................ 36
18.02. GRATUITIES PAYABLE FOR PROMOTIONAL EVENTS. ......................................... 37
18.03. FRONT SERVICES ATTENDANTS. ..................................................................... 37
18.04. PAYMENT OF PROMOTIONAL EVENT GRATUITIES. ............................................ 39
18.05. EXCEPTION. ................................................................................................. 39
**ARTICLE 19: COMPLIMENTED GUESTS** ........................................................... 39
19.01. ............................................................................................................... 39
**ARTICLE 20: SENIORITY** .................................................................................. 40
20.01. PROBATIONARY PERIOD. ............................................................................... 40
20.02. DEFINITION OF SENIORITY. ............................................................................ 40
20.03. LAYOFFS AND RECALLS. ............................................................................... 40
20.04. PROMOTIONS AND PREFERENCE FOR SHIFTS. .................................................. 41
20.05. BREAK IN CONTINUOUS SERVICE AND SENIORITY. ........................................... 43
20.06. NOTIFICATION. ............................................................................................. 43
**ARTICLE 21: GRIEVANCES AND ARBITRATION** ............................................... 45
21.01. DEFINITIONS. ............................................................................................... 45
21.02. STEP ONE PROCESS AND TIME LIMIT FOR FILING GRIEVANCE. ........................... 45
21.03. STEP TWO PROCESS - PROCEDURE FOR ADJUSTING FORMAL GRIEVANCES. .......... 46
21.04. EXTENSION OF TIME LIMITS. .......................................................................... 47
**ARTICLE 22: NO STRIKES - NO LOCKOUTS** ..................................................... 47
22.01. NO STRIKES. ................................................................................................ 47
22.02. NO LOCKOUTS. ............................................................................................ 48
**ARTICLE 23: MANAGEMENT RIGHTS AND RESPONSIBILITIES** ........................ 48
23.01. RIGHT TO MANAGE. ..................................................................................... 48
23.02. RULES AND POSTING. .................................................................................... 48
**ARTICLE 24: COURT APPEARANCE AND JURY DUTY** ...................................... 48
24.01. COURT APPEARANCE. .................................................................................... 48
24.02. JURY DUTY. ................................................................................................. 48
**ARTICLE 25: HEALTH AND WELFARE** ............................................................. 49
25.01. AMOUNT OF CONTRIBUTIONS. ....................................................................... 49
25.02. DELINQUENT CONTRIBUTIONS. ....................................................................... 49
25.03. ACCEPTANCE OF TRUST. ............................................................................... 49
**ARTICLE 26: PENSIONS** .................................................................................... 50
26.01. TRUST AND PLAN. ........................................................................................ 50
26.02. CONTRIBUTIONS. .......................................................................................... 50
26.03. ACCEPTANCE OF TRUST. ............................................................................... 50
26.04. DELINQUENT CONTRIBUTIONS. ....................................................................... 50

**ARTICLE 27: WAGES** ........................................................................................... **50**
   27.01. ESTABLISHED WAGES........................................................................................ 50
   27.02. MINIMUM WAGES............................................................................................. 50
   27.03. WAGE INCREASES........................................................................................... 51
   27.04. NEWLY HIRED EMPLOYEES.............................................................................. 52
**ARTICLE 28: OWNERS AND SUCCESSORS** ................................................ **52**
   28.01. OWNERSHIP. .................................................................................................. 52
   28.02. OBLIGATIONS ON EMPLOYER SELLING OR ASSIGNING.................................... 53
   28.03. OBLIGATIONS ON SUCCESSOR EMPLOYERS..................................................... 53
**ARTICLE 29: SUBCONTRACTING AND SUBLEASING** ........................... **54**
   29.01......................................................................................................................... 54
**ARTICLE 30: TRAINING** ................................................................................... **54**
   30.01. TRAINING PROGRAM........................................................................................ 54
   30.02. TRAINING TO SATISFY THE REQUIREMENTS IMPOSED BY THE EMPLOYER'S EVOLVING
   OPERATIONS AND GUEST EXPECTATIONS. ................................................................. 55
   30.03. FOOD & BEVERAGE TRAINING AND ASSESSMENTS. ....................................... 55
   30.04. SOUTHERN NEVADA JOINT MANAGEMENT CULINARY AND BARTENDERS TRAINING
   FUND................................................................................................................... 56
   30.05. NO CLAIM BASED ON TRAINING....................................................................... 57
**ARTICLE 31: JOB DESCRIPTIONS** .................................................................. **58**
   31.01......................................................................................................................... 58
**ARTICLE 32: OTHER BENEFITS**........................................................................ **59**
   32.01......................................................................................................................... 59
**ARTICLE 33: LABOR-MANAGEMENT COOPERATION**.............................. **59**
   33.01......................................................................................................................... 59
**ARTICLE 34: HOUSING FUND** .......................................................................... **59**
   34.01. HOUSING FUND............................................................................................... 59
**ARTICLE 35: TIP EARNERS' LEGAL ASSISTANCE FUND**.......................... **60**
   35.01. TIP-EARNERS' LEGAL ASSISTANCE FUND. ..................................................... 60
**ARTICLE 36: IMMIGRATION** ........................................................................... **61**
   36.01......................................................................................................................... 61
**ARTICLE 37: CONTINUITY OF SERVICE**........................................................ **61**
   37.01. REDEVELOPMENT OBLIGATIONS....................................................................... 61
   37.02. JOB OPPORTUNITIES AND RETENTION BONUS................................................... 62
   37.03. PRIORITY FOR EMPLOYMENT. .......................................................................... 63
   37.04. SURVIVAL OF ARTICLE. ................................................................................... 64
**ARTICLE 38: TERMINATION** ............................................................................ **65**
   38.01......................................................................................................................... 65
**EXHIBIT 1 – 2009 WAGE SCALES** ..................................................................... **66**
**EXHIBIT 2 - CHECK-OFF AGREEMENT** ........................................................ **68**
**EXHIBIT 3 - WAIVER OF BARGAINING RIGHTS AND AMENDMENTS TO
AGREEMENT** ......................................................................................................... **72**
**EXHIBIT 4 - POLITICAL ACTION COMMITTEE**........................................... **73**
**EXHIBIT 5 - SPECIALTY ROOM FOUR (4) HOUR SHIFTS, LUNCH ONLY** .............. **74**
**EXHIBIT 6 - CASUAL DINING/PRODUCTION VENUES AND FINE
DINING/SPECIALTY/BRANDED/CELEBRITY CHEF VENUES**.................................. **75**

D 00024

EXHIBIT 7 – BANQUET SERVICES FUNCTION GUIDELINES ................................ 76
SIDE LETTER #1 - BARTENDERS TRAINING PROGRAM ................................ 79
SIDE LETTER #2 - FRONT SERVICES ATTENDANT POSITIONS ............................ 80
SIDE LETTER #3 - SURVEILLANCE TAPES ................................................ 81
SIDE LETTER #5 - 401(K) PLAN ............................................................ 82
SIDE LETTER #6 - NEW FOOD AND BEVERAGE VENUE DEVELOPMENT ............. 83
SIDE LETTER #7 - SOMMELIER TRAINING .............................................. 87
SIDE LETTER  # 8 TESTING FOR PROMOTIONAL BIDDING ......................... 88
SIDE LETTER # 9 ALTERNATIVE DISPUTE RESOLUTION PROCESS ..................... 89
MEMORANDUM OF AGREEMENT ......................................................... 93

D 00025

## AGREEMENT

THIS AGREEMENT is made and entered into as of the 12th day of December, 2009 by and between CityCenter Hotel Casino LLC d/b/a ARIA Resort & Casino (hereinafter called the "Employer"), and the LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS, for and on behalf of CULINARY WORKERS UNION, Local No. 226, and BARTENDERS UNION, Local No. 165 (hereinafter called the "Union").

## WITNESSETH:

WHEREAS, pursuant to an agreement between the parties, the parties have, by negotiations and collective bargaining, reached complete agreement on wages, hours of work, working conditions and other related, negotiable subjects to be incorporated into a new Labor Agreement which shall supersede all previous verbal or written agreements in conflict with or modified by the Agreement applicable to the employees in the bargaining unit defined herein which may have existed between the Employer and the Union or between the predecessor of the Employer, if any, and the predecessor of the Union, if any.

NOW, THEREFORE, in consideration of the foregoing, the execution of this Agreement and the full and faithful performance of the covenants, representations and warranties contained herein, it is mutually agreed as follows:

## STATEMENT OF INTENT

The parties to this collective bargaining agreement enter this agreement committed to their continuing cooperative efforts and mutual success, and providing opportunities for employees.  The parties' relationship was forged based upon their recognition that they each improve their likelihood of success through mutual cooperation.

The parties are both committed to making Las Vegas the most successful and visited leisure, gaming, entertainment and convention destination in the world.  Working together we will ensure that guests will visit and return to our hotel/casinos. Through the dedication, hard work and delivery of exemplary guest service our employees satisfy our guests' expectations.

It is our goal to provide the training, support and environment so every single guest achieves the highest level of satisfaction with their visit.

We stand together to make our hospitality industry the envy of all.

D 00026

## ARTICLE 1: RECOGNITION OF THE UNION AND CONTRACT COVERAGES

### 1.01. Recognition of the Union.

(a)     The Employer agrees to recognize the Union as the exclusive collective bargaining representative for the Employer's employees at its establishment at 3730 Las Vegas Boulevard South, Las Vegas, Nevada, working under the Union's jurisdiction and working in those job classifications listed in Exhibit 1 attached hereto and made a part of this Agreement.  The Employer and the Union agree that all employees working in classifications listed in Exhibit 1 are properly within the bargaining unit and that the term "employee" as used in this Agreement refers to employees of the Employer working in such classifications.  Any classification established by the Employer, not listed in Exhibit 1, where the employees perform duties covered by this Agreement shall be a part of this Agreement at a wage rate comparable to related job classifications.

(b)     For clarification, "all employees" as used in subsection 1.01(a) includes workers the Employer may obtain from a temporary labor source, employment agency or other source besides the Employer's own hiring process regardless whether the workers are on the Employer's payroll or that of another entity and regardless of the job classifications or titles assigned to them by another entity, as long as they are performing bargaining unit work at the Employer's facility.  Temporary workers performing such bargaining unit work are covered by all economic terms and conditions of this Agreement.  The Employer shall make contributions to benefit funds called for by this Agreement for all hours temporary workers perform such bargaining unit work.  If temporary workers are not on the Employer's payroll, the Employer shall obtain and provide to the Union the same information about such employees as it provides about its own employees pursuant to Section 4.03.  The Employer shall also obtain the payroll and personnel records necessary to determine that any temporary workers performing bargaining unit work at the Employer's facility are being paid in accordance with the terms of this Agreement and supply copies to the Union upon the Union's request.  The Employer shall not enter into any arrangement with any source of temporary workers unless the Employer has the right under such arrangement to obtain and share with the Union the information described herein and shall terminate any arrangement for temporary workers as soon as it has the legal right to do so if the arrangement does not give the Employer the right to obtain and share with the Union the information described herein. The Employer shall provide to the Union copies of any and all contracts, agreements, purchase orders or other documents evidencing any arrangements existing as of the effective date of this Agreement under which the Employer may obtain temporary employees. This subsection 1.01(b) shall be effective as of June 1, 2010. The Employer and Union shall immediately form a committee of an equal number of high- level representatives of each party to share fully their information about the Employer's labor needs for big events and how those needs can be filled and on what terms. The committee shall have the power to amend this Subsection 1.01(b) by mutual consent. This Subsection 1.01(b) shall be effective at the mutual consent of the committee, but in any event no earlier than June 1, 2010.

D 00027

### 1.02. Non-Bargaining Unit Employees.

Non-bargaining unit employees shall perform no bargaining unit work except such occasional work as is reasonably connected with or incidental to the proper and orderly conduct of hotel operations.

## ARTICLE 2: HIRING OF EMPLOYEES

### 2.01. Hiring Procedure.

Whenever the employer finds it necessary to hire new employees for those classifications covered by the Agreement, it may recruit and procure applicants from any source.

At its sole option, the Employer may notify the Union who shall assist the Employer in obtaining applicants who meet the qualifications required by the Employer. When applicable, the Union's selection of applicants for referral shall be on a nondiscriminatory basis, and shall not be based upon or in any way affected by membership in the Union or the Union's bylaws, rules, regulations, constitutional provisions or any other aspects or obligations of Union membership, policies, or requirements, or upon an applicant's race, color, religion, sex, sexual orientation, age, national origin, actual or perceived disability, or a history of a disability.

The Employer shall be the sole judge of an applicant's suitability, competence and qualifications to perform the work of any job to be filled. The Employer may accept or reject any applicant for employment in accordance with applicable laws.

When the Employer considers applicants for employment who have not been referred to the Employer by the Union's dispatch office, the Employer shall, in order to maintain a consistent and orderly process, advise such applicants that in order to obtain employment they must be dispatched for available positions. The Union's referral service shall send applicants named by the Employer directly back to the Employer. The Union will process these applicants within four (4) hours during which the Union's referral service is open for business. Such applicants named by the Employer shall be processed by the service without any discrimination. Any applicant named by the Employer shall be permitted by the Union's referral service to register in the same manner as others. If there are any problems with processing of applicants, the parties will review such problems and make such changes as may be necessary.

### 2.02. No Individual Contracts.

No employee covered by this Agreement shall be compelled or allowed to enter into any individual contract or agreement with the Employer concerning conditions of employment.

## ARTICLE 3: UNION SECURITY

### 3.01. Check-Off.

The Check-Off Agreement and system heretofore entered into and established by the Employer and the Union for the check-off of Union dues by voluntary authorization, as

D 00028

set forth in Exhibit 2, attached to and made a part of this Agreement, shall be continued in effect for the term of this Agreement.

### 3.02. Indemnification.
The Union will indemnify and save the Employer harmless against any and all claims, demands or other forms of liability, which may arise out of, or by reasons of, any action taken or not taken by the Employer, at the request of the Union, in accordance with the provisions of this Article.

### ARTICLE 4: UNION REPRESENTATIVES

### 4.01. Union Representatives Visits.
(a)      Authorized representatives of the Union shall be permitted to visit the Employer's establishment for the purpose of communicating with employees and supervisors regarding Union business and collecting Union dues, assessments and initiation fees. Such visits shall not interfere with the conduct of the Employer's business or with the performance of work by employees during their working hours.  Union representatives will be required to report to the designated office or Security and sign in and wear identification while on the premises of the Employer.

(b)      Union Access for Benefits Program Education.
The parties jointly commit to providing bargaining unit employees with ongoing education about the Benefits Programs provided under this Collective Bargaining Agreement.  Representatives of the Health & Welfare Fund, Pension Fund or other benefit programs including financial institutions sponsored by Culinary Workers Union 226 or Bartenders Local 165 shall be permitted to visit the Employer's establishment for the purpose of educating bargaining unit employees on the following topics:

    1.      Enrolling them in the benefits plans;
    2.      Health, wellness, early detection and prevention programs;
    3.      The procedures and best ways to utilize the benefits programs.

Such visits will be scheduled at the mutual agreement of the parties and will be held in non-public, non-working locations which are designated and made available by the Employer.

The parties will attempt to provide 30 days notice of such visits in order to properly schedule and communicate with employees in advance.

### 4.02. Union Stewards.
The Union may select trained Union Stewards from among the employees. Union Stewards may act as Union representatives, or may assist Union representatives in proceedings under Article 21 of this Agreement (Grievance and Arbitration), and the discussion with the Employer's representative of questions or concerns regarding the Employer's work practices and procedures, provided that a designated Union official provides the Union Steward and the Employer's designated representative with specific

4
**ARIA**

written authorization permitting the Union Steward to engage in such activity. The Steward shall not engage in the authorized activities described above on paid work time, unless the Employer's designated representative provides specific written authorization to the Union Steward. No employee shall participate in meetings, discussions or other activities with the Union Steward while the employee is on paid work time, unless the Employer's designated representative agrees that the employee should attend on paid work time. Union Stewards engaged in activities authorized by the Union shall comply with the obligations imposed upon authorized Union representatives by Article 4 of this Agreement.

### 4.03. Employee Information.

To permit the Union to properly and efficiently carry out its responsibilities, the Employer shall provide the following information to the Union:

(a)     By the tenth (10th) day of each month, a list of all employees hired into the bargaining unit or transferred into the bargaining unit during the preceding month, including each employee's name, social security number, department, job title, home address, phone number, gender, status (full time, part time, etc.), date of hire, date of birth and ethnicity.

(b)     By the tenth (10th) day of each month, a list of all bargaining unit employees terminated, placed on leave of absence or transferred out of the bargaining unit, during the preceding month including each employee's name, social security number, the reason for such termination, leave of absence or transfer and the date(s) of such personnel transactions, and the expected date of return for leaves of absence.

(c)     The reports described in subsections (a) and (b) shall be sent to the Union by fax or mail or downloaded from the Company's FTP site by the Union or uploaded by the Company to the Union's FTP site or via email; after the Union has demonstrated to the Employer that the proper "PGP" security encryption measures exist in the Union's network.

(d)     The Employer shall furnish the Union with a quarterly list of all employees in the bargaining unit, including each employee's name, social security number, department, job title, home address, phone number, status (full time, part time, etc.) and date of hire, date of birth and ethnicity. Data regarding employee ethnicity will not be shared with any person, media or entity outside the Union and employee benefit funds. The Union agrees to sign a confidentiality form pertaining to the use of such data. This report shall be in an Excel spreadsheet or in a formatted text format like .csv format, containing header information in any one of the following media:

    1.     Downloaded by the Union from the Company's FTP site;
    2.     Uploaded by the Company to the Union's FTP site;
    3.     Via e-mail transmission (See 4.02(c) above);
    4.     CDROM.

**ARIA**

D 00030

## ARTICLE 5: SALARIES AND WAGES

### 5.01. Weekly Payment.

Regular employees shall be paid weekly, semi-monthly or bi-weekly.  Paychecks must show the number of hours paid for in that pay period, broken down by straight-time and overtime hours.  Personnel records on the source and dates of gratuities included in paychecks shall be made available to individual employees on request.

### 5.02. Gratuities.

All gratuities left by customers are the property of the employees exclusively and no Employer or department heads not covered by this Agreement shall take any part of such gratuities or credit the same in any manner toward the payment of an employee's wages, except as otherwise provided by this Agreement.  The Employer at its sole option may institute programs whereby gratuities are pooled and disbursed on a pro-rata basis to Front Service Employees and to self-service food outlets (e.g., buffet, cafeteria operation) employees.  Employees may be required to acknowledge in writing the pooling process and distribution formula established in the room.  The Employer shall not post or display notices restricting gratuities; provided, however, that where the Employer has special events, sales promotions or other functions where the price charged includes gratuities, the Employer may publish and distribute literature, brochures and tickets for same which contain a notice of statement that gratuities are included in such price.

Gratuities, regardless of the amount, signed by a registered hotel guest on that guest's individual hotel check, or by a registered hotel guest or other customer on his/her individual credit card, shall be paid to the employee in cash either after the end of the shift or immediately prior to the commencement of the employee's next shift, provided that, in the case of gratuities signed on a hotel check, the employee must have followed the Employer's established and published procedure for verifying that the person who signed for the gratuity is a registered hotel guest and is not exceeding his/her established credit limit.

### 5.03. Terminated Employees.

Employees who are discharged and/or who resign shall be paid in accordance with applicable laws.

(a)      Applicable Laws to Article 5, Section 608.020 - Discharge of an Employee - Immediate Payment:  Whenever the Employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable within twenty-four (24) hours.

(b)      Section 608.030 - Payment of Employee Who Resigns or Quits His/Her Employment: Whenever an employee resigns or quits his/her employment, the wages and compensation earned and unpaid at the time of his/her resignation or quitting must be paid no later than:

D 00031

1)    The day on which he/she would have regularly been paid the wage or compensation; or

2)    Seven days after he/she quits or resigns, whichever is earlier.

### 5.04. Deductions and Donations.
(a)    No employee shall be required to subscribe to any form of insurance or to make contributions or suffer any deductions from wages without written authorization of such employee, except as may be required by law.

(b)    There shall be no automatic cash deductions from an employee's wages for any cash shortage until after consultation with the employee and the responsibility for the shortage has been established by the Employer provided, however, that the employee may have the Union review the case with the Employer, prior to any such deduction. When any said deduction is made the Employer shall notify the employee in writing immediately upon determination that a cash shortage exists for which it intends to deduct the amount of the shortage from the employee's wages. So long as Food Servers observe the Employer's published procedures governing walkouts, there will be no automatic cash deduction from employee's wage pending an investigation.

### 5.05. Superior Workmen.
The wage scales in this Agreement are minimum scales and do not prohibit the Employer from paying higher wages. It is specifically agreed that employees compensated at said higher wage rates may be returned to the scales published herein at the sole discretion of the Employer. Employees paid Superior Workmen rates shall have their wages increased by amounts of not less than the increase in the minimum wage scales as specified in Exhibit 1, attached to and made part of this Agreement, for the classifications in which they are employed.

### 5.06. Combination Jobs.
When an employee works in two or more classifications in any day, he shall be paid for that day at the rate of pay for the highest classification, provided that this shall not apply in cases of relief for meal and rest periods.

Fountain Workers may perform work involving the service of alcohol involving service of beer and wine, in Express Gourmet Outlets, they may pour complements to other beverages (e.g., may add a shot of alcohol to a coffee drink).

### 5.07. Equal Pay.
The wage scales set forth in Exhibit 1 shall apply equally to male and female employees covered by this Agreement.

### 5.08. Gratuities For Large Groups.
A gratuity of eighteen percent (18%) shall be added to checks for parties of eight (8) or more in all restaurants for guests paying with cash or credit card. This provision shall not apply to complimented guests.

7
**ARIA**

D 00032

### 5.09. Guestroom Attendant Gratuities.
Cash gratuities left by guests checking out of rooms or designated for Guestroom Attendants shall be the property of the Guestroom Attendants.

### 5.10. Service Charge - Private Cocktail Parties.
A service charge of fourteen percent (14%) of the check shall be paid to Room Service Servers for setting up cocktail parties in private rooms. For these purposes, a cocktail party is a gathering of twelve (12) or more persons in a guest room or suite in which alcoholic beverages, mixes, glasses and ice are delivered by the Room Service Server. In these cases, charges are based on consumption only. Consumption is defined as an open bottle.

### 5.11. Gratuities and Service Charges - Room Service Deliveries.

(a) A gratuity of five percent (5%) with a cap of ten dollars ($10.00) per delivery shall be paid for delivering complimentary items, excluding meals, sent to a guest's room by the Employer.

(b) A gratuity of fifteen percent (15%) with a cap of one hundred seventy five dollars ($175.00) per server shall be paid for meals and/or in-house events paid by Employer.

### 5.12. Pooling Gratuities.
All gratuities left by customers in the Outlets are the property of the Employee exclusively. Gratuities may be pooled, and the total gratuity pool in each outlet may be divided evenly only among those Food Servers having worked that particular shift in the outlet in question. Food Servers taking an Early Out shall receive a prorated share of the gratuity pool, as determined by the number of hours worked during the particular shift.

It is understood that this system of gratuity distribution shall be revisited and reviewed by the Food Servers of each outlet 12 months from its inception, with a vote taken, at that time, among the Food Servers in each outlet as to whether or not this gratuity distribution system shall continue, in the particular outlet, for the remainder of this Agreement.

By way of explanation: A separate vote shall be taken in each of the particular outlets, with a majority of those voting in each of the particular outlets determining whether or not the system of pooling gratuities shall continue for the remainder of this Agreement as it pertains to their outlet.

### 5.14. Bartenders Serving Food.
Employees in bartender positions in any venue or outlet (including showrooms) may be required to take food orders and/or serve food in bar and/or counter areas.

D 00033

**5.15. Food Deliveries from Restaurant Outlets.**
For food deliveries made to the Poker Room, the property will continue it's current practice of having UNION restaurant deliver food items produced in their facilities and IRD handling other deliveries unless the size and scope of an event in the venue, as determined by management, requires that the Banquet Department provide the service.

## ARTICLE 6: DISCIPLINE

**6.01. Cause For Discharge.**
(a)     No regular employee, after having completed the probationary period under Section 20.01, shall be disciplined and/or discharged except for just cause.   The Employer shall follow a system of progressive discipline.   The parties agree that progressive discipline normally requires, prior to suspension or discharge, that an employee be given a written opportunity to correct the deficiency, but that within the principle of progressive discipline, the Employer may impose immediate suspension or discharge for dishonesty, incompetence, misconduct, insubordination, discourteous conduct toward a guest, failure to report to work without just cause, walking off the job during a shift, or drinking alcohol or use of controlled substance, or being under the influence thereof, during the employee's shift.

When an employee who has completed the probationary period is disciplined and/or discharged, the reason therefore will be given to the employee in writing.  Based on the Union and Employer's established practice when an employee is discharged, copies of the written notice to the employee will be sent to the Union within seventy-two (72) hours of the discharge.  Upon request by the Union, legible copies of all documents relevant to discipline or discharge, including videotapes, shall be provided to the Union.

(b)     Where there is reasonable cause to believe that an employee is under the influence of alcohol or a controlled substance, the employee, after being notified of the contents or this subsection, must consent to an immediate physical examination at an independent medical facility or suffer the penalty of discharge.  The Employer shall pay for the cost of the examination, and the employee shall be paid for all time required for the examination. There is an absolute presumption that an employee is under the influence of alcohol where his or her blood alcohol level meets or exceeds the legal presumption of intoxication recognized by the State of Nevada.

**6.02. Warning Notices.**
Warning notices issued to employees must specify the events of actions for which the warning is issued.  Warning notices shall be issued to employees as soon as possible after the Employer is aware of the event or action for which the warning notice is issued and has a reasonable period of time to investigate the matter.

A copy of any written warning notice shall be issued to the employee.  The employee shall be required to sign all notices for the purposes of acknowledging receipt.  Warning notices, written customer complaints, and reports of outside agencies or of the Employer's own security force concerning conduct of an employee shall become null and

D 00034

void one (1) year after the date of issuance and may not thereafter be used as a basis for or in support of any subsequent discharge or disciplinary action.

### 6.03.  Time of Discharge.
No employees shall be discharged on his/her day off or while on vacation.

### 6.04.  Disciplinary Suspension.
Suspensions shall become null and void one (1) year after the date of issuance and may not thereafter be used as a basis for or in support of any subsequent discharge or disciplinary action.

## ARTICLE 7:  REPORTING PAY

### 7.01.  Reasons for Payment.
When the Employer or its representative orders an employee to report for work, or fails to notify an employee not to report to work as previously scheduled, for any reason, and said employee is not allowed to work, the Employer shall pay the employee at the employee's regular rate of pay for his/her scheduled shift, provided however, that where an employee is sent home after commencing work because the Employer cannot present scheduled entertainment due to bona fide illness or disability of the entertainer or entertainers to perform, the employee shall be paid for the hours actually worked or four (4) hours, whichever is greater.

### 7.02.  Voluntarily Leaving Work.
Employees who voluntarily leave work with the Employer's approval will be paid for the actual hours worked.

### 7.03.  Notice by Employee.
If an employee is unable to report for work, he/she shall notify or cause notice to be given to the department head, assistant department head, shift supervisor or other designated Employer representative, who will be available for such purpose, at least four (4) hours prior to commencement of the employee's shift, except where it is unreasonable under the circumstances, for the employee to give such notice.  The Employer will log and maintain a record of such calls.

## ARTICLE 8:  DISCRIMINATION AND LIE DETECTOR TESTS

### 8.01.  Prohibited Discrimination.
There shall be no discrimination by the Employer or the Union against any employee because of membership or non-membership in, or activity on behalf of the Union provided that an employee's Union activities shall not interfere with the performance of his/her work for the Employer.  In accordance with applicable laws, there shall be no discrimination against any employee with respect to compensation, terms, conditions, privileges of or opportunities for employment because of race, color, religion, sex, or sexual orientation, age, national origin or disability as defined in the Americans with Disabilities Act.  Notwithstanding any other provision of this Agreement, the Employer

10
**ARIA**

is permitted to take all actions necessary to comply with the Americans with Disabilities Act, including but not limited to, the authority to take actions deemed by the Employer to be necessary to effect reasonable accommodations.

### 8.02.  Lie Detector Tests Prohibited.
No employee or applicant shall be required or requested by the Employer to take a lie detector test.

### 8.03.  Confessions or Statements.
Should the Employer request that an employee resign, or sign a confession or statement concerning his/her conduct, the employee is permitted to have a Union Representative present if the employee so requests.

### 8.04.  Bondable Status.
Employees who regularly, in the course of their employment, are required to handle money or negotiable instruments, may be required to maintain bondable status as a condition of employment.


## ARTICLE 9:  WORK SHIFT, WORK WEEK AND OVERTIME

### 9.01.  Shift and Weekly Overtime.
For the purposes of computing overtime only, eight (8) hours shall constitute a full shift based on a five (5) day workweek; ten (10) hours shall constitute a full shift, based on a four (4) day work week; and six (6) hours or less shall constitute a short shift, except overtime pay for banquet servers is due only when the employee works more than eight (8) hours on any one job.

All work performed in excess of eight (8) hours (or ten (10) hours if applicable) on one (1) workday, or in excess of forty (40) hours in a workweek shall constitute overtime and shall be paid for at time and one-half ($1-^1/_2$X) the employee's straight time hourly rate of pay.  Work performed on an employee's sixth (6th) and seventh (7th) consecutive days of work shall be paid for at time and one-half (1-½X) and two and one-half times (2-½X) the employee's straight-time hourly rate of pay respectively, except overtime for part-time employees will not be paid if the employee is regularly scheduled to work 6 days and if that sixth or seventh day is worked by a part-time employee at the employee's request, unless the employee works more than forty (40) hours in the workweek.

All work performed by an employee with a ten (10) hour shift on that employee's fifth (5th) consecutive day of work will be paid at time and one-half (1-½X), on that employee's sixth (6th) consecutive day of work will be paid at two times (2X), and on that employee's seventh (7th) consecutive day of work will be paid at two and one-half times (2-½X) the employee's straight-time hourly rate of pay respectively.

Overtime shall not be paid under this Section for more than one reason for the same hours worked.  Holidays not worked and paid for at straight-time under Section 12.02 (c) shall

11
**ARIA**

D 00036

count as a shift for the purposes of Section 9.03 (a), and also, if on an employee's regularly scheduled day of work for the purposes of computing weekly overtime.

### 9.02. Days Off.
The Employer supports the principle of providing its regular full time employees with two (2) days off, or three (3) days off for employees on a ten (10) hour per day schedule, during each seven (7) day work period. The Employer will schedule them consecutively, except that when business conditions dictate, the Employer may split them. In those instances, scheduling of split days off will be done according to the provisions of Section 20.04(b) of this Agreement. The use of Section 20.04(b) for scheduling of split days off applies if no one bids on the proposed shift. If no one bids on the proposed shift then the least senior may be assigned.

### 9.03. Guaranteed Work.
(a)     Regular full time employees who are scheduled and report for work at the beginning of their workweek shall be guaranteed pay for the following number of shifts for which they are scheduled in that workweek.

(b)     1.     Except as otherwise provided in this Section, not less than five (5) full shifts of eight (8) hours, or four (4) full shifts of ten (10) hours for:

| | |
|---|---|
| Host Person | Bartender (Non-Tipped) |
| Steward | Beverage Porter |
| Stove Cleaner | Banquet Set-up Porter |
| Kitchen Worker | Lead Banquet Set-up Porter |
| Bus Runner | Master Cook |
| Bus Person | Utility Cleaner (Porter, House Person) |
| Cook | Helper |
| Pantry | Specialty Helper I Butcher |
| Baker | Specialty Helper II Baker |
| General Cleaner (Porter, House Person) | Butcher |
| Guest Room Attendant | Front Services Dispatch Supervisor |
| Status Board Operator | Front Services Doorperson Supervisor |
| Linen Attendant | Slot Booth Cashier |
| Uniform Attendant | High Limit Slot Cashier |
| Dispatcher | Cashiers (F&B) |
| Room Service Reservationist | Bartender (Tipped) |
| Front Services Attendant | Apprentice Bartender |
| Doorperson | Sommelier |
| Baggage Handler | Ice Cream Maker |
| Sushi Cook | Lead Kitchen Worker |
| Seamer | |

D 00037

2.      Not less than five (5) full shifts of eight (8) hours, four (4) full shifts of ten (10) hours or five (5) short shifts as defined in 9.01 for:

| | |
|---|---|
| Server | Turndown Service Attendants |
| Server - Cocktail | Fountain/Counter |
| Bus Person | Food Server II |
| Bus/Runner | |
| Server – Specialty Room | |
| Gourmet Food Server II | |

3.      Not less than five (5) shifts of at least six (6) hours for all classifications assigned to the showroom (Head Usher, Usher, Bus Person, Cashier, Bartender, Apprentice Bartender, Beverage Porter, Fountain Worker).  Available work in excess of thirty (30) hours per week shall be distributed equitably.

4.      Not less than four (4) shifts of at least six (6) hours for Servers, Bus Persons, Bus/Runner, Food Server, Sommelier, Bartenders, and Apprentice Bartenders, assigned to work in Specialty/Gourmet outlets open only four (4) days per week.

5.      Not less than four (4) shifts of at least eight (8) hours for Host Persons, Cashiers, Master Cooks, Cooks, Pantry, Helpers, Baker, Specialty Helper II Baker, Bus/Runner Srvcs, Stewards, Kitchen Workers, Runners, and Beverage Porters assigned to work in Specialty/Gourmet outlets open only four (4) days per week.

6.      Guaranteed Work Exceptions.  Not less than five (5) shifts of at least four (4) hours for Host Persons, Cashiers, Food Servers, Bus Persons, Bartenders, Apprentice Bartenders, Gourmet Food Server II, Gourmet Food Server, and Sommelier assigned to work Specialty outlets having a separate and distinct lunch period. (See wage rate chart - Exhibit 6).

(c)      However notwithstanding the above provisions, the weekly guarantee shall not apply to the following situations:

1.      The first week of employment, including the first week of active employment on return from absence from work or layoff, and the last week of employment in cases of termination.

2.      The week in which an employee begins his/her vacation or other absence from the job if said vacation or absence does not begin at the end of the employee's scheduled workweek.

3.      The week in which an employee ends his/her vacation or other absence from the job if the employee does not return to work at the beginning of his/her scheduled workweek.

D 00038

4.      Shift changes brought about by senior employees bidding in accordance with Section 20.04.

5.      Where the Employer, Union and the employee have mutually agreed that the employee would be scheduled for and work less than the contractually provided for workweek and/or shift.

6.      When the Employer's establishment or any part thereof is closed as a result of an Act of God, fire or failure of an entertainer to perform.

7.      When the Employer closes any part of its establishment for any reason other than those stated in Paragraph 6 and notice thereof is given to affected employees at least two (2) weeks in advance.

8.      The Employer may establish six (6) hour shifts in the Front Service Department so long as there is no reduction of work opportunities for Bell employees. All six (6) hour shifts will be voluntary and optional for employees. No eight (8) hour shift employee will be requested and/or required to have a six (6) hour shift.

(d)    Employees called to work on their sixth (6th) or seventh (7th) consecutive days in a workweek or on any of the holidays listed in Section 12.01 shall be guaranteed a full or short shift on such days, depending on whether they are regularly assigned to a full or short shift, at the applicable rate of pay.

## 9.04. Single Shift.
No employee shall be required to work more than one (1) shift in any one (1) twenty-four (24) hour period, except as part of a regular weekly schedule. This shall not prohibit the performance of overtime work, provided that any such hours worked shall be compensated at one and one-half times (1-½X) their regular rate of pay.

## 9.05. Split Shift.
Split shifts shall be allowed only for Front Services Attendants, Food Servers and Bus Persons. The split shift shall be eight (8) hours within eleven (11) hours, with one (1) split. Any employee working a split shift shall receive three dollars ($3.00) per shift in addition to the regular rate of pay.

## 9.06. Posting.
The Employer shall post each week, in a conspicuous place in each department available to Union representatives, a work schedule showing the first and last name, the five (5) digits of the employee's identification number and classification of each employee, and specifying days off and starting and finishing times. When employees not originally scheduled to work during any week are later called into work during that week, their names, the last five (5) digits of the employee's identification number, and classifications

D 00039

shall be added to the posted work schedule, not later than the end of the first shift they work.

Showroom work schedules shall remain posted for four (4) consecutive weeks. At least seventy-two (72) hours notice must be given to employees whose scheduled days off are to be changed. An employee whose shift starting time is to be changed for his/her next scheduled shift must be so notified in person before leaving work on his/her prior shift. No employee shall be required to call in or stand by for call. Shifts may not be rotated.

## ARTICLE 10: EMPLOYEE CLASSIFICATION

### 10.01. Regular Full-Time Employees.

A regular full-time employee is an employee carried on the Employer's regular payroll who has been hired to work not less than the number of full or short shifts guaranteed for his/her particular classification under Section 9.03 of this Agreement.

### 10.02. Regular Part-Time Employees.

A regular part-time Employee is an Employee whose workweek is not guaranteed under the terms of Section 9.03 of this Agreement. The Employer shall endeavor to provide such Employees with the number of full or short shifts guaranteed for the Employee's particular classification under Section 9.03 of this Agreement to the extent possible. Such Employees shall have regularly posted schedules of work. To the extent possible, such regular posted schedule of work shall include the same days off each week for each Employee. It is agreed that while thirty (30) hours of work per week is not guaranteed, the Employer shall adjust staffing levels if the posted schedules of regular part-time Employees frequently fall below thirty (30) hours per week. The purpose of this paragraph is to provide the greatest possible continuity of regularly scheduled flexibility for the Employer to meet business requirements.

In addition to the posted schedule of work, regular part-time Employees will be offered work in their classification that is available at any time that an Employee is not already scheduled to work, in order of seniority within the classification if the Employee is qualified to perform the available work. A regular part-time Employee who does not wish to be offered available work in addition to the Employee's posted schedule of work may advise the Employer in writing of that fact.

Beginning January 1, 2011, and except as otherwise provided in this paragraph, the number of such regular part-time Employees shall not exceed twenty-five percent (25%) of the total number of Employees in any particular classification, and the balance shall be regular full-time Employees. Only for the purpose of this twenty-five percent (25%) part-time classification, Servers and Bus Person classifications will be by specific food outlet. When a layoff is required, the Employer shall first lay off regular part-time Employees, and then regular full-time Employees, following within each group the procedures of Section 20.03 of this Agreement. This paragraph shall not apply to banquet positions.

15
**ARIA**

D 00040

The Union agrees that it will not enforce the provisions of the prior paragraph relating to the percentages of full time and part time employees, until June 1, 2010. If, as a result of business levels, the Employer is unable to meet the percentages provided for on June 1, 2010, Employer shall so notify the Union; at that time the Union and the Company may agree an extension of the Union's policy of non-enforcement for a period of three (3) months. If, at the end of that three month period of time, the Employer believes that it is still unable to meet the percentages as result of business levels, an additional three (3) month extension will be granted upon the mutual agreement of the Employer and the Union.

When there is an opening to be filled in a regular full-time position, after any transfers which may take place in accordance with Section 20.04(b) of this Agreement, the Employer shall offer such opening to regular part-time Employees, using the procedure provided in Section 20.04(b) of this Agreement, before new Employees are hired.

Upon request by the Union, the Employer will meet with the Union and the Shop Steward(s) for the affected Employees to discuss any problems with the regular part-time employee classification, and the Employer will make good-faith efforts to resolve such problems. The Employer will make available to the Union, upon request, data regarding the number of Employees, their posted schedules, and their hours worked.

### 10.03. Seasonal Pool Food and Beverage Employees.
A seasonal employee is an employee hired as a temporary employee to work in the Employer's pool food & beverage area anytime from the opening of the pool season to the closing of the pool season. These employees have bidding rights within this classification only. Regular employees who transfer into this new classification will be assigned to the bottom of the part-time seniority list of whatever classification they subsequently bid into. Seasonal classification shall be limited to: Pool Cocktail Servers, Pool Bartenders, Pool Apprentice Bartenders, Pool Food Servers, Pool Bus Persons, Pool Food & Beverage Cashiers, Pool Fountain Workers, Pool Cooks, and Pool Pantry Workers, Hostperson, Cook Helper, Bar Porter.

## ARTICLE 11: VACATIONS

### 11.01. Amount of Vacation.
After twelve (12) months of continuous service, without a break in employment with the Employer, and on each annual anniversary date thereafter of this continuous employment with such Employer, an employee shall become entitled to a paid vacation, in accordance with the following schedule:

D 00041

| Months or Years of Continuous Service With the Employer | Amount of Paid Vacation |
|---|---|
| 12 months | 1 week |
| 2 years | 2 weeks |
| 6 years | 3 weeks |
| 12 years | 4 weeks |

### 11.02.  Break in Employment.

A change in ownership of the Employer shall not break an employee's continuity of service for the purpose of vacation eligibility.  Time absent from work while on authorized leave of absence or while on layoff, shall not break an employee's continuity of service.  Neither time absent from work while on authorized leave of absence, nor while on layoff shall change an employee's anniversary date.  Time absent from work while on authorized leave of absence or while on layoff shall be counted as months and years of continuous service in computing the number of weeks of paid vacation eligibility.  Provided, however, that the amount of paid vacation due an employee in a particular anniversary year will be reduced on a pro-rata basis, to reflect any time away from work while on authorized leave of absence or while on layoff in excess of a total of thirty (30) days during the twelve (12) months immediately preceding the employee's anniversary date.

### 11.03.  Time of Taking Vacation.

The Employer shall have the right to determine when vacation shall be taken.  The Employer will make a reasonable effort to accommodate all employee requests for vacation time, subject to business needs.  If more employees in a classification request a particular vacation period than the Employer can accommodate, seniority shall govern.  Once granted by the Employer, an employee's vacation period shall not be changed by the Employer except in the event of an emergency.  Subject to the business needs of the Employer, employees may request vacation time in one (1) week increments.

Earned vacation time must be initiated and completed within the succeeding twelve (12) month period following the anniversary date.

### 11.04.  Vacation Pay.

(a)      Vacations must be taken as paid time off, and no employee shall be required to work for the Employer during his/her vacation.  Vacation pay shall be computed on the basis of the employee's current rate of pay, or at the rate of pay of the classification in which the employee worked the majority of his/her preceding anniversary year, whichever is the greater; provided, however, that if any employee is regularly scheduled to work in two (2) or more classifications with different rates of pay, his/her vacation pay shall be computed on a pro-rated basis based on the respective periods of time that he/she worked in the different classifications in his/her preceding anniversary year.  Vacation pay shall be paid by separate check immediately prior to the commencement of his/her vacation.  If any holidays specified in Section 12.01 occur during an employee's vacation,

17
**ARIA**

D 00042

he/she shall receive an additional day's pay for each such holiday. Vacation pay shall be paid only at the time of vacation. At an employee's request, pro-rata vacation pay shall be paid at the time of the layoff, provided the employee is entitled to at least five (5) days vacation pay.

(b)     Vacation pay for employees classified as regular part-time and banquet part-time employees, shall be computed on a pro-rata basis of hours actually worked, as compared to a normal full-time year of 2,080 hours.

(c)     Employees may request vacation time in increments of one (1) day at a time. Vacation pay shall continue to be paid by separate check immediately prior to the commencement of vacation. However, in the case of vacation time taken on a per diem basis, vacation pay, for up to and including four (4) consecutive days taken, shall be paid on the next regularly scheduled date, for the payroll cycle in question.

(d)     Upon their request, employees in classifications covered by the IRS tip compliance program, and Banquet employees, regardless whether an individual employee participates in the program, shall be paid vacation pay in lieu of actual vacation time taken for earned vacation in excess of two weeks

## 11.05. Pro-Rated Vacations.
(a)     After an employee has at least six (6) months of continuous service with the Employer, he/she shall be entitled to pro-rated vacation pay upon termination of employment. For an employee having at least six (6) months, but less than one (1) year, of continuous service at the time of termination, the pro-rated amount of vacation pay shall be one-twelfth (1/12) of a week's vacation pay for each one (1) month of service since his/her date of employment by the Employer. For an employee having at least one (1), but less than five (5) years of continuous service at the time of termination, the pro-rated amount of vacation pay shall be one-sixth (1/6) of a week's vacation pay for each one (1) month of service since his/her last previous anniversary date of employment. For an employee having at least five (5), but less than eleven (11) years of continuous service at the time of termination, the pro-rated amount of vacation pay shall be one fourth (1/4) of a week's vacation pay for each one (1) month of service since his/her last previous anniversary date of employment. For an employee having eleven (11) years or more of continuous service at the time of termination, the pro-rated amount of vacation pay shall be one-third (1/3) of a week's vacation pay for each (1) month service since his/her last previous anniversary date of employment. The provisions of this paragraph shall not apply in cases of termination for proven theft.

## ARTICLE 12: HOLIDAYS

## 12.01. Recognized Holidays.
The following days shall be recognized as holidays under this Agreement:

| | |
|---|---|
| President's Day | Third Monday in February |
| Memorial Day | Last Monday in May |

18
**ARIA**

D 00043

| | |
|---|---|
| Independence Day | July 4th |
| Labor Day | First Monday in September |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | December 25th |

In addition to the six (6) defined holidays, employees who have completed their probationary period may schedule two (2) floating holidays, subject to management approval.

## 12.02. Holiday Pay.

(a)     Regular full-time and regular part-time employees, and banquet regular part-time employees shall be paid one (1) day's pay (based on their regularly scheduled number of shift hours) at their straight-time hourly rate of pay for each holiday as set forth in Section 12.01 on which they perform no work.  Employees shall not be eligible for holiday pay if they are on leave of absence on the day of the holiday.

(b)     Except as provided otherwise in Paragraph (c) of this Section, employees who work on any of the holidays set forth in Section 12.01 shall be paid double (2X) their straight-time hourly rate of pay for such work.

(c)     Employees who work on any of the holidays set forth in Section 12.01 which is their sixth (6th) or seventh (7th) day of work in a workweek shall be paid two and one-half (2-½X) or three (3X) times their straight-time rate of pay for such work, as the case may be.

## 12.03. Failure to Report.

(a)     If an Employee was scheduled by his/her Employer, at least one (1) week in advance of a particular holiday, to work on that holiday and fails to report for such scheduled work, he/she shall not receive any holiday pay.

(b)     If the employee has two (2) or more absences before and after a holiday, within one (1) year, the employee may be required to provide documentation justifying the absence.  In the absence of the requested documentation or a failure to present sufficient justification, holiday pay may be refused.

## 12.04. Floating Holiday Eligibility.

(a)     Employee is not eligible to request a floating holiday until he/she has completed his/her probationary period.

(b)     Floating Holiday eligibility shall be calendar year to calendar year.

(c)     Employee must be actively on the payroll and must have received prior management approval in writing.  Such approval shall not be unreasonably withheld.

(d)     Regular full-time or regular part-time employees only.

19
**ARIA**

D 00044

(e)     Employees will be paid floating holiday pay based on the number of hours in their regular shift at the time of the floating holiday.

(f)     Must be taken as paid time off.

(g)     Cannot be canceled within thirty (30) days of approved selection, except in emergency.

(h)     If the floating holiday has not been used or approved to be used prior to the effective date of the employee's termination, then the employee is entitled to one (1) paid floating holiday during the first six (6) months of the calendar year and two (2) paid floating holidays any time after the first six (6) months of the calendar year. The floating holiday(s) shall be paid at the time of termination if the employee has completed his/her probationary period.

## ARTICLE 13: LEAVES OF ABSENCE

### 13.01. Reasons for Leaves of Absence.

(a)     Leaves of absence without pay for a bona fide illness or injury compensable under the Employer's Insurance Company of Nevada (EICON) shall be granted for the period of time that a treating physician certifies that the employee is unable to perform his/her regular job duties.

(b)     Leaves of absence without pay for a bona fide medical disability or serious health condition not compensable under the EICON shall be granted for periods not to exceed six (6) months total during any twelve (12) month period except that an employee on a leave of absence under this subsection because of a pregnancy related medical condition may supplement the six (6) month leave provided here with a borrowing of part of the leave to which the employee would become entitled under subsection 13.01(d) after birth of an employee's child.

(c)     Leaves of absence without pay shall also be granted for reasonable periods for death or serious health condition in the employee's immediate family (spouse, child, parent, grandparent, brother or sister). As soon as possible, the employee shall provide, upon request, all proof or information available as to the need for such a leave.

(d)     Leaves of absence without pay for a period of up to twelve (12) months shall be granted for the birth and caring of employee's children or for the placement of a child with employee for adoption or foster care, provided that 1) the employee shall be entitled to a minimum of twelve (12) weeks during any twelve (12) month period; 2) eligibility for the leave ends one (1) year after the date of birth or placement of the child; or, if the employee has borrowed leave pursuant to Section 13.01(b) for pregnancy related disability, leave under this subsection shall be shortened by the same amount of time borrowed; and 3) proof of the child's birth or adoption is presented.

20
**ARIA**

D 00045

(e)   · Leaves of absence without pay or benefits shall be granted to up to four (4) employees, and an additional one (1) employee for every 750 employees in the Union's bargaining unit in excess of 2000, for the purpose of accepting employment with the Union, provided that 1) the leave may not exceed one (1) year without the mutual agreement of the Employer, the Union and the employee; 2) only one employee may take such leave from any one (1) department at any time during any one (1) year period; 3) the employee on Union employment leave shall not return or be assigned to any property owned and/or operated by his/her Employer for the purpose of engaging in Union business; and 4) while his/her seniority with the Employer will continue to accrue while on this leave, it shall not accrue for vacation entitlement purposes.

(f)      Leaves of absence may be granted by the Employer for other reasons and for periods mutually agreed upon between the Employer and the employee.

(g)      Probationary employees are not entitled to any leave pursuant to this Article, other than for a bona fide illness or injury compensable under the Employer's Insurance Company of Nevada (EICON), or otherwise required by law.

(h)      Leaves of absence shall be granted in writing and a copy forwarded to the Union; provided, however, that no employee shall lose any rights as provided in this Section by reason of the Employer's failure to grant a written leave of absence.

(i)      Upon return of an employee from a leave of absence provided in this section, the employee shall be returned to his/her regular job classification, shift and station (or station rotation) on the day the employee is to return to work.  Such employee shall be returned to work, after a leave under this FMLA not provided in this Article, within a reasonable time (in accordance with the law) or after a bona fide medical disability leave not subject to the FMLA, within five days after the employee notifies the Employer that he is available to return to work.

(j)      The Employer shall continue to make contributions for twelve (12) weeks to the Health and Welfare Fund under Article 25 of this Agreement for an employee who is on leave of absence because of a serious health condition, or to care for a spouse, child or parent who has a serious health condition, or for the birth or caring of a child or the placement of a child with the employee for adoption or foster care (or for two months for a bona fide medical disability not subject to the Family and Medical Leave Act ("FMLA").  The twelve (12) week period will begin on the date the leave of absence begins.  The contributions required under the provision shall be made at the minimum level necessary under the Health and Welfare Plan to maintain existing benefits under the Plan.  Leaves of absence shall not be granted for the purpose of taking outside employment.  Any employee on leave of absence who engages in new outside employment or expands the scope of current outside employment or actively works at current outside employment in conflict with his/her serious health condition shall have his/her employment with the Employer terminated immediately.

21
ARIA

D 00046

**13.02.  Leaves Due to Industrial Illness or Injury.**
An employee granted a leave of absence as a result of an industrial injury or illness shall be returned to work on the same shift and station (or station rotation) in the employee's regular job classification without loss of seniority, upon written certification by the treating physician that the employee is able to perform such work.

**13.03.  Medical Disability.**
An employee absent five (5) or more days due to his or her own serious health condition (or bona fide medical disability), whether or not compensable under the terms of the Nevada Industrial Insurance Act shall, upon request, present a release from his/her treating physician stating that the employee is physically able to perform the duties of his/her former position. However, if the absence exceeded twenty (20) days, the Employer may also promptly require the employee to be examined by a health care provider (within the meaning of the Family and Medical Leave Act) selected by the Employer, other than the one employed by or regularly retained by the Employer. Such examination shall be paid for by the Employer. If there is a dispute or conflict between the employee's treating health care provider and the health care provider selected by the Employer as to the physical ability of the employee to return to work and perform the duties of his/her former position, the dispute or conflict shall be resolved by a third medical opinion by a health care provider agreed upon by the employee's and Employer's health care providers. Employees absent due to illness or injury shall advise their Employer as to their expected date of return to work, and of any changes therein, but shall not be required to call or advise their Employer daily. If the employee neglects to advise the Employer when he/she calls in as to his/her expected date of return, the Employer's representative will inquire as to the employee's expected date of return.

**13.04.  Relationship to Family and Medical Leave Act.**
Where this Article provides rights greater than those provided for under the FMLA, this Article governs. Where the FMLA provides rights greater than those provided in this Article, the FMLA governs. The rights provided in this Article shall not be added to those provided by the FMLA to produce greater rights than an employee would have under either this Article of the FMLA standing alone; there shall be no duplication of rights. Any leave taken by an employee pursuant to Section 13.01(a)-(d) shall be counted as FMLA leave even if the employee would not have been entitled to take such leave under FMLA. Where the FMLA governs instead of this Article, all of the requirements for a leave under the FMLA must be met by the employee. Where this Article governs, only the requirements set forth in this Article, and not those in the FMLA must be met by the employee.

The following requirements shall apply to leaves of absences which are available only under the FMLA:

(a)      Eligibility for Leave.  Employees are eligible for leave under the FMLA if they have worked at least 1,250 hours during the twelve (12) months prior to the requested leaves of absences.

D 00047

(b)   <u>Conditions for Leave.</u>

(1)   An employee must provide the Employer with thirty (30) days advance notice for any leaves of absence that are foreseeable. If thirty (30) days notice is not given, the Employer has the right to delay the requested leave for thirty (30) days from the date notice is given. If leave is not foreseeable, employees must give as much notice as is practical, generally within one or two business days of when the need for the leave becomes known.

(2)   The employee must provide the Employer with a medical certification from a health care provider (within the meaning of the FMLA) for any leaves of absence for a serious health condition of the employee, or to care for the serious health condition of the employee's spouse, child or parent. The certification shall state the date on which the serious health condition commenced; the probable duration of the condition; appropriate medical facts about the condition; a statement that the employee is needed to care for the spouse, child or parent, if applicable; and a statement that the employee is unable to perform the functions of the position, if applicable. The Employer may also promptly require the employee to be examined by a health care provider (within the meaning of the FMLA) selected by the Employer other than the one employed by the Employer. Such examination shall be paid for by the Employer.

(3)   Extensions to FMLA leave may be granted but may not exceed a total of twelve (12) weeks per employee per twelve (12) month period. Extensions must be requested prior to the approved return-to-work date, and must include recertification of the reason or need to extend the leave and an adjusted return-to-work date.

(4)   An employee may substitute paid leave for FMLA unpaid leave by using already earned paid vacation leave. The period of FMLA leave may not exceed twelve (12) weeks.

(5)   When both spouses are employed by the Employer they may take only a combined total of twelve (12) weeks of FMLA leave during any twelve (12) month period for leaves taken for the birth or placement of a child, or to care for a parent with a serious health condition.

(6)   Any employee benefit accrued or earned prior to the date of the FMLA leave will not be lost as a result of the leave.

(c)   <u>Return from Leave of Absence.</u>

Upon return from a leave of absence, the employee shall be returned in accordance with Section 13.01(h) except that the employee shall be returned to work within a reasonable time (in accordance with the law) and that the employee has no greater right to job restoration or to any other benefits and conditions of employment than if the employee had been continuously employed throughout the leave period.

D 00048

### 13.05. Light Duty.

The Employer reserves the right to assign employees to work in light duty in classifications that are covered and excluded from the terms of this Agreement, during the time that an employee's bona fide illness or injury compensable under the Nevada Industrial Insurance Act precludes him/her from performing the duties of his/her classification. The employee shall be paid either the temporary total disability rate mandated by the EICON while assigned to light duty excluded from this Agreement, or the appropriate rate for the classification if the employee is assigned to perform bargaining unit work, unless the appropriate rate for the classification is less than the temporary total disability rate mandated by the EICON, in which case the temporary total disability rate will apply. The Employer shall assign the employee to work the shift and hours consistent with the needs of the business and the availability of light duty work, and without regard to restrictions upon a weekly guarantee. In any event, employees assigned light duty work shall be paid at least the temporary total disability rate required by Nevada law.

Time spent working light duty shall not count as shifts worked for completion of the probationary period. However, the employee's shifts worked, prior to and after assignment to light duty, shall be combined to complete the probationary period. Time spent working light duty shall not be considered a break in service when calculating seniority or vacation entitlement.

If the bargaining unit employee rejects the assignment to perform light duty work, whether within or outside of the bargaining unit, the employee shall be subject to disqualification of benefits under EICON. However, if the bargaining unit employee rejects the assignment to perform light duty work, the bargaining unit employee shall not otherwise be subject to discipline and shall continue to be entitled to leave for which the employee is eligible under Section 13.01(a) of this Agreement.

In the event a bargaining unit employee is assigned and accepts light duty work within the bargaining unit, all applicable provisions of this Agreement, subject to the modifications and restrictions set forth herein, shall apply to such employee, including accrual of seniority, and grievance and arbitration. In addition, the employee shall comply with all Company, House and Departmental rules to the extent required under Section 23.02 of this Agreement.

In the event a bargaining unit employee is assigned and accepts out-of-bargaining unit light duty work, the Employer shall make contributions on behalf of the employee pursuant to Articles 25 and 26 of this Agreement. In the event of a termination, the employee shall be entitled to all rights in accordance with Articles 6 and 21 of this Agreement, except in the event of an arbitration, the arbitrator's power shall be limited to restoring the employee to their pre-injury bargaining unit position. No other provisions of this Agreement shall apply to employee working in out-of-unit light duty positions. The employees shall comply with all Company, House and Departmental rules.

D 00049

Employees shall be prohibited from receiving double benefits or recovery, pursuant to the terms of this Agreement and an action or decision by the EICON, Nevada Department of Administration, or any other local, state, or federal department, agency or court.

### 13.06. Military Leave of Absence.
All employees covered by this Agreement will be granted Military Leave in accordance with MGM Resorts International's Military Leave Policy.

For purposes of Article 13, Section 13.06 only, the Union expressly waives its right to bargain over or in any manner object to changes made to MGM Resorts International's Military Leave Policy during the life of this Agreement so long as any such change does not reduce the leave for which an employee is entitled pursuant to MGM Resorts International's Military Leave Policy that is in effect as of the date of this Agreement.

## ARTICLE 14: MEALS

### 14.01. Meals By Employer.
For the convenience of the Employer, all employees covered by this Agreement shall be required to take their meals provided by the Employer, on the premises, in the areas designated by the Employer.

The Employer shall allow each employee an uninterrupted meal period of thirty (30) minutes, on the Employer's time. The meal period will normally be provided as close to the middle of the employee's shift as possible.

### 14.02. Number of Meals.
All employees scheduled to work shall be provided one (1) meal per shift, so long as such meal is provided in a dining room maintained by the Employer for the use of, and normally used by, all employees of the Employer, offering a full-course menu with a daily variety of hot and cold choices for all meals in a clean, pleasant, dining room-like setting. Should such conditions not be met, employees working a full shift shall be provided with two (2) meals per shift.

## ARTICLE 15: UNIFORMS AND FACILITIES

### 15.01. Uniforms Furnished by Employer.
(a)     Except as provided otherwise in Paragraph (b) of this Section, the Employer shall furnish or pay for all uniforms or work clothes worn by all employees on the job, and also shall launder or clean such uniforms unless the employee voluntarily elects to launder the garments at their own expense. The Employer shall make available a sufficient supply and variety of sizes of uniforms so that all employees will have clean and properly fitting uniforms at all times. A clean uniform shall be furnished to each employee as frequently as needed, but except in unusual circumstances, not more often than daily for Cooks and miscellaneous kitchen help, and not more often than every two days for all other employees. Employees must wear the uniforms furnished by the Employer. If the Employer does not furnish capes or sweaters to be worn as part of an employee's

25
**ARIA**

uniform, the employee may wear a personal sweater if it has been approved by the Employer as to style and appearance. Cold weather uniforms or appropriate cold weather jackets shall be furnished by the Employer for Doorpersons, Front Service Attendants and Baggage Handlers. Any other outer apparel or jewelry may not be worn without approval of the Employer. Approval shall not be unreasonably withheld.

(b)     The Employer shall not be required to furnish or pay for, or pay for laundering or cleaning, the following types of attire or clothes, even though the same may be required by the Employer to be worn on the job:

　　　1.     Black trousers, shirts, neckties or socks for all Server classifications, Bartenders, and Bus Persons, but the Employer will pay Bartenders (excluding those employed for banquets and as extra employees) two dollars ($2.00) per week toward the purchase and maintenance of black trousers when required by the Employer. When Servers and Bus Persons are required to purchase uniform black trousers/pants, the Employer shall provide specified black trousers/pants at a cost substantially below ordinary retail cost.

　　　2.     Black or brown street shoes for any employees, or low-heeled white shoes for Server classifications.

　　　3.     Clothing worn under jackets, vests, uniforms or other outerwear by any employees.

　　　4.     Ordinary shoes, boots, or hosiery for cocktail servers, so long as a special type is not required.

(c)     The cleanliness, fit, comfort, style and safety of uniforms are important to both the Employer and the employees. To further their joint interest in high-quality uniforms that best compliment the work environment, and to exchange information about uniforms and create acceptance of new or replacement uniforms, the Employer and the Union agree to establish one (1) joint committee to discuss front of the house uniforms and one (1) joint committee to discuss back of the house uniforms, on or after January 1, 2011. The committees shall consist of no more than six (6) individuals, three (3) appointed by the Employer and three (3) appointed by the Union. At least one of the Union's appointed members must work in the classification for which the new or replacement uniform is being considered. This provision shall not apply to individual uniforms replaced due to wear, tear, size changes etc. Decisions made by the Employer following consultation with the committee are not subject to Article 21.

## 15.02.  Care of Uniforms and Clothing.
(a)     The Employer shall not require employees to make deposits for uniforms or clothing furnished by the Employer. Employees shall not wear such uniforms or clothing except while working for the Employer and, where permitted by the Employer, while going to and from work. Except for normal wear and tear and damage incurred while at work, employees shall be responsible for their negligent or careless loss of or damage to

D 00051

uniforms and clothing furnished by the Employer. Employer has the right to deduct the cost for such damage or loss from the employee's paycheck.

(b) Employees claiming to have forgotten their identification badge when reporting for work may not be sent home if they have not previously reported for work without their badge within the preceding ninety (90) days. The Employer may not charge the employee more than the actual replacement cost of a lost identification badge.

### 15.03. Storage Units for Employees.
(a) Except as provided otherwise in Paragraph (b) of this Section, the Employer shall provide individual storage units with locks for all employees, and shall also provide and maintain in a clean and sanitary condition private dressing areas. Except for normal wear and tear, employees shall be responsible for loss of or damage to storage units, locks and keys furnished by the Employer, provided that such loss or damage is the fault of the employee. No representative of the Employer shall open an employee's storage unit unless the employee or a Union representative is offered an opportunity to be present, except in the case of an emergency, which shall not be defined to include searches.

(b) For all banquet employees for whom the Employer does not provide storage units, the Employer shall make available a room where they may leave their personal clothing and other articles while working. Such room shall be locked and the key kept by a designated Employer representative who shall be available to let employees in and out of the room as required.

Banquet employees who lose clothing as a result of the Employer failing to observe this Section, shall be reimbursed for the fair value of the clothing lost.

### 15.04. Theft.
Where employees, other than banquet employees, lose clothing through failure of the Employer to provide individual storage units with locks, the Employer shall reimburse the employee for the fair value of the lost clothing.


### ARTICLE 16: MISCELLANEOUS

### 16.01. Union Buttons.
A Union button with a mutually agreed design may be worn on the job however, in no event shall the Union button exceed the size of a U.S. quarter.

### 16.02. Rotation of Stations.
Except for restaurant areas reserved for hotel and casino executives, stations for qualified Food Servers shall be rotated equitably on a daily basis. Dining room employees, servers, and bar employees shall normally be assigned to a particular room or bar, but may be assigned to another area by the Employer in order to meet business demands so long as the employee is not adversely affected financially, except in the event of an emergency. Stations for Cocktail Servers, including those in the casino, shall be rotated

D 00052

on an equitable basis.   Cocktail Servers' stations at the swimming pool, a seasonal position, will be under a separate rotation on an equitable basis.  The rotation schedule shall be posted with, or as part of, the work schedule required to be posted under Section 9.06.

### 16.03. Break Periods.

(a) Food and Beverage Employees.  Employees working eight (8) hour or ten (10) hour shifts shall receive two (2) ten (10) minute break periods on the Employer's time, one (1) prior to their meal period and one (1) following the meal period.  Employees working six (6) or four (4) hour shifts shall receive one (1) ten (10) minute break period on the Employer's time.  Rest areas shall be maintained in a clean condition.  The Employer shall provide in convenient areas for each department a means of recording in and out times for their break periods.  It shall be the employees' responsibility to record their break periods.

(b) Hotel Operations Employees. Employer may combine meal and break times in its discretion.  If Employer does so, Employees working eight (8) hour or ten (10) hour shifts shall receive no less than sixty (60) minutes of paid break time (including a lunch period of at least thirty (30) minutes).  Employees working six (6) or four (4) hour shifts shall receive no less than forty (40) minutes of paid break time (including a lunch period of at least thirty (30) minutes).   Rest areas shall be maintained in a clean condition.  The Employer shall provide in convenient areas for each department a means of recording in and out times for their break periods.  It shall be the Employees' responsibility to record their break periods.

### 16.04.  Floor Coverings.

Floor slats, resilient compound mats or a comparable alternate type of floor covering, shall be provided at stations where employees in the Cooks and Miscellaneous Kitchen Help classifications stand to perform their work, and at permanent stations.

### 16.05.  Presentation of Checks.

When checks are presented to guests or customers, they shall be presented by either a Bartender, a Food Server or a Cocktail Server; provided, however, that the above provision of this section shall not apply in cases of banquets or where a master check for a group function is presented.  Notwithstanding the above, in restaurant outlets having Front bars, it is the right of the Bartender to take food orders from guest(s) seated at, and desiring to eat at, that Front bar; to place the order with the restaurant kitchen, through computer or any other means, and to have that food order delivered and presented to the guest(s) at the Front bar by a Food Server.  In these instances, it shall remain the right of the Bartender to present and settle the guest(s) check.

For purposes of this Section 16.05, the term "Front" is defined as any bar located in the public area of a restaurant where guest(s) may be seated and served beverages.

D 00053

**16.06.  Knife Sharpening.**
The Employer shall sharpen or pay a service to sharpen knives for Cooks, Butchers, Bakers and Pantry Workers at least once a month.

**16.07.  Restroom Assignments.**
Station assignment for cleaning of open restrooms will be gender specific (i.e., females assigned to the ladies restroom and males assigned to the men's restroom).  Restrooms that are located in areas of the facility that are closed may be assigned to persons of either gender.  Furthermore, in an emergency situation or if specific business needs demand, a supervisor may close a restroom and remain present as it is cleaned by personnel of either gender.

**16.08.  Duties of Guest Room Attendants and House Persons.**
(a)     The presently existing workload per shift for Guest Room Attendants shall not be increased during the term of this agreement.  The workload is defined as the number of rooms or "credits", credits for special items such as extra-dirty rooms and VIP rooms, and the assignment of pickup rooms.  A change in total square footage of the rooms assigned to a station shall also be considered to be an increased workload within the meaning of this subsection if the increase is five percent or more of the total square footage presently existing.  The maximum number of rooms or "credits", as established in this subsection, shall be reduced as follows:

ARIA Base (Floors 3-24) and North Tower (North Floors 25-54):

| Checkouts | Reduction in Rooms or "Credits" |
|-----------|---------------------------------|
| 8 | 1 |
| 9 | 2 |
| 10 | 3 |

ARIA Sky Suites (Floors 25-56, excluding Villas Floors 57, 58, 59)

| Checkouts | Reduction in Rooms or "Credits" |
|-----------|---------------------------------|
| 8 | 1 |
| 9 or 10 | 2 |

(1)     If during the course of the shift a scheduled checkout room becomes a stayover instead, the foregoing reduction will not be made with respect to that room.  If more than one credit is given for a suite, that same number shall be used in calculating the number of checkouts (for example, a suite worth three credits would be counted as three checkouts) when the suite is a checkout.  This subsection applies only to Guest Room Attendants assigned to day shifts.

D 00054

(2)    One (1) room or credit reduction whenever a Guest Room Attendant is required to make up three (3) rollaways on a shift.

(3)    One (1) room or credit reduction if a Guest Room Attendant accepts an assignment including rooms on more than two (2) floors during a shift, provided that Guest Room Attendants shall not be required to accept such an assignment.

(b)    Only a special team of House Persons and/or Utility Housepersons who have been trained fully in the cleanup and disposal of human wastes that may present biomedical hazards shall clean any vomit, feces or (in quantities greater than drops) blood from any room.

(c)    In each standard room serviced, a card shall be left indicating the name of the Guest Room Attendant that cleaned the room. The card shall not contain any reference to "gratuities." The language on the card shall be mutually agreed upon by the Employer and the Union.

(d)    Mattress Study.
The Employer and Union shall immediately form a committee of an equal number of representatives of each party to consider any ergonomic issues related to new mattresses. The Employer and the Union shall also jointly select an outside consultant knowledgeable in operations management and ergonomics. The consultant will review any safety issues regarding the new mattresses. The consultant's report will be presented to the Employer and the Union for further review.

It is the goal of the committee to mitigate the effect on workplace injuries and/or health issues surrounding the use of new mattresses.

(e)    EVS or PAD/Swing Shift GRA/House Person Workload.
On or after January 1, 2011, the Employer and the Union shall form a committee of an equal number of representatives from both parties at each property to consider issues related to EVS or PAD Porter, Swing Shift GRA and House Person employee workload.

(f)    VIP Rooms.
One (1) room or credit reduction shall be taken if a Guest Room Attendant is assigned three (3) VIP check in rooms as designated by the Employer during a shift. This provision shall apply only to standard rooms and does not include suites. Management shall not transfer VIP rooms or credits for non-VIP rooms or credits. This provision shall not apply to rush rooms, unless that rushed room is designated as VIP by the Employer. This provision shall be effective May 1, 2010.

The Union and the Employer agree to create a task force for the purposes of: 1) defining the term "VIP" and 2) exploring property specific challenges relating to GRA workload issues, including, but not limited to, concerns expressed by GRAs during negotiations regarding suites and VIP designated suites. However, nothing in this provision shall

D 00055

require or obligate the Company or the Union to agree to or enter into any agreement regarding workload reduction for suites or VIP designated suites.

## ARTICLE 17: BANQUETS

### 17.01. Definition.

A banquet shall be deemed to be any function which has been regarded and paid at the banquet rate according to the custom and usage of the trade, including cocktail parties. Steady extra banquet employees are banquet employees carried by the Employer on its regular payroll and used by the Employer as needed. Steady extra banquet servers shall be covered by the provisions of this Article 17 and, in addition, by Articles 6, 11, 20, 21, 25 and 26; provided, however, that (1) vacation pay under Article 11 shall be prorated on the basis of the time actually worked for the Employer by such employees, and (2) seniority under Article 20 shall be for the purpose of layoff and recalls only, and shall be applicable only as among the Employer's steady extra banquet employees. Banquet employees shall not be covered by Article 9, including but not limited to the provisions for shift or weekly overtime in Article 9.01.

### 17.02. Service Charge.

(a)     On all banquets, it is obligatory on the Employer that an eighteen percent (18%) service charge of the total charges for food and beverage shall be paid to the Food Servers, Cocktail Servers, Bus Persons who work the function, in addition to the designated wages. This distribution of such gratuities shall be in accordance with Section 17.05. The Employer shall post in a conspicuous place available to banquet employees, prior to or during the banquet function, the menu, the number of guests, the name of the group, and the price charged for the food and beverage.

Effective June 1, 2011 the obligatory eighteen percent (18%) service charge of the total food and beverage referenced above shall be increased to nineteen percent (19%).

(b)     Employer sponsored promotional events for which no charges are made to the customer shall be exempted from provisions of 17.02(a). Servers working such an event shall receive a guaranteed gratuity of eighteen percent (18%) based on current practice, not to exceed two hundred dollars ($200) per server. The Employer at their sole discretion can increase the guaranteed gratuity for any Employer sponsored event.

### 17.03. Employees Working Banquets

If a guest event is held in a food and beverage outlet, the opportunity to work the function will be offered first to the food and beverage personnel who normally work in that outlet. If those employees decline the function or additional staff is needed, such work will be available to banquet servers who have been trained to the service standards in the outlet. If banquet servers work a function in an food and beverage outlet, they may be required to wear uniforms and perform the job functions of personnel who work in the outlet during normal operating hours..

31
**ARIA**

D 00056

With the foregoing exceptions, the Employer shall first use regular banquet part-time employees for banquets. The regular banquet part-time list is: the "A" list as outlined in Article 17.01. The employer may use a "B" list as outlined below, as a supplemental pool hired and scheduled by the Employer.

The Union and the Employer agree to acknowledge "B" list classifications as on - call hired, trained, and maintained by the Employer.

Server "B" list employees are those employees who do not have other employment and/or are flexible enough to be scheduled at anytime when requested.

"B" list Servers will be limited to no more than fifty (50) employees so as to be able to provide more frequent employment for the "B" list employees.

Refusal to work more than three (3) times in three (3) months without a medical excuse or approval will result in the employee being placed on the "C" list.

"C" list employees will be eligible to bid on open "A" list positions. The Employer will consider hire date and job performance of "B" list employees before considering "C" list employees.

"B" list employees will be scheduled according to seniority.

Should a "B" list employee elect to take other employment and not be available for any length of time for this reason, they will be removed from the "B" list and placed on the "C" list. If in the future they elect to return to the "B" list, they will be placed at the bottom of the "B" list regardless of the fact they may have an earlier seniority date.

The Employer will designate days off, which will be posted and available for bid by "A" and "B" list employees, in order of classification seniority, on a yearly basis. "A" and "B" list employees may bid on one day off per week. Work schedules shall provide employees with their one bidded day off. The Employer may schedule employees to work on their bidded days off during busy times, with prior notice, no more than twenty (20) times per year.

### 17.04. Reporting Pay.

When the Employer or his/her representative orders a banquet worker to report for work and said employee is not allowed to work, the Employer shall pay the employee the minimum compensation provided in Section 17.07; provided, however, that the above provision of this Section does not apply to any employee reporting in a condition which obviously prevents the proper performance of the normal duties by the employee, to employees who report to work without a valid health card, to employees who previously have been designated in writing by the Employer to be unsatisfactory because of the

D 00057

commission of the kind of offense listed in Section 6.01(a) or, for a six (6) month period, to employees who previously have been validly so designated for any other reason.

### 17.05. Distribution of Gratuities.

All gratuities belong to the employees and no part of the gratuities belong to the Employer or any representatives of the Employer (other than management, as provided in Sections 17.02, 17.05, and/or 17.06) and are not a part of the basic wage established by this Agreement. The distribution of gratuities among banquet workers shall be in accordance with Sections 17.05 and/or 17.06. The Employer shall make available for examination by the employees involved and by the Union a breakdown of the distribution of gratuities for all food and beverage, the name and date of the function and room where held, the total price for all food and beverage, the number of guests in attendance, and the names and employee numbers of the banquet workers.

(a)     Banquet Gratuity Division.

Fourteen percent (14%) of the total gratuities of all functions shall be divided among management. Eighty-six percent (86%) of the total gratuities of all functions of a particular shift other than Cocktail Parties/Receptions, shall be pooled and equally divided among the Food Servers who work the function(s) of that particular shift.

By way of explanation: Gratuities are derived from all food, soft drinks and alcoholic beverages served tableside, or from a station, to which Banquet Servers are assigned.

The Coffee Break Crew shall divide equally all gratuities for all Coffee Break functions worked in the course of a day. The gratuity distribution is limited to those crew members having worked that day.

Banquet Beverage Bartender gratuities are those derived from any soft drinks and alcoholic beverages served over a Hosted bar and from any Hosted beverage station the Banquet Beverage Bartenders are assigned to work. The distribution of Hosted bar and Hosted Station gratuities shall be prorated according to the number of hours worked that day by each particular Banquet Beverage Bartender. It shall be limited to only those Banquet Beverage Bartenders having worked the Hosted bars and Hosted Stations that particular day.

Function shifts are enumerated as:

1)     Start time to 10:59 a.m. (Breakfast);
2)     11:00 a.m. to 1:59 p.m. (Lunch);
3)     2:00 p.m. to conclusion of last function (Dinner);
4)     Coffee Breaks.

(b)     Cocktail Party/Reception Gratuity Division.

On cocktail parties/receptions, as defined in Section 17.06, fourteen percent (14%) of the total gratuity shall be divided among management. Eighty-six percent (86%) of the total

D 00058

gratuity shall be divided evenly only among Bartenders and Cocktail Servers who work the cocktail party/reception.

(c)     Bar Backs/Apprentice Barbacks working Banquets will receive an automatic ten percent (10%) of the total Bartender gratuity based on the function the Bar Back/Apprentice Bartender worked.

### 17.06. Cocktail Parties/Receptions.

For purposes of this Section, a Cocktail Party/Reception is defined as an event serving soft drinks and alcoholic beverages only; there are no hors d'oeuvres or hot or cold buffet items served during a Cocktail Party/Reception.   All cocktail parties/receptions only, including those preceding a banquet, shall distribute gratuities in accordance with Sections 17.05 and/or 17.06, only among Bartenders and Banquet Food Servers who work the cocktail party/reception.  Banquet Food Servers shall not participate in the Cocktail Party/Reception gratuity pool, but shall participate in the distribution of gratuities for all other functions during the particular shift in accordance with Sections 17.05 and/or 17.06.  Management shall also participate in the gratuity distribution, as per Section 17.05 and/or 17.06.

### 17.07. Banquet Minimums and Limitations.

(a)     Breakfast:  Two (2) hours minimum.  A Food Server shall not be required to serve more than twenty-five (25) customers and for each additional person shall receive fifty cents (.50¢) in addition to his/her regular wages.

(b)     Luncheons:  Three (3) hours minimum.  A Food Server shall not be required to serve more than twenty-five (25) customers and for each additional person receive fifty cents (.50¢) in addition to his/her regular wages.

(c)     Dinners:  Four (4) hours minimum.  A Food Server shall not be required to serve more than twenty-five (25) customers and for each additional person shall receive sixty cents (.60¢) in addition to his/her regular wages.

(d)     Buffets:

　　　　1.     Breakfasts:  Two (2) hours minimum.

　　　　2.     Luncheons:  Three (3) hours minimum.

　　　　3.     Dinners:  Four (4) hours minimum.

A Buffet is a regular meal (breakfast, luncheon or dinner) where guests are served or serve themselves from a display of foods; provided, however, that for purposes of this Article, a buffet shall not be deemed to include buffets, cocktail buffets or other meals offered regularly to the public and served by regular employees.

34
**ARIA**

D 00059

    4.    There shall be no limit on the number of customers a Food Server may be required to serve at a buffet.

(e)    Work performed in excess of the minimum shifts set forth above shall be paid at the hourly rates set forth in Exhibit 1.

## 17.08.  Full Function.

No banquet employee eligible for gratuities shall share in gratuities unless he/she works the full function; provided, however, that at banquets where clean-up must be delayed until the conclusion of speeches or program, only that number of employees sufficient to do the clean-up work need be retained, and those employees not retained shall nevertheless share in the gratuities.

## 17.09.  Bartenders.

(a)    Bartenders assigned to work a banquet function shall be employed or paid for not less than four (4) hours for each banquet function.  Banquet Bartenders are responsible for transporting liquor, all setup, ice, glassware and breakdown work in the banquet room.  Apprentice Bartenders, Bar Porters, or Convention Porters will be responsible for transporting portable bars to and from work areas.

## 17.10.  Banquet Training and Work.

It is the objective of the Employer and the Union to increase the economic opportunities for all bargaining unit employees.  In recognition of the foregoing, the Southern Nevada Joint Management Culinary and Bartenders Training Fund shall establish a training course to help the bargaining unit employees acquire the banquet service skills needed to be eligible for employment.  All interested employees must complete the banquet training.

In order to give trained bargaining unit employees from other departments the opportunity to pick up extra banquet work, the Employer may staff banquets with in-house employees whenever possible, if there are not enough roll-call servers available. Post roll-call banquet work will be strictly voluntary.

## 17.11.  Setup and Breakdown.

Banquet Food Servers are responsible for all setup and breakdown work in the banquet room.  Typically, a banquet involves preparing the room for the event, serving of food and/or beverage, side work necessary to conduct the event, and returning the space to its original condition.

## ARTICLE 18:  PROMOTIONAL EVENTS

## 18.01.  Definition.

(a)    A promotional event shall be deemed to be any event for a person, persons, group or groups arranged by a travel agent, booking agent, hotel sales representative, convention agent, promotional representative, operator, or any other individual or agency

D 00060

where tickets, coupons or package prices for food and/or beverages to be served to patrons of such events are involved.

(b)    Any event for which no charges are made to the customer for that event.

### 18.02.  Gratuities Payable for Promotional Events.

The Employer reserves the option to pre-package food and/or beverage and within that package to include or exclude gratuities as it deems appropriate.  In those instances where a gratuity is excluded, the servers who provide the service shall be given an opportunity to present a check.   In these instances, checks so presented shall contain prominent verbiage to the effect that the "Gratuity is Not Included."

A guest whose pre-packaged plan has been determined by the Employer not to include gratuities, and which allows usage of pay as you enter, fast-food and/or self-serve outlets shall be given promotional materials, such as coupons and/or script, bearing "Gratuity Not Included," thereon.

Where the Employer and/or the guest pre-pays for food and/or beverage, and the gratuity is included in the price, the gratuity for food and/or cocktail servers shall be seventeen percent (17%) of the price charged for such food and/or beverage served.

For those events described in 18.01(b), servers working said event shall receive a guaranteed gratuity of seventeen percent (17%) of the cost of the event, not to exceed one hundred seventy-five dollars ($175.00).

Bartenders shall not participate in gratuities where Food or Cocktail Servers serve customers from a regularly established service bar.

### 18.03.  Front Services Attendants.

Where Bell Persons are not given the opportunity to room special event or complimented guests, they shall receive not less than $3.00 per guest checking in and out, provided the guest requests bell service.

For convention/group package guests, the Bell Department shall receive $3.00 per guest listed on the group manifest where baggage is delivered and removed as part of the group arrival or departure, provided the group requests group porterage.   In the event of a contracted porterage porte-cochere or management identified auxiliary area arrival and/or departure where special handling is facilitated by the Baggage Handler, the Baggage Handler receives $0.50 per guest listed on the group manifest, provided the porterage is paid at the contracted rate.

The $0.50 increase from $2.50 to $3.00 and the additional $0.50 for Baggage Handlers will be in effect for any verbal or written agreement for any groups booked or contracted or with any package operators if said agreements were executed after the date of execution of this Agreement.   All unappropriated funds from group porterage shall be distributed equitably among the bell desk employees in accordance with current practice.

36
**ARIA**

D 00061

Distribution of the $3.00 porterage charge for all Properties is as follows:

| | | |
|---|---|---|
| Bell Person | $2.60 | Paid to Bell Persons based on the number of deliveries; |
| Bell Supervisor | $0.25 | Divided equally among Bell Supervisors; |
| Dispatcher | $0.15 | Divided equally among Dispatchers. |

Delivery In/Outside Room: $2.50 per room delivery.

Distribution of $2.50 gratuity for all Properties is as follows:

| | | |
|---|---|---|
| Bell Person | $2.00 | Paid to Bell Persons who performed the delivery; |
| Bell Supervisor | $0.35 | Divided equally among Bell Supervisors; |
| Dispatcher | $0.15 | Divided equally among Dispatchers. |

Courtesy daily newspaper room deliveries and property specific collateral are exempt from delivery fee

The parties agree that the majority of front services deliveries are comprised of one or two items and that guests' should only be assessed one delivery fee for such deliveries. However, in the rare instances where deliveries involve multiple separate items from separate companies/groups, not contained in a bag, basket or similar container, or where such items are not tied or wrapped together, Bell Persons shall receive an additional $1.00 for each such delivery in excess of two items.  In no instance shall a card or note accompanying an item be counted as a separate item for the purpose of accessing delivery fees.

In cases where a Bell Person must bag item(s) prior to delivery or arrange multiple items while in a guest room, an additional $0.50 fee per guest room delivery will be paid solely to the Bell Person(s) performing the work.

Floral in house delivery:  $2.00 per delivery.

Distribution of $2.00 gratuity is as follows:

| | |
|---|---|
| Bell Person | $2.00 |

All other miscellaneous - convention runs, business center runs, and laundry runs will be discussed in the sub-committee task force by property.

The parties agree that it is the responsibility of the Bell Supervisor to manage the manifest and oversee the marking and tagging of bags.  Dispatchers are responsible for assisting the facilitation of the Bell Department delivery process.

D 00062

**18.04.  Payment of Promotional Event Gratuities.**
Gratuities for promotional events shall be paid to employees who provide service not later than the payday for the payroll period in which such service was rendered.  Upon request the Employer shall make available to the Union the names and dates of special event groups and the names of employees and amount of gratuities received by them on their paychecks for the pay period involved, with the gratuities broken down by source.

**18.05.  Exception.**
Affairs which are exclusively for the benefit of a charity shall be exempt from the provisions of this Article.

## ARTICLE 19:  COMPLIMENTED GUESTS

**19.01.**
(a)     On those occasions when individuals or members of a group are provided with food and/or beverages in a public room, which are complimented by the Employer, there shall be no guaranteed gratuity; provided, however, that the Servers who provide service shall be given the opportunity to present a check to the guest or guests being complimented.  In all instances of complimented guests, except those who are staying at the Employer's hotel and who are complimented when they check out, the checks presented by Servers shall contain the words, in prominent letters, "Complimentary - Gratuity Not Included."

(b)     Except for guests complimented for beverages in the casino, on those occasions when Servers are not given the opportunity to present a check to the complimented guest or guests, the Server shall receive from the Employer a gratuity of fifteen percent (15%) of the menu price for the food and beverage served, as established by the Employer for such service for that particular event.

(c)     Food Servers, Cocktail Servers and Bartenders, to whom are presented by guests or customers beverage and/or food tickets or coupons issued by the Employer, for which no charge is made, shall receive from the Employer a gratuity of fifteen percent (15%) of the established menu or bar price of the food and beverage served as established by the Employer for such service in that particular room.  In instances when beverage and/or food tickets or coupons issued are clearly marked, "Gratuities Not Included," there shall be no guaranteed gratuity.

(d)     On those occasions when members of a group which is not a special event as defined in Section 18.01, are complimented, as a group and not individually, with food and/or beverage in a public room, the checks presented to such persons shall be clearly marked "Gratuity Not Included," and in such cases, there shall not be any gratuity payable by the Employer.

(e)     Where guests receive a complimentary bottle of wine, there shall be no guaranteed gratuity provided for the wine.

38
**ARIA**

D 00063

## ARTICLE 20: SENIORITY

### 20.01. Probationary Period.

An employee will be considered as a probationary period employee until he/she has completed forty (40) shifts of work after his/her most recent date of hire by the Employer, after which his/her seniority shall date back to his/her most recent date of hire by the Employer. A probationary employee may be terminated at the discretion of the Employer, and such termination shall not be subject to the grievance and arbitration provisions of this Agreement. Probationary employees are not eligible for leaves of absence. The above probationary period may be extended by mutual agreement of the Employer and the Union.

### 20.02. Definition of Seniority.

(a)    House seniority is an employee's length of continuous service in years, months and days from his/her most recent date of hire into the bargaining unit by the Employer.

(b)    Classification seniority is an employee's length of continuous service in years, months and days from his/her most recent date of hire into or transfer into his/her present classification. Classification seniority shall not be considered interrupted because of the merger of two or more job classifications into one classification.

(c)    In the administration of this Agreement each of the classifications listed in Exhibit I is a separate and distinct classification.

### 20.03. Layoffs and Recalls.

(a)    In the event of layoffs due to a reduction in force, probationary employees within the affected classification(s) will be the first to be laid off. Employees will be laid off from and recalled to their regular job classifications in accordance with their house seniority, provided they have the qualifications to perform satisfactorily the work available in their regular job classification, unless a junior employee has significantly greater skills and/or qualifications. It is the responsibility of the employee to advise the Employer of a change in either address or telephone number. In accordance with their seniority, employees in layoff status will be offered, but not required to perform, all available work in their classifications.

(b)    In the event of a layoff because of circumstances affecting only a portion of the establishment such as a room closing (but not ordinary fluctuations of work), the affected employee may be laid off without regard to house seniority, provided the layoff is scheduled to be thirty (30) days or less.

(c)    Employees to be laid off in accordance with Section 20.03(a) may be laid off without regard to their respective house seniority as each completes his/her current workweek. At the time of layoff, the employee shall state availability or non -availability for extra work; where the employee indicates availability, he/she shall not be called for extra work after he/she refuses two (2) out of seven (7) offers. Notwithstanding the

D 00064

foregoing, an employee may declare unavailability for extra work for a definite period while on layoff.

### (d).  Schedule Realignment Post Layoff.

When a layoff occurs and positions are to be eliminated, the senior employees whose shifts are to be eliminated shall displace the junior employees on that shift.  Then the junior employees on that shift shall replace the junior employees overall.  This shall be done by house seniority.

Following the layoff affecting full-time classification, department will create a new departmental master schedule.  The order of schedule alignment will be in the following order:  1) those full-time shifts that match the new schedule will not be altered or affected; 2) those full-time shifts that do not match the new schedule will be altered by up to two hours from the employee's current shift either way to match the new schedule based on classification seniority; 3) those full-time shifts that do not match the new schedule will be altered by changing days off (remain consecutive days off ) to match the new schedule based on classification seniority; 4) the remaining positions that cannot be altered to match the new master schedule using the process outlined above shall be required to bid.  The department will post any vacant new master schedule shifts for bid using classification seniority.  An employee that fails to bid a posted full-time shift will be assigned any remaining shift by management.

### 20.04.  Promotions and Preference for Shifts.

(a)      When the Employer promotes an employee to another classification, the Employer will consider the Employee's seniority, qualifications, and ability to perform satisfactorily the work in the other classification, and prior performance, and, provided further, any employee before being promoted to the classification of Bartender must have passed the craft examination for Bartenders conducted by the Union.  When skills and/or qualifications are relatively equal among employees, the senior employee shall be the one promoted.  For purposes of this paragraph (a), a "promotion" shall be deemed to be a transfer from one classification to another, regardless of any change in compensation. All promotional opportunities within the bargaining unit classifications shall normally be posted.  The Employer will give preferential consideration to qualified bargaining unit employees for these openings.  The Employer and the Union agree that the goal is to maximize the availability of promotions for qualified employees.  Vacancies to be filled by promotion under this paragraph shall be posted for seventy-two (72) hours near the employee time clock or other location to which employees have regular access.  The Employer may fill the vacancy temporarily during the posting period.  An employee promoted under this Section who cannot perform satisfactorily the work of the job to which he or she was promoted, may be transferred back to his or her former job, within thirty (30) shifts after the date of the promotion.  If the employee's former shift and station is no longer available, the employee shall be entitled to the next opening in the former classification for which the employee is qualified.

D 00065

(b)     When there is a regular vacancy, or a temporary vacancy of at least ninety (90) days, on a particular shift or station, employees in the same job classification on other shifts or stations who desire to transfer to the vacancy, will be transferred on the basis of their classification seniority, providing they have the qualifications to perform the work and unless a junior employee has significantly greater skills and/or qualifications to perform the work.  An employee transferred under this Section shall assume the weekly schedule of days of work and days off, and the daily shift scheduled, applicable to the vacant position to which he/she transfers, and he/she shall not be eligible for another transfer under this paragraph for six (6) months.  An employee transferred under this section who cannot perform satisfactorily the work on the shift or station to which transferred may be transferred back to his/her former job within thirty (30) shifts after his/her date of transfer.  If the employee's former shift is no longer available, the employee shall be entitled to the next opening in the former classification for which the employee is qualified.  The resulting vacancy created by a transfer under this Section shall be filled in the same manner as the original vacancy.  Regular vacancies under this paragraph shall be posted for seventy-two (72) hours near the employee time clock or other location to which employees have regular access.  The Employer may fill the vacancy temporarily during the posting period.

(c)     Filling Vacancies – Food Service Classifications. For the purpose of this section, "Food Service Classification" means, Server, Bus Person, Host Person, Master Cook, Cook, Pantry Worker and Helper.

The filling of vacancies in food service positions is governed by the following provisions of the Collective Bargaining Agreement:  Article 2, Section 2.01; Article 10, Section 10.02 (next-to-last paragraph); and Article 20, Section 20.04.  This letter sets forth the relationship between these sections, and in particular the sequence to be followed in filling vacancies.  Additionally, this letter sets forth a new principle:  The first two (2) of each set of three (3) vacancies in a food service position, will be reserved exclusively for employees already working in the room where the vacancies occur.

The Employer and the Union agree that the following procedures will be used for filling vacancies in food service positions:

    1.      The first two vacancies out of every three vacancies in full-time positions in a food service classification in a room will be filled first through bidding within that room only pursuant to Section 20.04, in seniority order.  Only full-time employees in the classification in the room where the vacancy occurs are eligible to bid.  If a vacancy is not filled by this method, then it may be filled by offering it to those employees in the room who have part-time positions in the classifications, in seniority order.  If a vacancy is not filled by this method, the Employer may hire a new employee to fill the position.

    2.      The third vacancy out of every three vacancies in full-time positions in a food service classification in a particular room shall be filled by bidding pursuant

41
**ARIA**

D 00066

to Section 20.04.  If the vacancy is not filled by this method, then it will be filled by promotional bidding pursuant to Section 20.04(a).  If the vacancy is not filled by this method, the Employer may hire a new employee to fill the position.

(d)　　Sky Suites and Villas.  A guest room attendant or Houseperson who is assigned to the North Tower and/or to the Base Tower and who wishes to bid on a vacant position assigned to the Sky Suites or Villas must participate in and pass an interview to determine whether they meet the required qualifications for such assignment.

**20.05.  Break in Continuous Service and Seniority.**
An employee's continuous service, seniority and status as an employee will be broken when:

(a)　　He/she quits.

(b)　　He/she is discharged for just cause.

(c)　　He/she is absent exceeding the period of an authorized leave of absence.

(d)　　He/she is absent, due to injury or illness sustained during the course of employment, exceeding the period for which statutory, temporary total disability payments are payable under the Nevada Industrial Insurance Act, provided that the employee shall have one (1) week after his/her release in which to return to work. However, the time required for an appeal through the appeals officer level shall not, in and of itself, constitute a break in the employee's seniority.

(e)　　He/she is absent because of layoff exceeding six (6) months, or twelve (12) months if the layoff was caused by construction.

(f)　　He/she is absent exceeding six (6) months because of illness or injury not compensable under the Nevada Industrial Insurance Act.

**20.06.  Notification.**
An employee who is to be recalled to work by the Employer under Section 20.03 shall be notified to return to work by the Employer advising the employee, by telephone, or other available means of communication, of the date and time the employee is to report, and by confirming such communication by certified mail, return receipt requested, to the employee's current address on file with the Employer.  Reasonable advance notice must be given an employee being recalled.  If such employee fails to report to work within forty-eight (48) hours after the time specified for the employee to report, his/her seniority and continuous service shall be terminated, and the Employer shall be free to hire a replacement.

D 00067

**20.07.  Food and Beverage Outlet Seniority.**

Employee shall accumulate and retain seniority for purposes of the seniority rights provided for in Section 20.04 as follows

(a)  Employees in the following rooms shall accumulate and retain seniority only within their rooms for the following Fine Dining/Specialty/Branded/Celebrity Chef Venues (i.e. individual room seniority):

| | |
|---|---|
| BARMASA | Shaboo |
| Sage | Julian Serrano |
| Jean-Georges Steakhouse | Sirio Ristorante |
| American Fish | Blossom |
| Lemongrass | Jean Phillip Production Kitchen |
| Butcher Shop | Jean-Philippe Patisserie |
| Banquets | Carta Privada |
| In Room Dining | Showroom |
| ARIA Pastry Shop | Garde Manger |

(b)  Employees in the following rooms shall accumulate and retain seniority within all of the Express Gourmet Rooms listed below (i.e. combined seniority):

Sky Box to Go
Roasted Bean
Sweet Chill

(c)  Employees in the following rooms shall accumulate and retain seniority within the following  Casual Dining/Production Venues groups:

Group 1:    Café Vettro and Skybox Bar and Grill

Group 2:    Buffet, The Crossings and Main Kitchen

(d)  Employees in the following classifications shall accumulate and retain seniority in all Company outlets:

F&B Cashiers
Stewards
Bartenders
Apprentice Bartenders
Bar Porters

D 00068

## ARTICLE 21:  GRIEVANCES AND ARBITRATION

### 21.01.  Definitions.

For purposes of this Agreement, a grievance is a dispute or difference of opinion between the Union and the Employer involving the meaning, interpretation, application to employees covered by this Agreement.  Any violation or alleged violation of Section 22.01 or 22.03 shall not be subject to the Grievance and Arbitration Procedure.

### 21.02.  Step One Process and Time Limit for Filing Grievance.

(a)     Step One Process.

The Employer and the Union agree to implement (if they have not already done so) a Step One Process for complaints and disputes related to individual disputes raised by an employee.  The Step One Process gives responsibility to employees, union shop stewards and front line management to resolve workplace problems directly, quickly and cooperatively.  The Step One Process is designed to reduce the level of formalism in the grievance procedure.

Under the Step One Process, an employee with a complaint or dispute shall use his or her best efforts to, within five (5) calendar days of the incident or circumstances giving rise to the dispute, or within five (5) calendar days of the time the employee reasonably could have acquired knowledge of the event, present the matter to his/her immediate supervisor. An employee has the right to request the involvement of the shop steward in this Step One Process.  It shall be the responsibility of the employee to secure the presence of a union steward if he/she wishes to have the steward present during the discussion with the employee's immediate supervisor.

The supervisor involved in the Step One discussion shall use his/her best efforts to respond to the employee within five (5) calendar days of such discussion.  Such response may be in the form of a proposed resolution of the matter or may be a communication to the employee scheduling a meeting to further discuss the matter.

Settlements reached during the Step One Process shall be considered non-precedent setting, unless the Employer and the Union expressly agree that the settlement shall be reduced to writing and may be used as precedent in the future.  However, the Parties agree that if a resolution is reached during the Step One process, documentation of the resolution shall be prepared and signed off on by the Company, the Employee and the Steward (if involved).

The Parties agree to provide jointly the required Step One Process training to current management personnel (including third party operators involved in the administration and application of this Agreement) and shop stewards by November 30, 2008.  Refresher training will be scheduled at eighteen (18) month intervals for new management and shop stewards.

44
**ARIA**

The Step One Process shall be implemented at all MGM Resorts International's properties which elect to participate in the Step One Process, effective November 30, 2008, provided all initial training has occurred at such properties.

All grievances filed at any property which does not elect to participate in the Step One process shall be resolved under Section 21.03 of this Article and/or under the property specific mechanisms previously established and agreed upon between the Employer and the Union.

(b)     If the Parties are unable to resolve a dispute or complaint in the Step One Process, such dispute or complaint may be reduced to writing as a formal grievance and shall proceed to a Board of Adjustment as provided in Section 21.03 of this Article.

### 21.03   Step Two Process - Procedure for Adjusting Formal Grievances.
All grievances shall be adjusted exclusively in the following manner:

(a)     No grievance shall be entertained or processed unless it is received in writing by either party within twenty (20) calendar days after occurrence of the event giving rise to the grievance or after the aggrieved party hereto acquires knowledge of the occurrence of such event, whichever is later. The written grievance shall set forth the provisions of this Agreement alleged to have been violated, and every effort will be made to set forth all of the known facts allegedly constituting the violation. At the time it submits a grievance to the Employer, the Union shall furnish the Employer with copies of any written statements, reports or documents relied on by the Union or the grievant to support the grievance (but not including the employee's written grievance submitted to the Union).

(b)     BOARD OF ADJUSTMENT.  Any unresolved grievance shall be reduced to writing and scheduled for hearing by a Board of Adjustment within twenty (20) calendar days of the filing of the grievance. The Board of Adjustment shall be comprised of not more than three (3) representatives of the Employer and three (3) representatives of the Union.  For the purpose of attempting to resolve grievances prior to arbitration, the parties, at any meeting prior to the Board of Adjustment hearing and at the hearing, shall make full disclosure to each other of all facts and evidence then known to them which bear on the grievance.

(c)     Arbitration.  Any grievance not settled by the Board of Adjustment may be referred to arbitration by written notice by the party who filed the grievance within twenty (20) calendar days of the Board of Adjustment. Representatives of the Employer and the Union may agree to select an arbitrator, but if they are unable to do so, the arbitrator shall be chosen from the panel, received from the Federal Mediation and Conciliation Service ("FMCS"), of arbitrators who are members of the National Academy of Arbitrators and who reside in California or Nevada. No arbitrator shall be chosen to serve in two (2) consecutive arbitrations for the same hotel unless by mutual consent of the parties. The arbitrator shall be notified in writing of his/her selection, and shall have no authority, jurisdiction, or power to amend, modify, nullify or add to the provisions of this Agreement. No evidence shall be introduced as to withdrawal, during

45
**ARIA**

D 00070

negotiations, of a proposal to change the Agreement. The award of the arbitrator shall be final and binding upon the Employer, the Union, and the employee(s) involved. Except in discharge cases, the expenses and fees of the arbitrator shall be shared equally by the Employer and the Union. In discharge cases, the expenses and fee of the arbitrator, and of the court reporter, if any, shall be paid by the party losing the arbitration. Where, in a discharge case, reinstatement is ordered by an arbitrator with less than full back pay, the costs of arbitration shall be divided evenly between the parties.

### 21.04. Extension of Time Limits.
The time limits and other provisions set forth in Article 21 may be extended or waived by mutual agreement of the Parties.

### 21.05. Buyouts and Mitigation.
Employees with less than three (3) years' service, and Bell Captains regardless of years of service, may be offered before, after or at the time during the grievance process two (2) months' pay including the higher of declared or assigned tips in lieu of processing a grievance and arbitrating the discharge. In the event the employee declines this offer when made by the Employer, the Union will not arbitrate the discharge unless it objectively determines that, in its judgment, the discharge constituted a flagrant miscarriage of justice. In the event a positive determination is made, and the Union processes the discharge to arbitration, the arbitration procedure to be used, i.e., either type of expedited procedure or the regular arbitration procedure, shall be determined by the Employer notwithstanding the provisions of Section 21.03.

Any employee covered by this Agreement who is discharged by the Employer and who disputes his/her discharge was for just cause shall have an affirmative duty to mitigate any potential damages which might result to the Employer in the event the discharge involved is subject to Article 21 of this Agreement (Grievance and Arbitration) and an arbitrator overrules the discharge. In any dispute over the amount of back pay due to an employee under an arbitration award, the arbitrator shall have no authority to award any back pay to that employee for any period of time since his/her discharge unless the employee or the Union has affirmatively proven by a preponderance of the evidence that the employee has fulfilled his/her duty to mitigate damages with respect to that period of time.

### 21.05. Alternative Dispute Resolution Process.
Effective January 1, 2011 (or earlier if both parties agree), the Parties agree to implement the alternative dispute process set forth in Side Letter No. 9, attached to this Agreement.

## ARTICLE 22: NO STRIKES - NO LOCKOUTS

### 22.01. No Strikes.
During the term of this Agreement, neither the Union collectively nor employees individually, will engage in any work stoppages, picketing, sympathy strikes, or any other form of economic action or interference with the Employer's business.

D 00071

**22.02. No Lockouts.**

During the term of this Agreement, the Employer will not lock out any of the employees in the bargaining unit covered by this Agreement.

## ARTICLE 23: MANAGEMENT RIGHTS AND RESPONSIBILITIES

**23.01. Right to Manage.**

The right to manage the Employer's business and the direction of its employees, including, but not limited to, the following rights, are reserved to the Employer. Such rights include the right to direct, plan and control operations, to determine the number of employees to be employed, and to determine the means, methods and schedules of operations. The Employer shall have the sole right to direct and control its employees. The Employer reserves the right, which is hereby recognized by the Union, to initiate any action toward any employee, including, but not limited to, reclassification, retention, scheduling, assignment, promotion, transfer, layoff and/or rehire. Seniority among other factors, will be considered by the Employer when making these decisions. All of the foregoing rights are reserved by the Employer except to the extent they may be contrary to or inconsistent with the terms and conditions of this Agreement.

**23.02. Rules and Posting.**

The Employer may establish and administer reasonable rules, regulations and procedures governing the conduct of employees, provided that such rules, regulations and procedures are not inconsistent with any provisions of this Agreement. The Employer shall post and maintain any such rules in such places within its establishment so that all employees affected thereby, and business representatives of the Union, may have an opportunity to become familiar with them. The reasonableness of any rules, regulations and procedures provided for herein, are subject to the grievance procedures of this Agreement.

## ARTICLE 24: COURT APPEARANCE AND JURY DUTY

**24.01. Court Appearance.**

Employees required to appear in court, administrative proceedings or at the police department on behalf of the Employer during their normal working hours shall receive their straight-time rate of pay for hours lost from work, less witness fees received. If an employee appears in court or at the police department on behalf of the Employer on his/her days off, or after normal working hours, he/she shall receive his/her straight-time rate of pay for the hours spent in such appearance, less the witness fees received, but such time shall not be considered as time worked for any purposes under this Agreement.

**24.02. Jury Duty.**

A regular full-time, or a regular part-time employee who has completed the probationary period, as defined in Article 20.01, and who is required to serve on a jury, and loses work time because of such service, shall be paid the difference between the jury fee received

D 00072

and his/her straight-time rate of pay for not more than eight (8) hours per day. This Section shall apply only with respect to an employee's regularly scheduled days of work and shall not be applicable with respect to days on which the employee was not scheduled to work. Payment for such service hereunder shall be limited to not more than thirty (30) days in any calendar year, or to not more than thirty (30) days in any thirty-six (36) month period, if the jury duty service is voluntary. At the request of the Employer, the employee shall furnish satisfactory evidence of such service for which he/she claims payment hereunder. No employee, after having served on jury duty or having been required to stand by for same at the courthouse shall be required to report for work prior to eight (8) hours after completion of his/her jury service, unless his/her jury service ended in time for him/her to report for a regularly scheduled swing shift beginning not later than 4:00 p.m., and ending no later than 12:00 midnight. This Section shall not apply with respect to any jury summons received by an employee prior to his/her date of hire.

### ARTICLE 25: HEALTH AND WELFARE

**25.01. Amount of Contributions.**
There presently is in effect, pursuant to the agreement of the parties, a group life, medical, surgical and hospital plan involving a trust fund and trust agreement for the Hotel Employees and Restaurant Employees International Union Welfare Fund (the "Fund"). The parties hereto agree that the aforesaid trust agreement and any amendments shall be in effect during the period of this Agreement. The Employer shall make, as of December 12, 2009, for all hours worked on and after that date, a contribution to the Fund of Three Dollars and Ninety Cents ($3.90) per hour worked, on or before the fifteenth (15th) day of each month for the previous month. This rate of contribution may be increased on or after June 1, 2010 in accordance with the provisions of Section 27.03 of this Agreement.

Contributions shall be forwarded to the bank designated by the Hotel Employees and Restaurant Employees International Union Welfare Fund. A list of the names and social security numbers of employees covered shall accompany the payment. As used in this Section, "hours worked" shall mean all hours for which an employee is compensated, including vacation and holiday hours paid for.

**25.02. Delinquent Contributions.**
In the event the employer is in arrears in the payment of contributions, it shall be liable for late fees, interest and liquidated damages as established by the Trustees, legal fees, court and/or arbitration costs, and audit and other expenses incidental to the collection of said delinquency. The Employer shall make available for inspection and audit such payroll records as the Fund may lawfully require.

**25.03. Acceptance of Trust.**
The Employer and the Union agree to be bound by the Agreement and Declaration of Trust of the said Hotel Employees and Restaurant Employees International Union Welfare Fund as may, from time to time, be amended, and they do hereby irrevocably

48
**ARIA**

designate as their respective representatives on the Board of Trustees, such Trustees named in said Agreement and Declaration of Trust as Employer and Union Trustees, together with their successors selected as provided therein, and agree to abide and be bound by all procedures established, and actions taken by, the Trustees pursuant to said Trust Agreement.   Any provision in this Agreement that is inconsistent with the Agreement and Declaration of Trust, or the Plan of Benefits, rules, or procedures established by the Trustees, shall be null and void.

## ARTICLE 26: PENSIONS

### 26.01.  Trust and Plan.
There shall be continued for the term of this Agreement the Southern Nevada Culinary Workers and Bartenders Pension Plan Trust Agreement, pursuant to which there has been adopted a jointly negotiated pension plan for employees covered by this Agreement.

### 26.02.  Contributions.
Commencing December 12, 2009, said contributions shall be Sixty-Nine ($0.69) per hour worked. Said contributions shall be due and payable to the fund not later than the fifteenth (15th) day of each month.  A list of the names and Social Security numbers of the employees covered shall accompany the payment.  As used in this Section, "hours worked" shall mean all hours for which an employee is compensated, including vacation and holiday hours paid for.  This rate of contribution may be increased on or after June 1, 2010 in accordance with the provisions of section 27.03 of this Agreement.

### 26.03.  Acceptance of Trust.
By the execution of this Agreement, the Employer party hereto agrees to accept and be fully bound by the terms of said Pension Trust Agreement and Plan and any amendments thereto.

### 26.04.  Delinquent Contributions.
Contributions to the Pension Trust Fund shall be delinquent after the fifteenth (15th) day of the month in which such payments are due.  Interest at the rate of seven percent (7%) per annum shall be payable on all delinquent contributions.

## ARTICLE 27: WAGES

### 27.01.  Established Wages.
Except as provided otherwise in Sections 5.05 and 27.02, classifications and wage rates for the term of this Agreement shall be as set forth in Exhibit 1 attached hereto and made a part of this Agreement.

### 27.02.  Minimum Wages.
No employee covered by this Agreement shall receive a wage rate, exclusive of gratuities, less than that provided by applicable state and federal wage laws. In the event that applicable state or federal minimum wage laws are increased, an automatic

49
**ARIA**

adjustment will be made on affected classifications in this Agreement to comply with the preceding sentence.

### 27.03. Wage Increases.
(a)      The Employer shall pay the following additional amounts as of the dates shown. At least 30 days prior to each date, the Union shall inform the Employer how the increases shall be allocated to the Base Wage Rate and contributions to the Health and Welfare, Pension, Training, Housing and/or tip Earners Legal Assistance funds, provided that if the Union's notice to the Employer is less than 30 days, the Employer will not be excused from paying the increases as allocated by the Union unless there is actual prejudice to the Employer by the delay and then the Employer may be excused only for a period of time equal to the length of the Union's delay in giving notice. The Union shall make such allocation in its sole discretion.

| Date | Total Package Increase |
|------|------------------------|
| June 1, 2010 | $0.69 per hour |
| June 1, 2011 | $0.76 per hour |

(i)      Beginning with the Contract Year commencing on June 1, 2010 the increase in the Base Wage Rate for any Contract Year shall be multiplied by the total number of Hours Worked by employees in all tipped and non-tipped classifications during the Determination Period.   The product shall then be allocated as follows: Eighty three percent to an across-the-board increase for non-tipped classifications (product x .83 ÷ Total Non-tipped Hours worked by employees in all non-tipped classifications during the Determination Period = non-tipped employee wage increase); seventeen percent to an across-the-board increase for tipped classifications (product x .17 ÷ Total Tipped Hours worked by employees in all tipped classifications during the Determination Period = tipped employee wage increase).  Any increases in wages shall be added to the rates shown in Exhibit 1 for the affected classifications.

(ii)      Forty-five (45) days prior to the beginning of any Contract Year, either the Union or the Employer may propose a change to the percentage allocation for such Contract Year.  Such change of the percentage allocation must be approved by both parties to this Agreement and shall only be applicable to the Contract Year for which it was adopted.  Any changes to the percentage allocation in subsequent years must be separately proposed and approved in accordance with this procedure.

(iii) The parties have mutually agreed that classifications appearing on the Gaming Industry Tip Compliance Agreement (GITCA) with the Internal Revenue Service (IRS) and Banquet Servers shall receive wage increases designated for tipped classifications for the life of the agreement.

D 00075

Definitions

*"Contract Year"* shall be from June 1 to May 31, except that the first contract year applicable to ARIA shall be December 12, 2009 to May 31, 2010.

*"Base Wage Rate"* shall mean the wage rate for each Contract Year. The initial Base Wage Rate beginning with the Contract Year commencing June 1, 2007 for the Bellagio was Thirteen and thirty-one cents ($13.31) per hour. The Base Wage Rate for each subsequent Contract Year shall be determined by adding the Base Wage Rate allocation as made above to the Base Wage Rate for the preceding Contract Year.

*"Hours Worked"* shall have the same meaning as in Section 25.01.

*"Determination Period"* shall mean the period commencing on April 1st of a particular year and ending on March 31st of the following year.

*"Total Tipped Hours"* will be determined by utilizing the actual number of hours worked by tipped employees in the preceding Determination Period.

*"Total Non-tipped Hours"* will be determined by utilizing the actual number of hours worked by non-tipped employees in the preceding Determination Period.

### 27.04. Newly Hired Employees.

Newly hired employees, except banquet employees, who have worked in the Greater Las Vegas area casino industry in a culinary/bartender classification a minimum of two thousand (2,000) hours in the thirty-six (36) month period preceding the commencement of their employment, may for the first ninety (90) calendar days of their employment be paid a rate equal to eighty percent (80%) of the full contract rate of pay for the employee's classification. Thereafter they shall be paid a rate of equal to one hundred percent (100%) of the full contract rate of pay for the employee's classification.

Newly hired employees, except banquet employees, who have not worked in the Greater Las Vegas area casino industry in a culinary/bartender classification a minimum of two thousand (2,000) hours in the thirty-six (36) month period preceding the commencement of their employment may be paid at the eighty percent (80%) rate for the first one hundred eighty (180) calendar days of employment.

The Employer shall advise the employee of his/her obligation to furnish the Employer, within ninety (90) calendar days, with verification of the two thousand (2,000) hours of prior Greater Las Vegas area casino industry experience in a culinary/bartender classification on a form to be mutually agreed upon by the parties. An employee who produces such verification after ninety (90) calendar days, but before one hundred eighty (180) calendar days shall be increased to one hundred percent (100%) at that time, but not retroactively.

## ARTICLE 28: OWNERS AND SUCCESSORS

### 28.01. Ownership.

This Agreement shall cover all employees employed in classifications listed in Exhibit 1 in operations within the jurisdiction of the Union, in Greater Las Vegas, Nevada, which after the effective date of and during the term of this Agreement, are owned by, operated by or substantially under the control of the Employer. The term "Employer" shall be

D 00076

deemed to include any person, firm, partnership, corporation, joint venture or other legal entity substantially under the control of the Employer covered by this Agreement or a subsidiary of the Employer covered by this Agreement, or any person, firm, partnership, corporation, joint venture or other legal entity which substantially controls the Employer covered by this Agreement. The term "operations" shall be deemed to include any hotel-casino, hotel, condo-hotel, or a facility that combines two or more of these elements, in each case if the facility has more than 60 rooms, and any casino. It does not apply to any other type of enterprise. With respect to any person, firm, partnership, corporation, joint venture or other legal entity which substantially controls the Employer, it applies only to casinos, hotel-casinos and any operations as defined above that are in the same complex that includes casinos or hotel-casinos operated by the Employer covered by this agreement. Furthermore, it applies to joint-venture hotel-casinos and hotels operated by or majority-owned by the Employer and to joint-venture condo-hotels operated by the Employer (in each case, "Employer" as defined above is deemed not to include the joint venture itself).

### 28.02. Obligations on Employer Selling or Assigning.

In the event that the Employer sells, transfers, or assigns all or any part of its right, title, or interest in the operation covered by this Agreement or substantially all of the assets used in such operation, or in the event there is a change in the form of ownership of the Employer, the Employer shall give the Union reasonable advance notice thereof in writing, and the Employer further agrees that as a condition to any such sale, transfer or assignment, the Employer will obtain from its successor or successors in interest a written assumption of this Agreement including a promise that the successor or successors shall retain the employees employed in each of the units represented by the Union (subject to changes in the level of staffing) and furnish a copy thereof to the Union. The Employer further agrees that as a condition of any such sale, transfer or assignment, it will transfer to the successor(s) completed Forms I-9 for all bargaining unit employees, obtain from its successor(s) a written agreement that the successor(s) will maintain these Forms I-9 in lieu of completing new Forms I-9 for bargaining unit employees and furnish a copy of this agreement to the Union not less than 30 calendar days prior to the closing of the transaction. If the Employer performs these promises, it shall be relieved of its obligations hereunder to the extent that it has fully transferred its right, title, or interest. The Union shall not be required to post a bond or other security as a condition to obtaining an injunction or other equitable relief against a violation or threatened violation of this Section.

### 28.03. Obligations on Successor Employers.

This Agreement shall be binding upon the successors and assigns of the parties hereto. No provisions, terms or obligations herein contained shall be affected, modified, altered or changed in any respect whatsoever by the consolidation, merger, sale, transfer or assignment of the Employer's interest, or any part thereof, in any establishment covered by this Agreement.

D 00077

## ARTICLE 29:  SUBCONTRACTING AND SUBLEASING

### 29.01.

(a)  It is recognized that the Employer and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement and employed on a regular basis.  Therefore, no work customarily performed by employees covered by this Agreement shall be performed under any sub-lease, sub-contract, or other agreement unless the terms of any lease, contract or other agreement specifically states that (a) all such work shall be performed only by members of the bargaining unit covered by this Agreement, and (b) the Employer shall at all times hold and exercise full control of the terms and conditions of employment of all such employees pursuant to the terms of this Agreement.  The provisions of this Article apply to all operations on the Employer's premises covered by this agreement, regardless of location or displacement of employees or prior use of the area occupied by such operations.  Notwithstanding the foregoing provisions hereof the Employer may purchase from outside sources for use in its establishment convenience foods, prepared frozen foods, baked goods, pre-mixed salads and peeled vegetables.

(b)  Notwithstanding the foregoing provisions hereof, the parties recognize that services have been performed by third parties at ARIA and that ARIA may continue the services of any current independent outside contractor or entity which is providing ARIA with any services with persons employed by such contractor as of the date of this Agreement, and any subsequent independent outside contractors or entities providing the ARIA with the same services with persons not employed by the Employer, provided that the provision of such services by each contractor or other outside entity may not be expanded beyond the types and departmental and overall levels currently being done under such agreements. The Employer agrees to provide the Union with a list of any currently contracted work and to notify the Union in writing prior to any agreement with a new contractor or entity providing such services.

## ARTICLE 30:  TRAINING

### 30.01.  Training Program.

The parties recognize that job training is an important tool for promoting the development, success, and advancement of employees, and facilitating guest satisfaction. The parties further recognize that a cooperative training program will provide appropriate training for the classifications of employees covered by this Agreement.

Employees who successfully complete the Employer's training program for a classification covered by this Agreement shall be considered to have the basic skills for that classification for purposes of Article 20 of this Agreement.   Employees who successfully complete the Southern Nevada Joint Management Culinary and Bartenders Training Fund training program for a classification covered by this Agreement shall be considered to have the basic skills for that classification for purposes of Article 20 of this Agreement with the exception of fine dining courses.  In both cases, such training

53
**ARIA**

programs shall be made available equally to all interested employees and shall be offered at no cost to the employees. For purposes of this Section only, "employees" refers to all MGM Resorts Internationl's employees Company-wide.

If special skills are required of any bargaining unit employees (including but not limited to Bartenders), the Employer will make available a training program well in advance of the skills being added to job duties in an existing job classification.

### 30.02. Training to Satisfy the Requirements Imposed by the Employer's Evolving Operations and Guest Expectations.

The parties agree that the Employer must continue to innovate and modify its operations to attract and retain guests, and to keep pace with hotel/casino, leisure and convention destinations. The parties agree that employees must provide world class service to guests. The Employer may provide guest service training, to assist employees in their effort to meet guests' heightened service expectations and demands. Employer offered training shall be available to bargaining unit employees in order of classification seniority. However, the parties agree that the responsibility ultimately rests with individual bargaining unit employees to seek out opportunities, and invest the time, energy and effort to take advantage of all available training opportunities, including those which are not available through the Southern Nevada Joint Management Culinary & Bartender Training Fund training program or the Employer.

### 30.03. Food & Beverage Training and Assessments.

(a)     The Employer may offer, select and/or design Food and/or Beverage training programs, which may be presented at the Employer's discretion, by the Southern Nevada Joint Management Culinary & Bartenders Training Fund, the Employer and/or another organization. The Employer shall pay the costs associated with its Food and/or Beverage training programs, plus participating employees' hourly rates for time spent in classroom training at the Employer's establishment and subsequent assessment, provided that the Employer determines that such training is within the scope of the employee's current job classification and/or career ladder. The Employer shall pay participating employees' hourly rates for time spent in classroom training at the Southern Nevada Joint Management Culinary and Bartenders Training Fund and subsequent assessment, provided that the Employer specifically designs the training program to provide training required by the Employer to employees employed at its facility in designated job classifications, and the Employer determines that such training is within the scope of the employee's current job classification and/or career ladder.

(b)     At the Employer's discretion, the Employer may establish on-the-job training, to assist employees in Food & Beverage classifications to develop skills to qualify for transfer and/or promotional opportunities within traditional as well as alternative career paths. All interested employees who have the basic skills in their present positions, as assessed by the Employer, shall be eligible to take the training. The assessment of technical skills will be based on either MGM Resorts International or property specific job qualifications and may be developed in partnership with the Southern Nevada Joint

D 00079

Management Culinary and Bartenders Training Academy. The Employer will determine the number of participants in each training program. If any limit is placed on the number of employees who may take the training, the limit shall be applied by house seniority, which ties among employees in the same classification broken by existing classification numbers or lottery numbers, and with ties among employees in different classifications broken by drawing lots.

(c)     The employer shall pay participating employees' then-current hourly rates for up to twelve (12) hours of on-the-job training during a twelve (12) month period. An employee who successfully completes the twelve (12) hours of on-the-job training will be considered to have the basic skills to apply for a promotional opportunity.

(d)     Employees may be required to take additional venue-specific training and/or successfully complete an information examination and/or a performance examination, such as a cooking skills demonstration, to be considered for a promotion from casual dining/production venues to fine dining/specialty/branded/celebrity chef venues, promotion to other classifications in the same career ladder or a transfer and/or promotion within fine dining/specialty/branded/celebrity chef venues. An information examination may be in writing or oral, and will be oral if the employee taking the examination is not proficiently literate, and literacy is not necessary for the position in question. The Employer will notify the Union well in advance of the administration of a performance examination and provide the employee with any materials needed to successfully complete the examination well in advance. The Union may have one Union representative present to observe the performance examination, upon the Union's request. If multiple employees pass the examination process then the most senior employee will be selected.

(e)     The records of the training, assessment(s) and examination(s) described in this Article shall be made available to the Union upon request.

(f)     For the purpose of this Article, "casual dining/production venues" and "fine dining/specialty/branded/celebrity chef" venues, and others to be determined by mutual agreement of the Employer and the Union, are listed in Exhibit Side Letter #7.

(g)     The Employer and the Union will, within an agreed upon time frame, establish a working committee comprised of management, shop stewards and the union to evaluate how well the training requirements and initiative are working and what modifications, if any, are needed to improve it.

### 30.04. Southern Nevada Joint Management Culinary and Bartenders Training Fund.

The parties agree to participate in the Southern Nevada Joint Management Culinary & Bartenders Training Fund. The Employer shall contribute four cents ($.04) for each hour worked effective June 1, 2008. As used in this Section, "hours worked" shall mean all hours for which an employee is compensated, including vacation and holiday hours paid

D 00080

for. This rate of contribution may be increased on or after June 1, 2009 in accordance with the provisions of section 27.03 of this Agreement.

Contributions to the Training Fund shall be delinquent after the fifteenth (15th) day of each month for hours worked the previous month. Reporting procedures and interest on delinquent contributions shall be established by the Trustees of the Fund.

By execution of this Agreement, the Employer party hereto agrees to accept and be fully bound by the terms of the Training Fund's Trust Agreement and Plan and any subsequent amendments thereto.

### 30.05. No Claim Based on Training.

The parties agree that the Union shall not claim any non-bargaining unit work performed by employees when in promotional training or when temporarily working out of a bargaining unit classification as business needs dictate. In such circumstances, the Employer will make contributions if the employee is participating in the HEREIU Welfare Fund and/or the Southern Nevada Culinary and Bartenders Pension Fund for hours worked in the non-bargaining unit classification.

### 30.06. Food & Beverage Venues Program to Promote Success and Employee's Advancement

The Employer and the Union agree that employees' opportunities for advancement and development are directly tied to the Employer's continued success. To that end, the Employer and the Union agree to the following:

**Diversity Commitment** - The Employer and the Union restate their commitment to equal employment opportunity and the development and maintenance of a diverse workforce. The Employer and the Union are committed to the recruitment, training, promotion and recognition of employees without regard to gender, race, color, creed, national origin, age, religion, union affiliation, veteran status, disability, or sexual orientation. The Employer and the Union will encourage all employees, including women and minorities, to pursue training programs to qualify for promotional opportunities.

**Career Ladders** - The Employer shall prepare lists of bargaining unit job classifications selected by the Employer, indicating the potential promotional sequence, from one job classification to the next, of qualified bargaining unit employees, referred to as "career ladders." For each job classification included on a career ladder, the Employer shall specify the required knowledge, skills, ability, experience and training an employee must posses, to qualify for the next classification in the career ladder. The Employer has primary responsibility to define these career ladders and will seek input & consultation from the Union and the Culinary Training Academy. The Employer and the Union shall encourage employees to consider and pursue training and other opportunities to qualify for promotional opportunities. Employees shall be responsible to pursue and satisfactorily complete the training program offered by the Southern Nevada Joint Management Culinary & Bartender Training Fund, Employer or another source to qualify for classifications in their career ladders.

D 00081

**Joint Training Committee and Culinary Apprenticeship Program** - The Employer and the Union will form a Joint Training Committee ("JTC") to explore the establishment of a Training Program (which may include a formal culinary apprenticeship program) to facilitate an employee's expected promotional sequence within a career ladder. The JTC shall be composed of three representatives selected by the Employer and three representatives selected by the Union. Once designed and implemented by the Employer, all of the Employer's employees (not limited to bargaining unit employees) shall be eligible to apply to participate in the Training Program. Employees will be selected to participate in the Training Program by the Employer. The Training Program may include on-the-job, classroom components, and "e-learning," and may be administered by the Southern Nevada Joint Management Culinary & Bartender Training Fund, Employer or another source. The number of programs for designated trainee and/or Apprentice positions shall be determined by the Employer.

The Employer may establish a wage progression for Apprentices. Such progression may include step wage rates with the final step reaching 100 percent of the wage rate for the job classification for which the apprentices are training. Further, no apprentice will have his or her current wage rate at the time of entering apprenticeship reduced. Wage rates above Apprenticeship scale shall be frozen until the Apprenticeship scale is higher. Upon the successful completion of their apprenticeship, employees' classification seniority shall be recognized as the date they began the apprenticeship program. No employees may be displaced to make room for apprentices. In the event of a reduction in force, apprentices shall be laid off before other employees, in order of their seniority; however, apprentices may return to their former position or a vacant position for which they are qualified. Apprentices may continue classroom training and/or "e-learning" while on lay off, with the approval of the Employer.

**Mentoring Program** - The Employer may establish a "Mentoring Program," to facilitate the familiarization of employees with the duties, responsibilities, demands and qualifications of other job classifications and/or career ladders. The Employer will determine the number of available mentor slots and employees to participate in the Mentoring Program. Employees interested in promotional opportunities who indicate their desire to participate in the Mentoring Program may be paired, if selected, with a mentor.

## ARTICLE 31: JOB DESCRIPTIONS

### 31.01.

The parties shall confer regarding the content of job descriptions, and the Employer shall give good-faith consideration to the Union's views. Such job descriptions shall determine the duties of each classification and shall be used as guidelines to evaluate job performance and skills, qualifications and experience for all purposes under this Agreement. Employees shall be assigned a reasonable workload within the framework of each job description.

D 00082

## ARTICLE 32: OTHER BENEFITS

**32.01.**

If the Employer in its discretion establishes scholarship programs and/or child care programs, bargaining unit employees shall be eligible to participate in such programs on the same basis as non-bargaining unit employees. The Employer shall give good-faith consideration to including bargaining unit employees in other benefit programs which the Employer may in its discretion establish (excluding medical and related programs, pension programs, and programs established exclusively for executives).

## ARTICLE 33: LABOR-MANAGEMENT COOPERATION

**33.01.**

The Employer and the Union have entered into this Agreement, and the changes embodied herein, for the purpose of establishing a more cooperative and more flexible relationship among the Employer, the Union and the employees. The Employer shall not apply the provisions of this Agreement in an arbitrary or unfair manner. The Union will administer the Agreement fairly toward the Employer. To further these objectives, the parties agree to consider methods of encouraging such a relationship during the life of this Agreement, including, among other things, regular meetings between Union Stewards, Union Representatives, other Union employees where appropriate, and appropriate management officials with authority for the purpose of discussing problems, employee suggestions, methods of improving morale or productivity, and other subjects.

## ARTICLE 34: HOUSING FUND

**34.01. Housing Fund.**

The parties agree to jointly establish and participate in a fund for the purpose of providing financial assistance to bargaining unit employees to find housing in the Las Vegas area. The fund shall at all times meet the criteria of 302(c)(7) of the Labor-Management Relations Act, 1947 and contributions thereto shall be tax-deductible by the Employer. The Employer shall contribute one half cent (½ ¢) per hour for each hour worked effective December 12, 2009. As used in this Section, "hours worked" shall mean all hours for which an employee is compensated, including vacation and holiday hours paid for. This rate of contribution may be increased on or after June 1, 2010 in accordance with the provisions of section 27.03 of this Agreement.

Contributions to the Housing Fund shall be delinquent after the fifteenth (15th) day of each month for hours worked the previous month. Reporting procedures and interest on delinquent contributions shall be established by the Trustees of the Fund.

By execution of this Agreement, the Employer party hereto agrees to accept and be fully bound by the terms of the Housing Fund's Trust Agreement and Plan and any subsequent amendments thereto. Any disputes or differences of opinion concerning the initial terms of the Trust Agreement shall be subject to arbitration under this Agreement. If such disputes or disagreements exist contemporaneously between the Union and other Las

D 00083

Vegas hotel-casino employers who have agree to participate in this fund, or between the Employer and one or more such other employers, then the parties agree that all such disputes or disagreements shall be combined and submitted for resolution in a single arbitration procedure.

## ARTICLE 35: TIP EARNERS' LEGAL ASSISTANCE FUND

### 35.01. Tip-Earners' Legal Assistance Fund.

The parties agree to jointly establish and participate in a fund for the purpose of providing the assistance of legal counsel to bargaining unit employees in tipped classifications for who are subjected to audits of their tip income by the Service. The fund shall at all times meet the criteria of 302(c)(8) of the Labor-Management Relations Act, 1947 and contributions thereto shall be tax-deductible by the Employer. The Employer shall contribute, upon the Union's direction, an allocated cents per hour for each hour worked effective June 1 of each year of the contract. As used in this Section, "hours worked" shall mean all hours for which an employee is compensated, including vacation and holiday hours paid for. This rate of contribution may be increased on or after June 1, 2010 in accordance with the provisions of section 27.03 of this Agreement. The Union directed no allocation to the Fund in 2009

Contributions to the Tip-Earners' Legal Assistance Fund shall be delinquent after the fifteenth (15th) day of each month for hours worked the previous month. Reporting procedures and interest on delinquent contributions shall be established by the Trustees of the Fund.

By execution of this Agreement, the Employer party hereto agrees to accept and be fully bound by the terms of the Tip-Earners' Legal Assistance Fund Fund's Trust Agreement and Plan and any subsequent amendments thereto. Any disputes or differences of opinion concerning the initial terms of the Trust Agreement shall be subject to arbitration under this Agreement. If such disputes or disagreements exist contemporaneously between the Union and other Las Vegas hotel-casino employers who have agree to participate in this fund, or between the Employer and one or more such other employers, then the parties agree that all such disputes or disagreements shall be combined and submitted for resolution in a single arbitration procedure.

D 00084

## ARTICLE 36: IMMIGRATION

**36.01.**

In the event that a post-introductory employee has a problem with his or her right to work in the United States, the Employer shall notify the Union in writing as soon as the problem is known. Upon the Union's request, the Employer shall meet with the Union to discuss the nature of the problem to see if a resolution can be reached. Whenever possible, the meeting shall take place before any action is taken by the Employer.

As part of the Employer's six (6) month notification process, whenever possible the Employer agrees to share with the Union the names of employees whose work authorizations are going to expire.

Upon request, employees shall be released for up to five (5) unpaid working days during the term of this Agreement in order to attend to Immigration and Naturalization Service ("INS") proceedings and any related matters for the employee only. The Employer may request verification of such absence.

A post-introductory employee who is not authorized to work in the United States and whose employment has been terminated for this reason shall be immediately reinstated to his or her former classification without loss of prior seniority provided the former employee produces proper work authorization within twelve (12) months of the date of termination, and to his or her former shift and station if the former employee produces proper work authorization within ninety (90) days of the date of termination. If the employee produces proper work authorization within twelve (12) months from date of termination, the employee would return, without loss of prior seniority, to his or her former classification displacing the least senior employee in that job classification. Such Employees do not accrue vacation or other benefits based upon particular Plan policies during such absences.

If the employee needs additional time, the Employer will rehire the employee into the next available opening in the employee's former classification, as a new hire without retaining seniority, upon the former employee providing proper paperwork authorization within a maximum of twelve (12) additional months from the date the employee notifies the Employer that he or she needs additional time. The parties agree that the employee would be subject to an introductory period upon rehire in such event.

**Change of Status/Immigration**. On the day an employee becomes a U.S. citizen, the Employer will compensate the employee with a one (1) time paid personal holiday in recognition of his or her citizenship.

## ARTICLE 37: CONTINUITY OF SERVICE

**37.01. Redevelopment Obligations.**

If the Employer closes substantially all of the business covered by this Agreement for the purpose of redevelopment, the terms and conditions set forth in this Article shall apply.

D 00085

**37.02. Job Opportunities and Retention Bonus.**

(a)     Employees will actively participate in pursuing Job Opportunities through the Company's internal program within MGM Resorts International properties.

(b)     The Employer will pay to eligible employees in the bargaining unit a Retention Bonus in the applicable gross amount set forth below.  In order to be eligible for payment of a Retention Bonus set forth below, an employee must be continuously employed by the Employer for at least six (6) months before the date of layoff; and 2) must be laid off from his or her position as result of a close of the business (an employee who is offered a comparable position in any MGM Resorts International Las Vegas property shall not be considered "laid off" for purposes of this Article).  Any employee who: 1) is offered and declines a comparable position within the MGM Resorts International organization; 2) voluntarily quits/resigns his/her employment with the Employer; or 3)  who is terminated for cause by the Employer, shall not be eligible for a Retention Bonus.

However, in the event that an employee is offered a position within the MGM Resorts International organization that is not comparable, i.e. a position which does not provide substantially similar compensation to the employee, the Employer will supplement the employee's compensation until the employee begins earning a substantially similar rate of pay or comparable compensation or up to the applicable Retention Bonus amount ("Supplemental Payment").  The Supplemental Payment will be made on a quarterly basis and will be determined as follows:
For an employee offered  a full time position at a lower base hourly wage rate than the base hourly wage rate for the position held by the employee at the property closed for redevelopment, the employee will be paid a gross amount equal to the difference between the two base hourly wage rates for all hours worked during the quarter.

For an employee offered a part time, on call or steady extra position, the employee will be paid a Supplemental Payment in a gross amount equal to the difference between the quarterly average of total wages earned in the last year of operation of the property closed for re-development (Base Earnings) and the total wages earned in each quarter in the new position.  Supplemental Payments for partial quarters will be based upon a pro-rated portion of Base Earnings.
The Employer shall have no obligation to make Supplemental Payments to an employee under Paragraph (b)(2) above if the employee refuses, declines or becomes unavailable for work scheduled or offered.

The Employer may immediately discontinue Supplemental Payments for an employee who:  a) is offered and declines a comparable position; b) voluntarily quits or resigns from employment; or c) who has been paid Supplemental Payments equal to the Retention Bonus amount that the employee was eligible for on the date the property was closed for re-development.

Payments made to an employee either as a Retention Bonus or a Supplemental Payment are subject to all legally required taxes and withholdings.

61
**ARIA**

D 00086

(c)      Retention Bonus.

| Years of Continuous Service/Employment at the Casino by the Employer and by a Predecessor Employer | Retention Bonus Gross Amount |
|---|---|
| 20 or more | $12,000.00 |
| 15 to 20 | $ 9,000.00 |
| 10 to 15 | $ 6,000.00 |
| 5 to 10 | $ 4,000.00 |
| 1 to 5 | $ 2,500.00 |
| Less than 1 year | $ 1,250.00 |

**37.03. Priority for Employment.**

(a)      For a period of one (1) year following the closing of the business the Employer agrees to offer jobs at any hotel, hotel-casino, or condo-hotel or a facility that combines two or more of these elements, that it owns, develops or operates on the site of the business covered by this Agreement, on a priority basis to bargaining unit employees who qualified for a Retention Bonus and meet the requirements set forth below ("Priority Hiring List").

(b)      Employees hired by the Employer from the Priority Hiring List shall be considered new employees with no residual rights from their former employment. This is not a recall of former bargaining unit employees.

(c)      Upon receipt of the WARN Act notice regarding the closure of the hotel/casino, the Union will present to the Employer a list of employees whom it represents who desire priority hiring in accordance with the terms of this Article. The list shall include for each employee the name, social security number, the address and the job title held by the employee at the Employer's business on the date of the WARN Act notice. It will be the Union's responsibility to keep the Employer notified of each such former employee's last known address during the period between the closure of the business and the opening of the Employer's new business(es) at the site of the former business.

(d)      The Employer's obligation is to offer employment to employees eligible for and entitled to priority hiring for any job that falls within the same job family that include the employee's job title. The job families consist of those job titles that are listed under the following six groups in Exhibit 1 to this Agreement.

      a.      Cooks and Miscellaneous Kitchen Help
      b.      Dining Room Classifications
      c.      Casino Employees
      d.      Bell Desk Service
      e.      Housekeeping Classifications
      f.      Bar and Banquet Employees

D 00087

(e)    An employee shall not be entitled to Priority Hiring at a covered facility if he or she:

1)    Voluntarily removes his or her name from the list at any time prior to opening of covered facility.

2)    Voluntarily quits or abandons his or her job at any time before the closing of the business covered by this Agreement.

3)    Cannot be located through the efforts of the employer and the Union after sharing with each other all available information about the employee's whereabouts.

4)    Is terminated for cause before the closing of the business covered by this Agreement.

5)    Is not qualified for any position available.

6)    Fails to report to the job interview at the facility scheduled in writing sent to the employee's last known address.  The interview shall be scheduled with at least three (3) weeks' notice.

7)    Rejects two (2) job offers made by the facility.

8)    Is scheduled to be incarcerated when the facility opens to the public.

9)    Is receiving or is eligible to receive retirement or disability benefits from the Social Security Administration.

10)   Is receiving or has applied for disability retirement from the Southern Nevada Culinary & Bartenders Pension Fund.

11)   Has been convicted of a felony since the date of layoff.

12)   Fails to report for work when contacted by the facility.

13)   Is not qualified or lacks the ability to perform satisfactorily the work in the classification.

### 37.04.  Survival of Article.

This Article shall be and remain in full force and effect until May 31, 2012 and shall survive the expiration or termination of this Agreement and at all times, any disputes over the interpretation or application of this Article shall be resolved as provided in 21.03(b) of the Agreement, regardless whether the Agreement is in effect or has expired by its terms.

D 00088

## ARTICLE 38: TERMINATION

**38.01.**

This Agreement shall be in full force and effect from December 12, 2009, to and including May 31, 2013, and from year to year thereafter unless sixty (60) days written notice to change, modify or terminate is given by either party prior to May 31, 2013, or in any subsequent year thereafter. However, either the Union or the Employer may reopen the Agreement for the re-negotiation of core economics applicable to the period between June 1, 2012 and May 31, 2013, by giving notice to the other party in writing not less than 90 days or more than 120 days prior to June 1, 2012. Core economics shall consist only of wages, health and welfare contributions, pension contributions, training fund contributions and housing fund contributions. If the Employer and the Union fail to reach an agreement by the end of May 31, 2012, all provisions of the Agreement restricting economic action by the parties, including strikes and lockouts, shall be suspended only for the purpose of resolving the negotiations over core economics. In all other respects, the provisions of the Agreement shall be unchanged for the period June 1, 2012, through May 31, 2013, except as the parties may otherwise agree, and the provision of the Agreement restricting economic action shall remain intact and enforceable.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this _17TH_ day of _September_, 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO
LLC dba ARIA

BY: _____

ITS: _PRESIDENT_

LOCAL JOINT EXECUTIVE BOARD
OF LAS VEGAS

BY: _____

ITS: _President_

BY: _____

ITS: _Secretary-Treasurer_

D 00089

## EXHIBIT 1 – 2009 WAGE SCALES

| | | 2009 | | | |
|---|---|---|---|---|---|
| | | **Hourly Rates** | | **Daily Rates** | |
| | **TP/NT** | **100%** | **80%** | **100%** | **80%** |
| **CLASSIFICATION** | | | | | |
| Sommelier | Tipped | $12.9752 | $10.3802 | $103.8016 | $83.0413 |
| Master Cook | Non-tipped | $17.4548 | $13.9638 | $139.6384 | $111.7107 |
| Cook | Non-tipped | $17.0985 | $13.6788 | $136.7880 | $109.4304 |
| Butcher | Non-tipped | $17.0985 | $13.6788 | $136.7880 | $109.4304 |
| Master Sushi Cook | Non-tipped | $17.4548 | $13.9638 | $139.6384 | $111.7107 |
| Baker | Non-tipped | $17.3173 | $13.8538 | $138.5384 | $110.8307 |
| Crepe Maker | Non-tipped | $17.3173 | $13.8538 | $138.5384 | $110.8307 |
| Ice Cream Maker | Non-tipped | $17.3173 | $13.8538 | $138.5384 | $110.8307 |
| Pantry Worker | Non-tipped | $16.5673 | $13.2538 | $132.5384 | $106.0307 |
| Helper | Non-tipped | $15.7673 | $12.6138 | $126.1384 | $100.9107 |
| Stove Cleaner | Non-tipped | $14.6860 | $11.7488 | $117.4880 | $93.9904 |
| Lead Kitchen Worker | Non-tipped | $16.1360 | $12.9088 | $129.0880 | $103.2704 |
| Kitchen Worker | Non-tipped | $14.4360 | $11.5488 | $115.4880 | $92.3904 |
| Utility Porter | Non-tipped | $14.9860 | $11.9888 | $119.8880 | $95.9104 |
| Utility Houseperson | Non-tipped | $14.9860 | $11.9888 | $119.8880 | $95.9104 |
| Housekeeping Linen Attendant | Non-tipped | $15.6048 | $12.4838 | $124.8384 | $99.8707 |
| General Cleaner | Non-tipped | $14.4673 | $11.5738 | $115.7384 | $92.5907 |
| Houseperson | Non-tipped | $14.4673 | $11.5738 | $115.7384 | $92.5907 |
| Guest Room Attendant | Non-tipped | $14.1985 | $11.3588 | $113.5880 | $90.8704 |
| Turndown Service Attendant (4 Hour Shift) | Non-tipped | $14.1985 | $11.3588 | $56.7940 | $45.4352 |
| Status Board Operator | Non-tipped | $15.7110 | $12.5688 | $125.6880 | $100.5504 |
| Uniform Attendant | Non-tipped | $15.6048 | $12.4838 | $124.8384 | $99.8707 |
| Seamer | Non-tipped | $16.8460 | $13.4768 | $134.7680 | $107.8144 |
| Gourmet Food Server | Tipped | $11.8828 | $9.5062 | $95.0624 | $76.0499 |
| (6 Hour Shift) | Tipped | $12.0828 | $9.6662 | $72.4968 | $57.9974 |
| Gourmet Food Server II | Tipped | $11.8828 | $9.5062 | $95.0624 | $76.0499 |
| Cocktail Server | Tipped | $11.8828 | $9.5062 | $95.0624 | $76.0499 |
| (6 Hour Shift) | Tipped | $12.0828 | $9.6662 | $72.4968 | $57.9974 |
| Lounge Server | Tipped | $11.8828 | $9.5062 | $95.0624 | $76.0499 |
| Cocktail Service Attendant | Tipped | $12.3828 | $9.9062 | $99.0624 | $79.2499 |
| Banquet Server - Hourly | Tipped | $12.6140 | $10.0912 | $100.9120 | $80.7296 |
| Banquet Server - Hourly - Temp | Tipped | $12.6140 | $10.0912 | $100.9120 | $80.7296 |

D 00090

|  |  | 2009 | | | |
|  |  | **Hourly Rates** | | **Daily Rates** | |
| CLASSIFICATION | TP/NT | 100% | 80% | 100% | 80% |
| Host Person | Tipped | $15.2890 | $12.2312 | $122.3120 | $97.8496 |
| (6 Hour Shift) | Tipped | $15.4890 | $12.3912 | $92.9340 | $74.3472 |
| Host Person | Non-tipped | $15.8610 | $12.6888 | $126.8880 | $101.5104 |
| (6 Hour Shift) | Non-Tipped | $16.0610 | $12.8488 | $96.3660 | $77.0928 |
| Usher | Non-tipped | $14.5710 | $11.6568 | $116.5680 | $93.2544 |
| (6 Hour Shift) | Non-tipped | $14.7710 | $11.8168 | $88.6260 | $70.9008 |
| Fountain Worker | Non-tipped | $13.4298 | $10.7438 | $107.4384 | $85.9507 |
| (6 Hour Shift) | Non-tipped | $13.6298 | $10.9038 | $81.7788 | $65.4230 |
| Cashiers-F & B | Non-tipped | $16.3360 | $13.0688 | $130.6880 | $104.5504 |
| (6 Hour Shift) | Non-tipped | $16.5360 | $13.2288 | $99.2160 | $79.3728 |
| Order Taker | Non-tipped | $16.3360 | $13.0688 | $130.6880 | $104.5504 |
| (6 Hour Shift) | Non-tipped | $16.5360 | $13.2288 | $99.2160 | $79.3728 |
| Bus Person (Regular) | Tipped | $12.0953 | $9.6762 | $96.7624 | $77.4099 |
| (6 Hour Shift) | Tipped | $12.2953 | $9.8362 | $73.7718 | $59.0174 |
| Bus/Runner | Tipped | $12.3390 | $9.8712 | $98.7120 | $78.9696 |
| Bus/Runner - Services | Non-tipped | $12.9110 | $10.3288 | $103.2880 | $82.6304 |
| Bartender TD | Tipped | $16.2515 | $13.0012 | $130.0120 | $104.0096 |
| (6 Hour Shift) | Tipped | $16.4515 | $13.1612 | $98.7090 | $78.9672 |
| Bartender - Service TI | Tipped | $16.9390 | $13.5512 | $135.5120 | $108.4096 |
| (6 Hour Shift) | Tipped | $17.1390 | $13.7112 | $102.8340 | $82.2672 |
| Apprentice Bartender | Tipped | $13.8203 | $11.0562 | $110.5624 | $88.4499 |
| (6 Hour Shift) | Tipped | $14.0203 | $11.2162 | $84.1218 | $67.2974 |
| Bar Porter | Non-tipped | $14.9860 | $11.9888 | $119.8880 | $95.9104 |
| (6 Hour Shift) | Non-tipped | $15.1860 | $12.1488 | $91.1160 | $72.8928 |
| Mini-Bar Attendant | Non-tipped | $14.4460 | $11.5568 | $115.5680 | $92.4544 |
| Front Service Baggage Handler | Tipped | $14.4610 | $11.5688 | $115.6880 | $92.5504 |
| Front Service Dispatcher | Non-tipped | $14.4460 | $11.5568 | $115.5680 | $92.4544 |
| Front Service Door Person | Tipped | $12.4140 | $9.9312 | $99.3120 | $79.4496 |
| (6 Hour Shift) | Tipped | $12.6160 | $10.0928 | $75.6960 | $60.5568 |
| Front Svc Bell Person | Tipped | $12.1753 | $9.7402 | $97.4024 | $77.9219 |
| (6 Hour Shift) | Tipped | $12.3753 | $9.9002 | $74.2518 | $59.4014 |
| Supply Attendant | Non-tipped | $14.9860 | $11.9888 | $119.8880 | $95.9104 |
| Convention Porter | Non-tipped | $14.9860 | $11.9888 | $119.8880 | $95.9104 |
| Lead Banquet Set-Up Porter | Non-tipped | $15.9859 | $12.7887 | $127.8872 | $102.3098 |

D 00091

## EXHIBIT 2 - CHECK-OFF AGREEMENT

1.      Pursuant to the Union Security provision of the Agreement between ARIA (hereinafter, referred to as the "Employer") and the LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS, representing the Culinary Workers Union, Local No. 226, and the Bartenders Union, Local No. 165 (hereinafter, referred to as the "Union"), the Employer, during the term of the Agreement, agrees to deduct each month Union membership dues (excluding initiation fees, fines and assessments) from the pay of those employees who have authorized such deductions in writing as provided in this Check-Off Agreement. Such membership dues shall be limited to amounts levied by the Unions in accordance with their Constitutions and Bylaws. Deductions shall be made only for those employees who voluntarily submit to the hotel employing them the original or a facsimile of a written authorization in accordance with the "Authorization for Check-Off of Dues" form set forth below. It is the Union's responsibility to provide the employees with this form.

2.      On and after the date this agreement is ratified by employees represented by the Union, the required authorization shall be in the following form:

## PAYROLL DEDUCTION AUTHORIZATION

Date _____

I, the undersigned, hereby request and voluntarily authorize the Employer to deduct from any wages or compensation due me, an amount equal to the regular monthly dues uniformly applicable to members of _____ ("Union") in accordance with the Constitution and Bylaws of the Union.

This authorization shall remain in effect and shall be irrevocable unless I revoke it by sending written notice to both the Employer and the Union by registered mail during a period of fifteen (15) days immediately succeeding any yearly period subsequent to the date of this authorization or subsequent to the date of termination of the applicable contract between the Employer and the Union, whichever occurs sooner, and shall be automatically renewed as an irrevocable check-off from year to year unless revoked as hereinabove provided, irrespective of whether I am a Union member.

Signed _____

Social Security No. _____

The Employer shall continue to honor authorization in the following form executed by employees prior to the date of this agreement is ratified by employees represented by the Union:

67
**ARIA**

D 00092

## PAYROLL DEDUCTION AUTHORIZATION

Date _____

I, the undersigned, a member of _____, hereby request and voluntarily authorize the Employer to deduct from any wages or compensation due me, an amount equal to the regular monthly dues uniformly applicable to members of _____ ("Union") in accordance with the Constitution and Bylaws of the Union.

This authorization shall remain in effect and shall be irrevocable unless I revoke it by sending a written notice to both the Employer and _____, by registered mail during a period of fifteen (15) days immediately succeeding any yearly period subsequent to the date of this authorization or subsequent to the date of termination of the applicable contract between the Employer and the Union, whichever occurs sooner, and shall be automatically renewed as an irrevocable Check-Off from year to year unless revoked as herein above provided.

3.      Deductions shall be made only in accordance with the provisions of said Authorization for Check-Off of Dues, together with the provisions of this Check-Off Agreement.

4.      The original or a facsimile of a properly executed Authorization for Check-Off of Dues form for each employee for whom Union membership dues are to be deducted hereunder shall be delivered to the Employer before any payroll deductions are made. Deductions shall be made thereafter only under Authorization for Check-Off of Dues forms which have been properly executed and are in effect. Any Authorization for Check-Off of Dues which is incomplete or in error will be returned to the Union by the Employer.

5.      Check-Off deductions under all properly executed Authorization for Check-Off of Dues forms which have been delivered to the Employer on or before the fifteenth (15th) day of any particular month thereafter shall begin with the following calendar month.

6.      Deductions shall be made in accordance with the provisions of this Check-Off of Union Membership Dues section, from the pay received on the first payday of each month regardless of the payroll period ending date represented on that payroll check. These provisions for dues deductions shall not apply to Banquet Workers.

7.      The Employer agrees to make deductions as otherwise provided in this Check-Off of Union Membership Dues section in the case of employees who have returned to work after authorized leave of absence.

8.      In cases where a deduction is made which duplicates a payment already made to the Union by an employee, or where a deduction is not in conformity with the provisions

D 00093

of the Union Constitution and By-Laws, refunds to the employee will be made by the Union.

9.      The Employer shall remit each month to the designated financial officer of the Union, the amount of deductions made for that particular month, together with a list of employees and their Social Security numbers, for whom such deductions have been made. The information shall be in computer readable electronic form, in any one of the following media:

    1.      3½" diskette in Formatted Text (Space Delimited) format;
    2.      CD ROM in Formatted Text (Space Delimited) format;
    3.      ZIP Disk in Formatted Text (Space Delimited) format;
    4.      Via e-mail transmission; after the Union has demonstrated to the Employer that the proper "PGP" security encryption measures exist in the Union's network.

The report shall contain header information and be set up so that position "1" is the first position (not position 0). The positional formatting shall be as follows:

| | |
|---|---|
| Positions 1-13 | Social Security Number with the dashes |
| Positions 14-54 | Name as Last name, First name |
| Positions 55-60 | The dollar amount of the remittance without a dollar sign, left justified, and with the minus sign in front for negative amounts (such as -30.00). |

The remittance shall be forwarded to the above designated financial officer not later than the fifteenth (15th) of the month, for the deduction from the first paycheck received by the employee prior to the fifteenth (15th) of the month for the month the dues are being paid.

10.     Any employee whose seniority is broken by death, quit, discharge or layoff, or who is transferred to a position outside the scope of the bargaining unit, shall cease to be subject to check-off deductions beginning with the month immediately following that in which such death, quit, discharge, layoff, or transfer occurred.

11.     In the event any employee shall register a complaint with the Employer alleging his/her dues are being improperly deducted, the Employer will make no further deductions of the employee's dues.  Such dispute shall then be reviewed with the employee by a representative of the Union and a representative of the Employer.

12.     The Employer shall not be liable to the Union by reason of the requirements of this Check-Off Agreement for the remittance of payment of any sum other than that constituting deduction made from employee wages earned.

ARIA

D 00094

13.    The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action taken by the Employer in reliance upon payroll deduction authorization cards submitted to the Employer.

D 00095

## EXHIBIT 3 - WAIVER OF BARGAINING RIGHTS AND AMENDMENTS TO AGREEMENT

During the negotiations resulting in this Agreement, the Company and the Union each had the unlimited right and opportunity to make demands and proposals with respect to any subject matter as to which the National Labor Relations Act imposes an obligation to bargain. The Company expressly waives its right to require the Union to bargain collectively, and the Union expressly waives its right to require the Company to bargain collectively, over all matters as to which the National Labor Relations Act imposes an obligation to bargain, whether or not (a) such matters are specifically referred to in this Agreement or (b) such matters were discussed between the Company and the Union during the negotiations which resulted in this Agreement, except for matters that were not within the contemplation or knowledge of the Company or the Union at the time this Agreement was negotiated and executed. As used in this Exhibit, the waiver of the right to "bargain collectively" includes the waiver of the right to require the other party to negotiate. This agreement contains the entire understanding, undertaking, and agreement of the Company and the Union, after exercise of the right and opportunity referred to in the first sentence of this Exhibit, and finally determines all matters of collective bargaining for its term, except as provided above. It expressly supersedes any past or present practices, policies, understandings, and agreements not specifically provided for and incorporated into this Agreement. Changes in this Agreement, whether by addition, waiver, deletion, amendment, or modification, must be reduced to writing and executed by both the Company and the Union, or be made by the Employer, in writing, as rules governing employee conduct and the work environment.

D 00096

## EXHIBIT 4 - POLITICAL ACTION COMMITTEE

The Employer agrees to honor political contribution deduction authorizations from its employees, in the following form:

> I hereby authorize the Employer to deduct from my pay the sum of one dollar ($1.00) per month and to forward that amount to the UNITE - HERE TIP – "To Insure Progress". This authorization is signed voluntarily and with the understanding that the UNITE - HERE TIP – "To Insure Progress" will use this money to make political contributions and expenditures in connection with Federal elections. I am aware of my right to refuse to sign this authorization without reprisal. This authorization may be revoked by mailing notices of revocation by United States Registered or Certified Mail, Return Receipt Requested, to the Treasurer, Hotel Employees and Restaurant Employees International Union UNITE – HERE TIP – "To Insure Progress", 275 7th Avenue, New York, New York 10001, and to the Employer.

The political contribution deduction shall be made once each month during which an employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within thirty (30) days after the last day of the preceding month to the UNITE – HERE TIP – "To Insure Progress", 275 7th Avenue, New York, New York 10001, accompanied by a form stating the name and Social Security number of each employee for whom a deduction has been made, and the amount deducted.

The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits or other terms of liability that shall arise out of or by reason of action taken by the Employer in reliance upon payroll deduction authorization cards submitted to the Employer.

Employees who revoke their authorization will not have a subsequent authorization honored by the Employer until the commencement of the following calendar quarter, at the earliest.

Signed_____   Social Security No._____

D 00097

**EXHIBIT 5 - SPECIALTY ROOM FOUR (4) HOUR SHIFTS, LUNCH ONLY**

| Position | 2009 (100%) | 2009 (80%) |
|---|---|---|
| Host/NT 8331 | 12.6880 | 10.1504 |
| Host/TP | 15.4390 | 12.3512 |
| F&B Cashier 8386 | 16.2360 | 12.9888 |
| Food Server 8385 | 12.0328 | 9.62624 |
| Bus Person 8387 | 12.2453 | 9.79624 |
| Bartender/TP 8388 | 16.4015 | 13.1212 |
| Bartender/NT 8390 | 16.8390 | 13.4712 |
| Gourmet Food Server | 12.0328 | 9.62624 |
| Gourmet Food Server II | 12.0328 | 9.62624 |
| Apprentice Bartender | 13.9703 | 11.1762 |
| Sommelier | 13.1252 | 10.5002 |

D 00098

## EXHIBIT 6 - CASUAL DINING/PRODUCTION VENUES AND FINE DINING/SPECIALTY/BRANDED/CELEBRITY CHEF VENUES

For purposes of Article 30.03 (f) ARIA's current food and beverage venues are designated as follows:

**Casual Dining/Production Venues**

| | |
|---|---|
| Café Vettro | Skybox Bar and Grill |
| The Buffet | Breeze Café |
| The Crossings | |

**Express Gourmet**

Skybox To Go
Roasted Bean
Sweet Chill

**Fine Dining/Specialty/Branded/Celebrity Chef Venues**

| | |
|---|---|
| American Fish | Jean George's Steakhouse |
| Sirio Ristorante | Blossom |
| Sage | Julian Serrano |
| Jean Philippe Patisserrie | Jean Philippe Production Kitchen |
| In Room Dining | Lemongrass |
| BARMASA | Shaboo |

If, during the term of this agreement, the Employer permanently closes any of the above named venues, the Employer will notify the Union as to the designation of the replacement venue.

D 00099

## ARIA BANQUET SERVICES FUNCTION GUIDELINES

| # | Function | Definition | Additional Notes | Set-Up | Type |
|---|----------|-----------|------------------|--------|------|
| 1 | Client Banquet Director Catering Director Designated Function | Any function that requires a specific mode of service as directed by client or a service upgrade needed for the function, as long as it does not violate Hotel or Union regulations. | 1) Crossover of service staff is permitted in order to accommodate these requirements. 2) In the event that staffing levels exceed traditional Aria Standards, additional charges may apply. | Varies | Either |
| 2 | Continental Breakfast | Beverages, Breads, Fruit, Pastries, Cereals and Hot Breakfast Sandwiches, Eggs, bacon, oatmeal on Buffet Lines | Designed as self service with stationed food and beverage.  CB can service events with breakfast sandwiches.  CB can only do events with hot food (eggs, bacon, oatmeal) when the guest self serves and goes to a breakout room for meeting while they eat - i.e #7 Food Rooms. | Pockets, racks of flatware or rollups placed on buffet line | CB |
| 3 | Coffee Breaks | Beverages, Pastries, Candy, Snacks, Fruit, etc(without set tables) regardless of location | Designed as self service with stationed food and beverage | Pockets, racks of flatware or rollups placed on buffet line | CB |
| 4 | Meeting Room Functions | Functions that take place in rooms where meeting is taking place as well | Rooms in which a meeting or presentation is taking place where food is also available.  Minimal interruption is imperative | Pockets, racks of flatware or rollups placed on buffet line | CB |
| 5 | Set Table Functions | Any function that requires tables to be partially or fully set with china, glass, silver or napkins. | Also referred to as "full service functions". Traditionally a greater number of servers are required and they remain in the room for the duration of the event. | Tables set according to standards of department or customized specifications. | A-List |
| 6 | Receptions | Typically afternoon or evening functions with displayed, passed or action station food items. Bars are common. Duration of function normally falls within typical guidelines of six hours or less. Seating is not provided for the entire attendance. | These functions require continuous service to attend to room replenish stations, pass and clear drinks and food.  Requires a bartender. | Pockets or racks of flatware, if any, is required. Passed functions may not require flatware | A-List |
| 7 | Food Rooms | Food function rooms related to a meeting group that are separate from the actual meeting room. (This does not apply to food set up in hallway or secondary room with food consumed solely in meeting room.  In such cases, function would be considered a meeting room function - #4). | Food rooms may be utilized as a mixed use room shared by A-List and Coffee Breaks.  Room is considered a destination food outlet. Style of service needs to be determined by requirements laid out by menu - Continental, Lunch, etc. | Varied styles of service setup for these parties | Either |
| 8 | Roll-In Lunches and Dinners | Lunches or Dinners that are set on temporary tables with the intent of entering meeting rooms and the guests consuming food throughout their meeting. | These meals are designed so that groups may continue their meeting as they eat. Minimal service is required so as not to interrupt presentation. | Rolled Silverware | CB |
| 9 | Slot Tournaments | Events that have no table-side service but require servers to remain in room throughout entire function for continued cleanup | These functions require continuous service to attend to room replenish stations and clear drinks and food. Event also requires a bartender | Buffets, flatware on buffets, coffee station, table maintenance on cocktail rounds | A-List |
| 10 | Hospitality | Functions that are intended as "welcome room" or "home base" for guests. Traditionally, these see a flow style of attendance and may run over an extended period to time. | While it is important to have the hospitality room swept consistently, hospitality rooms do not offer passed items or continuous service levels. | Pockets, racks of flatware or rollups placed on buffet line | CB |
| 11 | Box Breakfast or Snack | Intended as "to go" these breaks are designed for guests on the move | Boxed items are considered pre-made and placed out for removal | Flatware is disposable and built into the box | Either |
| 12 | Box Lunch | Boxed items are considered pre-made and placed out for guest pickup.  In the event that boxes are being "built" by the guest, we will need to re-examine the requirements of the group. | For Box Breakfast, Lunch and Snack all events that call for 800 or less "boxes" will be CB and events with 801+ "boxes" will be assigned to A-List without regard to where the event takes place. | Flatware is disposable and built into the box | Either |
| 13 | Front Lobby | Events designed to accommodate departing guests at this location. | Generally, these BEO's provide "to go" coffee and light food items for guests departing our property. | Pockets, racks of flatware or rollups placed on buffet line | CB |
| 14 | Exhibits | Continental Breakfasts or morning breaks throughout room | Designed as self service with stationed food and beverage.  If breakfast consists of more than breakfast sandwiches in the hot food, then the title "Continental" no longer applies and the function would be assigned to the A List. | Pockets, racks of flatware or rollups placed on buffet line | CB |

## ARIA BANQUET SERVICES FUNCTION GUIDELINES

| # | Function | Definition | Additional Notes | Set-Up | Type |
|---|----------|-----------|------------------|--------|------|
| 15 | Exhibits Lunches | Functions that are not Continental Breakfasts (#2) or Coffee Breaks (#3) | Traditionally, service levels need to be higher than Coffee Break level as room needs to be kept clean and clear throughout duration of function. Guests normally have little or no seating or table space, hence the extra attention. | Pockets or racks of flatware (Reception) or rollups for other food functions. Disposable may also be used. | A-List |
| 16 | Office Rooms | Rooms that hold staff and act as a "war room" or "command center" through the duration of the program. | This is often a meeting planner or destination management company. Special attention is usually required. | Any type of setup may be required. These setups may vary with each BEO. | CB |
| 17 | Green Rooms | Rooms housing talent, executives or staff as holding, staging or planning area. | Green rooms may be located in any room within the banquet space. Many times, riders are extensive and require very special attention. On a rare occasion, A-List service is required. | Any type of setup may be required. These setups may vary with each BEO. | CB |
| 18 | Action Stations | Action Station that requires an attendant to service the station such as an Ice-cream Station preparing milk shakes, scooping ice-cream etc. | Every other action station will require a chef attendant i.e. carving station, banana foster station, pasta, omlete station etc. | Any type of setup may be required. These setups may vary with each BEO. | A-List |
| 19 | Restaurants | If a group is hosting an F&B event in one of our fine dining rooms in non-operating hrs, that particular restaurant server will get first rights of refusal | See Article 17.03 | Any type of setup may be required. These setups may vary with each BEO. | A-List |
| 21 | Cash Concessions | Beverages, Pastries, Candy, Snacks, Fruit, etc(without set tables) regardless of location | Designed as self service with stationed food and beverage that require bartenders | Pockets, racks of flatware or rollups placed on buffet line | A-List |
| 22 | Cash Concessions | Beverages, Pastries, Candy, Snacks, Fruit, etc(without set tables) regardless of location | Designed as self service with stationed food and beverage that require no bartenders | Pockets, racks of flatware or rollups placed on buffet line | CB |

D 00101

## SIDE LETTER #1 - BARTENDERS TRAINING PROGRAM

The Employer agrees that all Bartenders hired by the Employer shall have completed the Bartenders Local 165 Joint Apprenticeship Training Program, and passed the craft exam related to that program, so long as in the Employer's sole judgment this results in a sufficient supply of best qualified applicants.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this 17Th day of September, 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO LLC dba ARIA

BY: _____

ITS: _____President_____

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS

BY: _____

ITS:  President

BY: _____

ITS:  Secretary-Treasurer

D 00102

## SIDE LETTER #2 - FRONT SERVICES ATTENDANT POSITIONS

When openings are available in full-time Front Services Attendant positions, after transfers in accordance with Section 20.04(b), two out of every three such openings shall be offered to regular part-time Front Services Attendants, in accordance with Section 10.02 and every third such position shall be offered in order of seniority to regular full-time Baggage Handlers who are qualified for the position. If no Baggage Handler bids, then the position shall be offered to regular part-time Front Services Attendants.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this 17th day of September, 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO LLC dba ARIA

BY: _____

ITS: _____President_____

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS

BY: _____

ITS: ___President___

BY: _____

ITS: ___Secretary-Treasurer___

D 00103

## SIDE LETTER #3 - SURVEILLANCE TAPES

The Union recognized that Employer, upon written request by the Union, will be disclosing to the Union confidential information, including but not limited to surveillance video tapes ("Tape(s)"), which would otherwise not be made available, and which constitutes confidential information belonging to the Employer. The Union agrees to hold all such information in strict confidence and agrees not to communicate or otherwise transmit any such information to others or to use such information for any purpose other than to review the Tape(s) for the sole purpose of resolving a grievance except, however, as may be required by law, or as may be necessary to reveal to a judicial officer. Where at all possible, the tape will be reviewed by the Union at the Employer's place of business.

It is also understood, that the Union will return the Tape(s) to the Employer once the grievance/issue is resolved. Under no circumstances will the Employer release original Tape(s) to the Union. Further, the Union agrees not to copy the Tape(s) provided by Employer without prior written consent of the Employer. The Union will treat the Tape(s) supplied to it by Employer as confidential and shall keep all such Tape(s) in a secured area accessible only to the Union's representatives directly involved with the grievance/issue.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this 17th day of September, 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO
LLC dba ARIA

BY: _____

ITS: PRESIDENT

LOCAL JOINT EXECUTIVE BOARD
OF LAS VEGAS

BY: _____

ITS: President

BY: _____

ITS: Secretary-Treasurer

77
ARIA

D 00104

### SIDE LETTER #5 - 401(K) PLAN

Upon receipt of a copy of a current determination letter from the Internal Revenue Service stating that the Union 401(k) Plan meets the requirements for qualification under Section 410(a) of the Internal Revenue Code, the Employer will begin withholding the amount designated as an elective employee contribution to the 401(k) Plan. Such designation must be properly made by an employee on the payroll deduction authorization and contribution election form supplied by the Union 401(k) Plan for this purpose. Neither the Employer nor the Union shall have any obligation to make any contributions to the Union's 401(k) Plan (including non-elective or matching contributions).

The Union shall be responsible for ensuring that the form and operation of the 401(k) Plan comply with the provisions of applicable law (including the Internal Revenue Code and ERISA). The Union's responsibility with respect to the 401(k) Plan shall include ensuring compliance with the fiduciary responsibility and reporting and disclosure provisions of ERISA and the Internal Revenue Code.

The sole involvement of the Employer with the Union 401(k) Plan, and the only obligation of the Employer thereunder, shall be to withhold the designated contributions from employee's wages and transmit such contributions to the Trustees of the 401(k) Plan. The Employer shall not be required to pay, nor shall the Employer have any obligation or responsibility for, any liability, cost or expense relating to the 401(k) Plan.

The Union shall indemnify, defend and save the Employer harmless against any and all actions, suits, investigations, audits, claims, proceedings, liabilities, damages, fees (including counsel fees), taxes (including interest, penalties or additions to tax), expenses, costs or charges which arise out of, or result from, (1) the form or operation of the Union 401(k) Plan, (2) any action against the Employer relating to the Union 401(k) Plan, other than an action relating to the failure of the Employer to properly deduct elective employee contributions or to timely transmit elective employee contributions to the Trustees of the Union 401(k) Plan, or (3) the Employer's reliance on the payroll deduction authorization and contribution election form submitted to the Employer in connection with the Union 401(k) Plan.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this 27th day of September, 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO
LLC dba ARIA

BY: _____

ITS: ___President___

LOCAL JOINT EXECUTIVE BOARD
OF LAS VEGAS

BY: _____

ITS: ___President___

BY: _____

ITS: ___Secretary-Treasurer___

78
**ARIA**

D 00105

**SIDE LETTER #6 - NEW FOOD AND BEVERAGE VENUE DEVELOPMENT**

The Employer and the Union agree that the development and expansion of innovative and creative food and beverage venues is integral to the Employer's success. Therefore, the Employer commits to maximize opportunities to develop, advance and promote qualified bargaining unit employees, and the Union commits to partnering with the Employer to provide the Employer with the flexibility to develop innovative and creative food and beverage venues, understanding that the Union, the bargaining unit employees and the Employer will all benefit from the Employer's continued success. To that end, the Employer and the Union agree to the following:

1.      **Advance Notice** - The Employer shall provide the Union at least ninety (90) days notice before the opening of a new branded, fine dining or ultra/gaming lounge venue (each a "venue", collectively "venues") located on the Employer's premises, covered by the CBA, provided that if the Employer is unable to provide ninety (90) days notice because the decision to open the outlet is made within ninety (90) days of the opening, it will provide as much notice as possible under the circumstances. Upon the Union's request, the Employer shall meet with the Union to explain the concept, size and expected requirements for employees of the venue. If the Employer intentionally fails to give this required advance notice to the Union, then the remaining provisions of this section shall not apply to the venue and the venue shall be staffed in compliance with all provisions of the parties' CBA.

2.      **Night Clubs and Ultra Lounges** - The provisions of this Side Letter shall not extend to employees working in Night Clubs and, for those employees represented by the Culinary Union, Ultra Lounges. These excluded venues shall be governed by the existing practice of the property where the venue is located, and shall not be governed by Article 9 (Work Shifts, Work Weeks and Overtime), Article 10 (Employee Classification) and Article 20 (Seniority) of the applicable collective bargaining agreement. Bargaining unit employees working in Night Clubs and Culinary Union employees working in Ultra Lounges shall be employed in seniority units, separate and distinct from the rest of the bargaining unit. Employees represented by the Bartenders Union, Local 165 who work in Ultra Lounges will be covered by the terms of this Side Letter.

3.      **Hiring Flexibility** - During the duration of the new collective bargaining agreement, the Employer may hire Food & Beverage employees for any venue covered by this side letter (excluding Night Clubs and certain employees in Ultra Lounges as noted above in paragraph 2) from any source, without regard to Article 20, for positions up to 30% (thirty percent) of the tipped bargaining unit positions and 30% (thirty percent) of the non-tipped bargaining unit positions in each such venue (calculated on opening and annually thereafter). The remaining 70% (seventy percent) will be hired through bidding by existing bargaining unit employees, provided they meet the qualification standards required by each venue (including testing, evaluation and interviews as provided in this Side Letter). The Employer may if it chooses fill more than seventy percent (70%) of the positions in the group of non-tipped classifications through bidding by bargaining unit employees, but that imbalance may not be used to offset an imbalance in the group of

D 00106

tipped classifications in favor of employees from outside the bargaining unit and vice versa. If there is not a sufficient supply of qualified candidates among existing bargaining unit members, the Employer may fill the remaining portion of the 70% (seventy percent) with employees from any source, including outside and non-bargaining unit employees. While the Employer is committed to maximizing opportunities for current bargaining unit employees, the provisions contained in this Agreement, including Paragraphs 5 and 6, shall not be interpreted as limiting the Employer's ability to utilize the 30% hiring flexibility provided for in this Paragraph 3.

4.    **Notification of Job Opportunities** - Informational postings shall be posted throughout the Employer's premises in all locations where the Employer usually posts notices for bargaining unit employees. The postings will indicate the available job vacancies including the title of the positions, the duties and responsibilities of the position and a summary of qualifications applicants are required to possess. The postings will include prominently the fact that bidders will be required to pass a test given at the conclusion of the seven day study period.

5.    **Replacement Venues Opportunities** - When the Employer replaces an existing venue with a new fine dining, ultra/gaming lounge or branded venue, each employee working in the existing venue at the time of the closure will be provided with an opportunity to train to become qualified to work in the new venue. Provided that the replacement venue is similar in operations and in nature to the prior venue, incumbent employees (those employed in the previous venue at the time of its closure) shall receive priority consideration over current bargaining unit employees for work in the new venue and shall be offered the opportunity to bid into that venue before those opportunities are made available to other current bargaining unit employees. Shifts and stations shall be awarded in accordance with Paragraph 8 of this Agreement.

6.    **New Venues Opportunities** - The Employer will conduct bidding for bargaining unit positions in new venues in accordance with the agreed-upon interpretations of the provisions of the collective bargaining agreement of the property. Shifts and stations shall be awarded in accordance with Paragraph 8 of this Agreement.

7.    **Seniority and Retention** – Bargaining unit employees, who move to a venue not operated by the Employer, shall receive credit for service in the bargaining unit for all purposes, based on the practice of the property where the venue is located.

Bargaining unit employees who move to a venue not operated by the Employer, and subsequently return to other positions within the bargaining unit for which they are qualified shall have their house seniority and classification seniority honored based on the practice of the property where the venue is located.

Employees who move to a venue not operated by the Employer, and subsequently are notified of a lay off, may use their house seniority, based on the agreed upon interpretations of the provisions of the collective bargaining agreement of the property

D 00107

where the venue is located, to fill a position for which they are qualified, in order to avoid layoff.

8.     **Special Provision for New F & B Venues** - During the first 90 days following the official opening date of a new F & B venue, the Employer may assign shifts and stations according to its discretion; provided that the existing bargaining unit employees who transfer into the venue from fulltime positions must be scheduled first for fulltime positions in seniority order in the venue, to the extent fulltime positions are available. Eighty days after the opening date, all shifts and stations shall be put up for bid and the resulting successful bids shall be effective as of the 91st day following opening.

The Employer shall have the right to combine existing classifications (including but not limited to Bartenders serving food), and to determine qualifications for each. If a new classification is needed in order to meet the service standards of the new venue, the Employer and the Union shall meet to negotiate said position and wage rate.

9.     **Testing** - The Employer may administer testing for qualifications to fill positions, as follows:

All applicants shall be subjected to the same testing, with the same standards for passing, before their applications are given final consideration.

Publications about the venue will be made available to potential bidders to give them a clear understanding of the style and standard of service for this venue so they can make an informed decision about whether to bid. Upon request by the bidder, the Employer will provide study materials to aid in their testing preparation. These materials may include items required to pass the test including required skills, service standards and any other items with the exception of general knowledge that employees in the classification are reasonably expected to have. The tests shall be administered no sooner than seven days from the close of bidding in order to give bidders adequate time to study. The bid sheet will include prominently the fact that bidders will be required to pass a test given at the conclusion of the study period.

If special skills are required of any bargaining unit employees (including, but not limited to, Bartenders), the Employer will make available a training program well in advance of the skills being added to job duties in existing and/or new job classifications. The training will be offered for pre-opening vacancies only.

Positions will be awarded in order of seniority to bidders who have passed the tests, regardless of their respective test scores, and by lottery where seniority is the same.

The Union will be entitled to:
Upon request, seven working days prior to testing or in order to address concerns raised after the completion of testing in accordance with Article 21.02, written copies of: (a) assessment methods, (b) subjective evaluations (c) ratings, (d) performance, skill based or other testing, test results and (e) any other criteria that the Employer uses to determine the

D 00108

qualifications of applicants, all of which [(a) through (e)] must be sufficiently transparent and detailed to allow for an objective examination under the CBA. The Employer agrees to preserve such records in accordance with applicable laws, for a minimum of six months.

Inspect all records of the testing, evaluation and bidding process.

Within five working days of being notified of the test results, the opportunity to discuss any concerns that the Union may have with the test methods and/or results, prior to the results being published.

10.     This Side Letter controls where it conflicts with the CBA.  Nothing contained in this Side Letter shall be interpreted as triggering any obligation on the part of the Employer to negotiate modifications to any current agreements or memoranda of understanding between the Union and the Employer regarding food and/or beverage outlets (each of which is listed in Exhibit Q attached) and the parties agree that all such outlet memoranda and agreements shall continue in full force and effect for the duration of the new contract.  In addition, the parties agree that certain of the Employer's properties have room seniority for certain food and beverage outlets and that said room seniority shall continue for the duration of the new contract, based on the practice of the property.

11.     The Employer shall require as part of its agreement with third party food & beverage operators covered by this side letter, that the entity's management personnel responsible for the direction of bargaining unit employees or human or labor relations with respect to that venue, to participate in an annual review/training of the provisions of the collective bargaining agreement

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this 17ᵗʰ day of September, 2010 in Clark County, State of Nevada.


EMPLOYER – CITYCENTER HOTEL CASINO LLC dba ARIA

BY: _____

ITS:   PRESIDENT


LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS

BY: _____

ITS:   President

BY: _____

ITS:   Secretary-Treasurer

D 00109

## SIDE LETTER #7 - SOMMELIER TRAINING

Requests for Leaves of Absence or Vacations for the purposes of Sommelier training and/or education shall not be unreasonably denied.

The Employer shall reimburse related costs up to two hundred dollars ($200.00) per calendar year, effective 1/1/10 provided that the training and/or education is sponsored by The Court of Master Sommeliers or a recognized trade wine event and proper documentation of attendance and receipts for reimbursement are presented.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this 17ᵀᴴ day of September 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO LLC dba ARIA

BY: _____

ITS: PRESIDENT

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS

BY: _____

ITS: President

BY: _____

ITS: Secretary-Treasurer

D 00110

## SIDE LETTER # 8 TESTING FOR PROMOTIONAL BIDDING

The Employer may administer testing to determine whether an employee bidding on a promotional opportunity as provided for in 20.04 has the qualifications and ability to perform satisfactorily the work .

All bidders/applicants shall be subjected to the same testing, with the same standards for passing, before their bids/applications are given final consideration.

Publications about the venue will be made available to potential bidders to give them a clear understanding of the style and standard of service for this venue so they can make an informed decision about whether to bid.  Upon request by the bidder, the Employer will provide study materials to aid in their testing preparation.  These materials may include items required to pass the test including required skills, service standards and any other items with the exception of general knowledge that employees in the classification are reasonably expected to have.  The tests shall be administered no sooner than seven days from the close of bidding in order to give bidders adequate time to study.  The bid sheet will include prominently the fact that bidders will be required to pass a test given at the conclusion of the study period.

Positions will be awarded in order of seniority to bidders who have passed the tests, regardless of their respective test scores, and by lottery where seniority is the same.

The Union will be entitled to:  Upon request, seven working days prior to testing or in order to address concerns raised after the completion of testing in accordance with Article 21.02, written copies of: (a)    assessment methods, (b) subjective evaluations (c) ratings, (d) performance, skill based or other testing, test results and (e) any other criteria that the Employer uses to determine the qualifications of applicants, all of which [(a) through (e)] must be sufficiently transparent and detailed to allow for an objective examination under the CBA. The Employer agrees to preserve such records in accordance with applicable laws, for a minimum of six months.

Inspect all records of the testing, evaluation and bidding process.

Within five working days of being notified of the test results, the opportunity to discuss any concerns that the Union may have with the test methods and/or results, prior to the results being published.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this 17ᵗʰ day of October 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO LLC dba ARIA

BY: _____

ITS: _____ PRESIDENT _____

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS

BY: _____

ITS: _____ President _____

BY: _____

ITS: _____ Secretary-Treasurer _____

84
ARIA

## SIDE LETTER # 9 ALTERNATIVE DISPUTE RESOLUTION PROCESS

The Parties recognize that there exists a mutual concern regarding the prompt, efficient and effective resolution of arbitration matters related to discipline and/or termination matters. The Parties agree, therefore, to implement program ("Program") designed to facilitate early presentation of arbitration matters to a neutral party for evaluation and resolution. However, the Parties both understand and agree that this Program is not intended as a substitute for early resolution of grievance matters through the Step One Process and/or the Board of Adjustment ("BOA") process. Rather, it is intended to provide a procedure whereby the Parties are able to obtain a timely resolution of certain grievances.

### A.   Coverage.

A grievance challenging disciplinary action or termination issued to an employee, that is not resolved through the Step One or BOA processes, may be subject to the Program. A grievance meeting the criteria set forth in this paragraph herein may be submitted to the Program if a timely demand for arbitration is made by the Party who filed the grievance and use of this Program is indicated in the demand.

The non-filing Party may object to the submission of the grievance to the Program, by providing written notice to the other Party within twenty (20) calendar days of the receipt of the demand for arbitration. In such event, the grievance shall proceed under Section 21.03 of this Article.

### B.   Structure of the Program.

The Parties shall submit the grievance to a three person panel for a final and binding decision.

#### 1.   Panel and Hearing Dates.

A panel of three (3) persons shall be established ("Panel"). One member of the Panel shall be selected by each Party. The person selected by each Party shall hold a high level position with their organization, shall commit to participate in the Program for the entire period of the Program, and shall be given full authority to act as a neutral decision maker relative to any grievance presented to the Panel. The third member of the Panel shall be the Panel Chairperson and shall be selected jointly by the Parties. The Parties will share equally in the costs associated with engagement of the Panel Chairperson. The Panel Chairperson shall be a member of the National Academy of Arbitrators and shall be someone who agrees to serve as the Panel Chairperson for the entire period of the Program.

D 00112

Each month, the Parties will select up to two consecutive days (based upon the number of grievances) on which the Panel will hear cases covered by the Program.

2.    **Presentation of Cases.**

a.    Scheduling of Cases.  The Panel representatives for the Parties shall work together to identify the cases which are ready for presentation to the Panel and shall create the monthly agenda of cases.

b.    Exchange of Written Materials and Information.

One week prior to the monthly hearing date the Parties shall exchange the following:

–    all written documentation which they anticipate presenting to the Panel for each case scheduled to be heard by the Panel; and

–    a list of witnesses each Party anticipates it will present at the hearing.

If one Party objects to the use of an identified document, it shall notify the other Party immediately and the Parties shall attempt to resolve such dispute prior to the date of the hearing.  If the Parties are unable to resolve such dispute, the Parties shall present the dispute to the Panel and the Panel shall have the authority to determine whether such document may be used during the Panel Hearing.

The Panel Chairperson shall have the authority to issue subpoenas (at the request of either party) requiring production of documents or other information and requiring witnesses to appear for the Panel hearing.

c.    Opening Statements.

The Parties shall each have an opportunity to present an opening statement to the Panel.  The Company shall present first, followed by the Union, unless a different order of presentation is requested by the Panel.

During opening statements the Union and Employer representatives shall identify those persons who may offer relevant testimony and are available to testify before the Panel.  The Panel shall identify those witnesses which it wishes to have testify and in what order. Witnesses will be questioned by the Parties, but shall be allowed to provide testimony in narrative form.  All Panel members shall be allowed to ask questions of the witnesses and each Party's representative shall also

D 00113

be provided with an opportunity to ask questions of the witness, following their initial testimony.

    d.    <u>Panel Assessment.</u>

Once the Panel has determined that all witnesses and other information has been provided to it, the case will be submitted to the Panel for evaluation and decision. All panel deliberations and individual panelists' decisions shall be absolutely confidential. The Panel shall determine the outcome of the case. The decision shall be made by a majority vote of the panelists. The Panel Chairperson shall prepare a draft of a written decision on each case and forward the draft to the two other panelists for review and comment. Within two (2) weeks of the presentation to the panel, a single decision will be issued to the Parties and no dissenting opinion or comment will be made or issued. Decisions issued by the Panel will not be published and will not be considered to be precedent setting.

**3.**     **Participants.**

Union presentations shall be conducted by Union Grievance Specialists and/or Stewards. Employer presentations shall be conducted by Human Resources/Labor Relations personnel, operational or management personnel. Attorneys and other legal representatives will not be used by either Party to conduct the presentation of its case. However, nothing in this paragraph is intended to limit or restrict the right of either Party to seek legal assistance in the preparation of its presentation. The Parties agree and understand that during the first six (6) months of the Program the Parties may elect to have legal assistance during the Panel hearing.

**4.**     **Procedures.**

Prior to the presentation to the Panel, the Parties will discuss and prepare a joint submission of documents to the Panel which will include (but is not necessarily limited to) a copy of the Collective Bargaining Agreement (or all relevant provisions), a copy of any Step One and/or Step Two documentation, a copy of the discipline(s) or termination challenged and a copy of any statements relied upon by the Employer in making its decision.

The Parties may use documentary and/or demonstrative evidence in the presentation of cases, including but not limited to copies of personnel and/or disciplinary records, policies and procedures, correspondence between the Employer and the Union, statements, investigative records and/or grievance process records, video tapes or other records which relate to the case presented. The only objection which is properly made to the presentation of such

D 00114

documentation is that a document is not authentic or is not appropriately presented under a provision of the Collective Bargaining Agreement. If a dispute arises regarding the presentation of evidence, such dispute shall be resolved by the Panel Chairperson.

5.    **Decision by Panel.**

The Panel's decision shall be final and binding on both Parties.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this _17th_ day of _September_ 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO LLC dba ARIA

BY: _____

ITS: _____PRESIDENT_____

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS

BY: _____

ITS: _____President_____

BY: _____

ITS: _____Secretary-Treasurer_____

D 00115

## MEMORANDUM OF AGREEMENT

This Agreement is made and entered into by and between the ARIA (hereinafter called the "Employer"), and the LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS for and on behalf of the CULINARY WORKERS UNION, LOCAL 226, and BARTENDERS UNION, LOCAL 165 (hereinafter called the "Union"), and is hereby attached to and made a part of the Collective Bargaining Agreement(s) between those parties.

The parties hereby establish the following procedure for the purpose of ensuring an orderly environment for the exercise by the Employer's employees of their rights under Section 7 of the National Labor Relations Act and to avoid picketing and/or other economic action directed at the Employer in the event the Union decides to conduct an organizing campaign at any operation (at which the Union does not have representation rights) owned and operated by the Employer covered by Section 28.01 of the above referenced agreements between the parties among employees employed in classifications listed in Exhibit 1 of such agreements.

The parties mutually recognize that national labor law guarantees employees the right to form or select any labor organization to act as the employees' exclusive bargaining representative for the purpose of collective bargaining with the Employer, or to refrain from such activity.

The Employer will take a neutral approach to unionization of employees employed in classifications listed in Exhibit 1 of the agreements between the parties. Within ten (10) days following receipt of written notice from the Union of its intent to organize employees employed in classifications listed in Exhibit 1 of the agreements between the parties, the Employer will inform such employees that it has no objection to their selection of a collective bargaining agent. The Employer will not take any action nor make any statement that will directly or indirectly state or imply to such employees any opposition by the Employer to the selection by such employees of a collective bargaining agent, or preference for or opposition to any particular union as a bargaining agent.

The Union and its representatives will not coerce or threaten any employee of the Employer in an effort to obtain authorization cards.

Within ten (10) days following receipt of a written request from the Union, the Employer will furnish the Union with the following information with respect to employees of the Employer currently represented by the Union.

     (a)     Name.
     (b)     Current Address.
     (c)     Current Department.
     (d)     Current Job Classification.
     (e)     Whether the employee has given formal notice of intent to terminate his/her employment relationship at ARIA.

Upon request, the Employer will update this information monthly.

The Union may request recognition as the exclusive bargaining agent for the employees in the traditional bargaining unit represented by the Union in the hotel-casino industry in Las Vegas. A disinterested, neutral party mutually satisfactory to the Employer and the Union will be selected to conduct a review of employees authorization cards and membership information submitted by

D 00116

the Union in support of its claim to represent a majority of the employees in the unit. If a majority of employees within the unit has joined the Union or designated it as their exclusive collective bargaining representative, the Employer will recognize the Union as such representative of the employees and will extend to such employees this Collective Bargaining Agreement between the Union and the Employer together with any amendments agreed to by the parties. The Employer will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this agreement.

During the life of this Agreement, the Union will not engage in picketing or other economic activity at any operation covered by this Section, provided that if the Employer recognizes any union as the exclusive collective bargaining representative of employees in the unit, or any part thereof, traditionally represented by the Union, this paragraph shall terminate immediately and without notice. It is expressly agreed and understood that this Memorandum of Agreement, which shall expire at 12:01 a.m., May 31, 2012, shall be inapplicable to any operation of the Employer in Laughlin, Nevada or elsewhere outside of greater Las Vegas.

The parties agree that any disputes over the interpretation or application of this Section shall be submitted to expedited arbitration in the manner provided in Subparagraph 3 (b) of Section 21.03 of the agreements between the parties, with Gerald McKay of Hillsborough, California, or any other person mutually acceptable to the parties, as the arbitrator. If agreement cannot be reached on the selection of an arbitrator, the parties will request that the American Arbitration Association provide them with a panel of seven (7) arbitrators who are members of the National Academy of Arbitrators from which to select the arbitrator in accordance with the Association's standard procedures for expedited hearings. The arbitrator shall have the authority to order the non-compliant party to comply with this Section.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this _17th_ day of _September_, 2010 in Clark County, State of Nevada.

EMPLOYER – CITYCENTER HOTEL CASINO
LLC dba ARIA

BY: _____

ITS: _____PRESIDENT_____

LOCAL JOINT EXECUTIVE BOARD
OF LAS VEGAS

BY: _____

ITS: _____President_____

BY: _____

ITS: _____Secretary-Treasurer_____

90
**ARIA**

Exhibit B

*Luxor*

# POOL AGREEMENT

When the Pool opens each season, the employees having exclusive rights to the pool area will fill the positions. Exclusive rights are defined as being the first employee to transfer to the Pool area in the spring with choice of shift and station and the employee able to return to the steady extra board at the end of the season.

Vacancies for Bartenders in the Pool area shall be posted in accordance with Section 20.04(b) of the collective bargaining agreement. Employees transferring under this Section shall abide by the following procedure:

- The employee will have exclusive rights behind the aforementioned employees.
- Employees with exclusive rights to the Pool shall be obligated to return to the Pool each season unless they have accepted another position through the normal bidding process in accordance with Section 20.04(b) of the collective bargaining agreement. Until March 1, 2010, the six-month "lock" under Section 20.04(b) shall not apply to any employee who transfers to the Pool. After March 1, 2010, employees who fill pool positions shall lose their full time status and be subject to the "lock". Time since their last transfer to the Pool before that date shall be counted towards the "lock" as well as time after that date.
- At the end of the Pool season, those employees will return to the steady extra board in order of their steady extra board seniority. Their steady extra board seniority shall be defined as the date they transferred to the Pool area.
- Any remaining Pool shifts not filled by regular employees shall then be offered to steady extra board employees, provided that the Employer need not offer regular pool shifts (as opposed to extra work at the pool) to more than 50% of the employees on the respective steady extra boards. The scheduling of all remaining Pool shifts will follow the guidelines established for the steady extra board.
- Those steady extra board employees working at the pool will retain exclusive rights to the Pool.

When an employee transfers out of the Pool through the normal bidding process, he or she shall lose his or her exclusive rights to return to the Pool the following season.

Stations for Bartenders shall be posted for bid once the Pool is fully opened and the Employer has assessed which bars will be open on a regular basis.

Starting no earlier than January for each upcoming pool season, the Employer may supplement the staffing of Bartenders at the Pool by hiring new employees in these classifications after all regular and steady extra employees have been given the opportunity to bid for Pool assignments. The new employees may be assigned to the steady extra boards as they are hired. They shall be placed at the bottom of the steady extra boards by hire date and lottery numbers for those with the same hire dates. Former regular and steady extra employees shall not be transferred involuntarily from Pool assignments as long as new employees have Pool assignments. New employees hired for the pool season shall be placed at the bottom of the inside steady extra board by hire date and lottery numbers for those with the same hire dates.

D 00171

FOR THE EMPLOYER:

RAMPARTS, INC. dba LUXOR
HOTEL/CASINO

By _____

Its: Employee Relations Director

FOR THE UNION: Local 165

LOCAL JOINT EXECUTIVE BOARD OF
LAS VEGAS

By: _____

Its: Sec. Tres.

By: 8/10/09

Its: _____

Exhibit C

## MEMORANDUM OF AGREEMENT

### THE BEACH POOL AGREEMENT

This Memorandum of Agreement (the "Agreement") is entered into this 24TH day of February 2011, by and between Mandalay Bay Resort and Casino (hereinafter called the "Employer" or "Mandalay Bay") and Bartenders Union Local No. 165 (hereinafter called the "Union").

This Memorandum of Agreement sets forth the relationship between Employer and the Union in recognition of the fact that the Employer operates "The Beach," a specialty pool complex at its premises at 3950 Las Vegas Blvd. South, Las Vegas Nevada ("Property"). The Employer and the Union are parties to a currently effective collective bargaining agreement (hereinafter referred to as the "Labor Agreement"), which contains provisions relating to such operations at the Property, which shall be modified as set forth in this Agreement.

I.    **Beach Overview.**

A.    **Overview.**

The Beach is an 11.5 acre pool complex consisting of 6 pools. Employer operates the following venues within The Beach: The Beach Bar and Grill, the Beach Casino Bar, Snack Shack, South Lagoon, Bikini Bar. Employer also provides Food and Beverage service to guest Cabanas and to guests in the chairs on the deck (collectively, "The Beach Operations").

B.    **ONE Bar.**

The ONE Bar (formerly known as the Bambu Bar) will be merged with The Beach Operations and henceforth shall be subject to the terms of this Agreement. Existing staff in the ONE Bar will retain their current seniority.

C.    **Moorea.**

All positions that service Moorea, our European Day Club, shall be exempt from this Agreement and continue to be staffed on a seasonal basis.

II.   **Promotion and Hiring of Employees.**

A.    **General Staffing.**

This Agreement solely addresses staffing of the Bartender and Apprentice Bartender classifications in The Beach. The Employer reserves the right to review other classifications in The Beach at a later date for inclusion into this Agreement.

1

1.     **Initial staffing for 2011 season.**

For the initial season of this Agreement, Apprentice Bartenders and Bartenders will establish exclusive rights to The Beach. Exclusive rights will be established via classification bid sheets that will be posted for exclusive rights to The Beach in future seasons. In the event that Full Time staff does not bid on all available exclusive rights bids to The Beach, Employer will open the bids to the Casino steady extra boards for Apprentice Bartender and Bartender; provided, however, that the Employer need not offer regular shifts at The Beach (as opposed to extra work at The Beach) to more than 50% of the employees on the respective steady extra boards. The scheduling of all remaining shifts for The Beach Operations will follow the existing guidelines established for the steady extra board..

During pre-opening training for the initial pool season, Bartenders and Apprentice Bartenders with exclusive rights will pick their seasonal assignment in order of pool exclusive rights seniority.

2.     **Staffing for future seasons.**

For each future season, Employees who have exclusive rights to The Beach Operations will choose their shift and station in order of their exclusive rights seniority during the training period for The Beach opening.

During in the initial 2011 season and for all subsequent seasons, any vacancies for Bartenders and Apprentice Bartenders in The Beach remaining after Employees with exclusive rights select their shift and station, shall be posted in accordance with Section 20.04(b) of the Labor Agreement. These employees will obtain exclusive rights subordinate to the employees mentioned above. Bartenders and Apprentice Bartenders that establish exclusive rights to the pool after the initial group will establish seniority numbers below the initial group in the order that they establish exclusive rights. Bartenders and Apprentice Bartenders that establish exclusive rights to the pool will establish seniority on the steady extra board in the Casino by getting a slot on the bottom of the steady extra board assigned the day exclusive rights are established for The Beach.

Starting no earlier than January for each upcoming season, the Employer may supplement the staffing of Bartenders at The Beach by hiring new employees in these classifications after all regular and steady extra employees have been given the opportunity to bid for assignments in The Beach. The new employees may be assigned to the steady extra boards as they are hired. New employees hired for the pool season shall be placed at the bottom of the Casino steady extra board by hire date and lottery numbers for those with the same hire dates.

3.     **Procedures applicable to all Employees transferring to The Beach under this Section.**

* Full Time and Steady Extra staff will relinquish rights to their existing seniority spot on the full time or steady extra board, and be assigned a seniority date based upon the date they originally transferred to The Beach. An employee's full time

2

D 00174

classification seniority number or steady extra board seniority number will be used for the purposes of a tie breaker.

- Employees with exclusive rights shall return to the Casino steady extra board at the end of The Beach season. The most senior Bartender and Apprentice Bartender with exclusive rights will be assigned to The Beach first and return to the Casino steady extra board for Bartenders and Apprentice Bartenders last.
- During the wind up and wind down periods of The Beach, Bartender and Apprentice Bartender shifts may need to be adjusted based on staffing. In the event of inclement weather or temporary declines in business during the season, the least senior Bartender and/or Apprentice Bartender will return back to their slot on the Casino steady extra board until such time that they can be reactivated.
- At the end of The Beach season, those employees will return to the steady extra board in order of their steady extra board seniority.
- Employees accepting a spot with exclusive rights for The Beach shall be required to observe the six-month "lock" under Section 20.04(b).
- Bartenders and Apprentice Bartenders with exclusive rights are eligible after the initial 6 month lock period to accept promotional full time shifts through the normal bidding process in accordance with Section 20.04(b) of the Labor Agreement. In the event that an employee accepts a regular full time shift inside the property after accepting exclusive rights to The Beach, then the employee will reestablish classification seniority based on the first day worked of the new full time shift. When an employee transfers out of The Beach through the normal bidding process, he or she shall lose his or her exclusive rights to return to The Beach the following season.
- Employees with exclusive rights to The Beach shall be obligated to return to The Beach each season.

## B.  Steady Extras.

The Company shall expand the Casino steady extra board for Bartender and Apprentice Bartender positions to accommodate the off season provision of this Agreement.

## III.  Qualifications and Training Positions.

## A.  Qualifications

In order to be qualified to hold a position in the Beach an employee shall meet each of the following requirements.

1.  Fully participate in and successfully complete the Employer's required training program.

2.  Pass all auditions, tests (oral and written) and interviews administered as part of the training program.

3.  Pass all demonstrative skills tests established by the Employer.

3

D 00175

4.      Demonstrate the required knowledge and language skills to discuss in detail any question regarding the menu, the property, and the venue.

The Employer has the sole discretion to determine: (i) whether an employee has satisfactorily participated in and completed the training program; (ii) whether an employee has successfully passed all auditions, tests and interviews; (iii) whether an employee has successfully passed all demonstrative skills tests; and (iv) whether the employee has demonstrated the requisite knowledge and language skills.  Such determinations shall be exercised in good faith.

## B.   Training

Employees must be able to attend and pass a comprehensive training program to master fundamental concepts of bartending and pool based cocktails for the first initial season that an employee goes out to The Beach.  Ongoing training will occur, which is including but not limited to successive season openings, closings, and training during the regular seasonal operation.  However, it is understood that employees that have passed the initial training period will not be subject to removal from The Beach for difficulties in mastering future training concepts; provided, that any material change in job duties and responsibilities will be worked out with the Union at that time.  Employees who have difficulties with future training initiatives will be subject to the progressive disciplinary process.

Employees shall be paid for their training time.  In advance of the training, the Employer will share with the Union the criteria that it anticipates will be used for judging the aptitude and qualifications of those taking the training and the anticipated methods for compiling the results of the training and rating of applicant performance in training and/or testing.  Upon request of the Union, Mandalay Bay shall meet with the Union to discuss and in good faith consider any concerns or disagreements the Union may have with such criteria and methods and, where it believes appropriate, modify the criteria and methods to address these concerns, provided, however, that the Employer retains the discretion to make the final determination as to the criteria and methods, such discretion to be exercised in a reasonable and lawful manner.  The Union will be entitled to inspect all of the records of the training, including any evaluations or rating forms, and, upon request of the Union, the Employer will meet to discuss any disagreements the Union has with the Employer's tentative selections for the positions.  The Employer shall in good faith consider all such disagreements and, where it believes appropriate, modify its tentative selections to address the Union's concerns provided, however, that the Employer retains the sole and exclusive authority to make final determinations as to the selections, subject to the grievance and arbitration procedure, such authority not to be exercised arbitrarily.  Any subsequent hiring into The Beach positions shall be subject to the grievance and arbitration procedure provided under the Labor Agreement.

## IV.   Assessment Period.

Employees selected for a position in The Beach shall be provided with a thirty (30) shift assessment period.  If, during that period, the Employer determines that the employee

4

cannot perform the work in satisfactory manner, pursuant to Article 20.04(b) of the Labor Agreement, the employee shall be transferred back to his/her former job, shift and station and requisite seniorities. Similarly, due to the unique nature of this Agreement, for the initial 2011 season only, a one time exception is made in that if the employee determines that he or she does not wish to remain in The Beach, within thirty (30) shifts after the date of transfer to The Beach he or she shall advise the Employer and shall be transferred back to his/her former job, shift and station. The Employer agrees not to permanently fill the vacancy until the completion of the 30 shifts from the date of transfer.

## V.   **Banquets/Special Events.**

### A.   **Banquet Events.**

All evening banquet operations at The Beach will be staffed and managed by the Banquet Beverage Department. A banquet event is an event that occurs after the regularly scheduled close of The Beach to guests and coordinated through a Banquet Event Order. Banquet Bartenders scheduled for banquet/special events will not be eligible for pop-up Banquet Event Orders. Pop-up orders will be offered to the next available Steady Extra Banquet Bartender. In the event that Banquet Bartenders are not available to work the special pool events, the portable bars will be offered to the Steady Extra Casino Bartenders first and then to The Beach Bartenders.

### B.   **Beach Concerts.**

Beach Concerts and special events in the evening operated by the Beach Management Team will be staffed in the same manner as Beach Concerts. Any portable bars staffed during Beach Concerts or special events will be staffed by Banquet Beverage. All permanent bar locations during Beach Concerts will be staffed by Beach Bartenders. All specialty kiosks, i.e. beer carts and tasting tables for Beach Concerts and daytime operations will continue to be staffed by cocktail servers based on past practice.

MANADALAY CORP.
DBA MANDALAY BAY RESORT & CASINO

By _Laura L. Leo_

Its _VP of HR_

Date _2/28/11_

LOCAL JOINT EXECUTIVE
BOARD OF LAS VEGAS

By _____

Its _PRESIDENT_

Date _2-24-11_

By _____

Its _Secretary Treasurer_

Date _2-24-11_

5

Exhibit D



### SIDE LETTER #8

### POOL AGREEMENT

When the Pool opens each season, the employees having exclusive rights to the pool area will fill the positions. Exclusive rights are defined as being the first employee to transfer to the Pool area in the spring with choice of shift and station and the employee able to return to the On-Call board at the end of the season.

Vacancies for Bartenders, Bar Backs, Bar Porters and Cocktail Servers in the Pool area shall be posted in accordance with Article 7.04 of this Agreement. Employees transferring under this Section shall abide by the following procedure:

- The employee will immediately lose his or her Full-Time seniority number.
- The employee will give up his or her Full-Time status and become a Full-Time Flex employee.
- The employee will have exclusive rights behind the aforementioned employees.
- Employees with exclusive rights to the Pool shall be obligated to return to the Pool each season unless they have accepted another position through the normal bidding process in accordance with Article 7.04 of this Agreement.
- At the end of the Pool season, those employees will return to the On-Call Board in order of their On-Call Board seniority. Their On-Call Board seniority shall be defined as the date they relinquished their Full-Time status and transferred to the Pool area.
- Any remaining Pool shifts not filled by Full-Time employees shall then be offered to On-Call Board employees, provided that the Employer need not offer regular pool shifts (as opposed to extra work at the pool) to more than 50% of the employees on the respective On-Call boards. The scheduling of all remaining Pool shifts will follow the guidelines established for the On-Call Board.
- Those On-Call Board employees will not retain exclusive rights to the Pool.

When an employee transfers out of the Pool through the normal bidding process, he or she shall lose his or her exclusive rights to return to the Pool the following season.

Stations for Bartenders shall be posted for bid once the Pool is fully opened and the Employer has assessed which bars will be open on a regular basis.

Stations for Cocktail Servers shall be rotated equitably on a daily basis.

Starting no earlier than January for each upcoming pool season, the Employer may supplement the staffing of Bartenders, Bar Backs, Bar Porters and Cocktail Servers at the Pool by hiring new employees in these classifications after all Full-Time and On-Call employees have been given the opportunity to bid for Pool assignments. The new employees may be assigned to the On-Call boards as they are hired. They shall be placed at the bottom of the On-Call boards by hire date and lottery numbers for those with the same hire dates. The hiring of these new employees shall not be subject to the normal 75%/25% ratio of Full-Time to On-Call employees but as of the following October 1, at the latest, that ratio shall be restored. As of that October 1, the new hires shall be separated (inversely by hire date and lottery numbers for those with the same hire dates) except to

D 00178

fill vacancies at the Pool or on the On-Call board.  Former Full-Time and On-Call employees shall not be transferred involuntarily from Pool assignments as long as new employees have Pool assignments.  New employees hired for one pool season shall have priority to be rehired as new employees for the next pool season.

In Witness Whereof, the parties hereto, by their duly-designated representatives, have hereunto set their hands this 24th day of February, 2011, in Clark County, State of Nevada.

FOR THE EMPLOYER:                          FOR THE UNION:

MGM GRAND HOTEL, LLC.                       LOCAL JOINT EXECUTIVE BOARD OF
                                            LAS VEGAS

By: _____              By: _____

Its: _____Presirent_____                   Its: _____PRESIDENT_____

                                           By: _____

                                           Its: _Secretary TREASURER_

D 00179

Exhibit E

## MEMORANDUM OF AGREEMENT

Memorandum of Agreement (the "MOA") is entered into this 4th day of January, 2013, by and between Victoria Partners dba Monte Carlo Resort and Casino ("Employer") and the Bartenders Union Local 165 (the "Union").

WHEREAS, the Employer and the Union are parties to a currently effective Collective Bargaining Agreement (the "Agreement");

WHEREAS, the Employer and the Union have agreed to a process for such pool bartenders to return to the steady extra board at the end of each pool season without losing their place on the steady extra board;

THEREFORE, this MOA sets forth the process for pool bartenders to return to the steady extra board at the end of each pool season. This MOA shall control with respect to any provision where the MOA and the Agreement are in conflict. Accordingly, Employer and Union agree as follows:

1.  Prior to the opening of the Monte Carlo pool for the 2013 pool season, the Employer shall post bid sheets for pool bartender positions. These pool bartenders will be classified as "Pool Bartenders" and covered by all applicable provisions of the Agreement. Pool Bartenders will work at the Monte Carlo pool each pool season. The "pool season" will be determined by the Employer in its sole discretion, the duration of which may be subject to weather conditions and/or business levels.

2.  At the beginning of the 2013 pool season, the Pool Bartenders shall be placed on the bottom of the steady extra board, in accordance with their house seniority.

3.  Each pool season thereafter, the Pool Bartenders shall return to the Monte Carlo pool for the duration of the pool season. At the end of each pool season, the Pool Bartenders shall then return to the steady extra board in the order they were on the date they returned to the Monte Carlo pool.

4.  Pool Bartenders shall have the option to place themselves on the "unavailable for work" list during the non-pool season for one (1) calendar month at a time. However, Pool Bartenders must be available to work on New Year's Eve and Superbowl Weekend. Pool Bartenders are not permitted to take any vacation time during the pool season (except in cases of emergency).

5.  Any Steady Extra Bartender who successfully bids on a seasonal Bartender position at the Monte Carlo pool shall be returned to the bottom of the steady extra board, in accordance with their house seniority.

**MEMORANDUM OF AGREEMENT**
Page 2

6. In the event the Employer relinquishes operation of the Monte Carlo pool to a third party, Pool Bartenders shall have the one-time option to return to a Bartender position within Monte Carlo while retaining their classification seniority. The placement of such Bartenders shall be consistent with the provisions of the *Decker* decision.

EMPLOYER – VICTORIA PARTNERS
dba MONTE CARLO RESORT AND CASINO

BY: _____

ITS: V.P. HR. _____

BARTENDERS UNION LOCAL 165
of LAS VEGAS

BY: _____

ITS: Sec.-Tres _____

BY: _____

ITS: President 2/9/13 _____

Addendum to original language February 6, 2013.

Any employee who elects to go out to the pool as a Pool Bartender will have **one** opportunity to bid back into the regular bartender classification using their original house and classification seniority under the following guidelines.

The employee will notify management of their desire to re-enter the Regular Bartender classification. Notice MUST be given during the off season, not while the pool is in operation.

Upon notification the employee will remain on the extra board in the order they were on during the previous off season, for a 90 day waiting period.

At the end of the 90 waiting period the employee may exercise their bidding rights for the next available opening within the bartender classification.

This one time opportunity will not apply to steady extra bartenders who bid for the Pool Bartender position, a bar back who becomes a Pool Bartender during any season, or an external Bartender hired specifically for the pool. This opportunity applies only to full time bartenders who bid for the Pool Bartender positions.


EMPLOYER- VICTORIA PARTNERS          BARTENDERS LOCAL 165
Dba MONTE CARLO RESORT AND CASINO    of LAS VEGAS

BY: _____        BY: _____

ITS: V. P. + R.                      ITS: Sec. Tres

                                     BY: _____

                                     ITS: President 2/9/13

Exhibit F

## MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (the "Agreement") is made and entered into as of the ___ 16 day of May, 2013, by and between CityCenter Hotel Casino LLC d/b/a ARIA Resort & Casino (the "Employer" or "ARIA"), and Bartenders Union Local 165 (the "Union").

WHEREAS the Employer and the Union are Parties to a Collective Bargaining Agreement ("CBA") effective through May 31, 2013.

WHEREAS the Employer and the Union have agreed to a process for such pool bartenders to return to the part-time board at the end of each pool season without losing their place on the part-time board;

THEREFORE this Agreement sets forth the process for pool bartenders to return to the part-time board at the end of each pool season. This Agreement shall control with respect to any provision where the Agreement and the CBA are in conflict. Accordingly, the Employer and the Union agree as follows:

1. Prior to the opening of the 2014 "pool season", the Employer shall post bid sheets for Pool Bartender positions. These Pool Bartenders will be classified as "Pool Bartenders" and covered by all applicable provisions of the CBA. Pool Bartenders will work at the ARIA pool each pool season. The "pool season" will be determined by the Employer in its sole discretion, the duration of which may be subject to weather conditions and/or business levels. The Employer will offer all shifts to Pool Bartenders in seniority order for all proceeding "pool seasons". Any vacated or new Pool Bartender position will be posted for bid.

2. Upon the execution of this Agreement and the initial hiring/bid process, the Pool Bartenders shall be placed on the bottom of the part-time board, in accordance with their classification seniority,

D 00128

3. Each pool season thereafter, all Pool Bartenders shall return to the ARIA pool for the duration of the pool season. At the end of each pool season, all Pool Bartenders shall then return to the part-time board with the seniority that they began the pool season with.

4. Pool Bartenders shall have the option to place themselves on the "unavailable for work" list during the non-pool season for one (1) calendar month at a time. However, Pool Bartenders must be available to work on New Year's Eve, Super Bowl Weekend, and March Madness (if applicable due to weather conditions and the formal opening of the pool). Pool Bartenders are not permitted to take any vacation time during the pool season (except in extreme cases, at the discretion of management approval).

5. Any employee who elects to go out to the pool as a Pool Bartender will have one (1) opportunity to bid back into the regular Bartender classification using their original house and classification seniority under the following guidelines:

   a. The employee will notify management of their desire to re-enter the regular Bartender classification. Notice must be given during the non- pool season, not while the pool is in operation.

   b. Upon notification the employee will remain on the part-time board for a ninety (90) day waiting period.

   c. At the end of the ninety (90) day waiting period the employee may exercise their bidding rights for the next available opening within the Bartender classification.

   d. This one (1) time opportunity will not apply to part-time Bartenders who bid for the Pool Bartender position, an Apprentice Bartender who becomes a Pool Bartender during any season, or an external Bartender hired specifically for the pool. This opportunity applies only to full-time Bartenders who bid for the Pool Bartender positions.

6. Pool Bartender positions will be bid out and awarded in order of current classification seniority, as follows:

   a. Full-time Bartenders

Page 2

D 00129

      b.   Part-time Bartenders

      c.   Any remaining positions will be filled through internal hires who have passed Bartender

          Craft Exam.

      d.   External hiring.

7.   All current seasonal Pool Bartenders will be separated from employment at the completion of the

     2013 "pool season" as designated by the Employer and in accordance with Article 10.03

     (Seasonal Pool Food and Beverage Employees) in the CBA.

8.   In the event the Employer relinquishes operation of the ARIA pool to a third party, Pool

     Bartenders shall have the one (1) time option to return to a Bartender position within ARIA while

     retaining their classification seniority.  The placement of such Bartenders shall be consistent with

     the provisions of the *Decker* decision.

IN WITNESS WHEREOF, the Parties hereto by their duly designated representatives have hereunto set

their hands this 10th day of March, 2013, in Clark County, State of Nevada.

For CityCenter Hotel Casino LLC
d/b/a ARIA Resort & Casino

By: _____

Its: Director of Employee Relations

Date: 5/16/13

For Bartenders Union Local 165

By: _____

Its: Sec / Tres

Date: May 16, 2013

D 00130

Exhibit G

# McCRACKEN, STEMERMAN & HOLSBERRY

Attorneys at Law

**Las Vegas**

1630 S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9846

Richard G. McCracken (CA, NV)
Steven L. Stemerman (CA, NV)
W David Holsberry (CA, NV)
Elizabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
Florence E Culp (NV)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Paul L. More (CA, NV)
Sarah Varela (CA, AZ, NV)
Sarah Grossman-Swenson (CA, NV)


**San Francisco**

Davis, Cowell & Bowe, LLP
595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

November 1, 2013

Michael J. Johnson
National Labor Relations Board Region 28
600 Las Vegas Boulevard South, Suite 400
Las Vegas, NV 89101-6637

Re:   Local Joint Executive Board of Las Vegas Bartenders Union Local 165
(Case Nos. 28-CB-114212, 114250 and 114263)

Dear Mr. Johnson:

This is the Charged Party's position statement in reference to the above charge. A copy of the collective bargaining agreement between Local 165 and Aria is attached. The issue in this case concerns seasonal pool bartenders. Section 10.03 of the collective bargaining agreement provides:

> A seasonal employee is an employee hired as a temporary employee to work in the Employer's pool food & beverage area anytime from the opening of the pool season to the closing of the pool season. These employees have bidding rights within this classification only. Regular employees who transfer into this new classification will be assigned to the bottom of the part-time seniority list of whatever classification they subsequently bid into. Seasonal classification shall be limited to: Pool Cocktail Servers, Pool Bartenders, Pool Apprentice Bartenders, Pool Food Servers, Pool Bus Persons, Pool Food & Beverage Cashiers, Pool Fountain Workers, Pool Cooks, and Pool Pantry Workers, Hostperson, Cook Helper, Bar Porter.

Under this language, regular bartenders who are brought to the pool during the season when the pool is open return to the interior and go to the bottom of the part-time seniority list. The employment of seasonal bartenders hired to work there during the pool season ends with the closing of the pool season.

Aria followed this language with respect to most of the bartenders assigned to its pool. That included terminating the employment of all the seasonal bartenders hired to work at the pool each year. Unknown to the union, however, there were three exceptions. The charging parties were not terminated. Instead, they were allowed to work sporadically during the off-season, at a bar that opened occasionally when weather was good. They decided among themselves who would work when. (This type of scheduling is in violation of Sections 10.01 and

McCRACKEN, STEMERMAN & HOLSBERRY

Michael J. Johnson
November 1, 2013
Page 2

10.02 of the agreement, which provide either a guaranteed workweek for full-time employees or regularly posted schedules of work for part-time employees.)

Section 10.03 does not answer many of the questions that arose concerning the exact ways that regular bartenders should move out to the hotel and back again for the pool season. Earlier this year, Local 165 began an effort with several hotels, including Aria, to develop a more specific set of rules. The union held a meeting on April 26, 2013 with all the bartender employees at Aria (members and non-members). It asked Aria management to spread the word throughout the beverage department about this meeting, so that as many as possible would attend. Management agreed to do this. See e-mails between Lana Loebig and Tamara Lelyk, attached. The meeting was held and many bartenders attended, including the charging parties. See the attached sign-in sheets. There was extensive discussion of what the rules should be. No one in attendance objected to the continuation of the rule that seasonal pool bartenders (like other seasonal pool employees) would be terminated at the end of each season. The charging parties informed everyone, however, that even though they were hired as seasonal pool employees, they had not been terminated but instead had continued working at the bar and therefore should be treated as regular employees and have priority for pool jobs in the upcoming 2013 season and beyond. The other bartenders – the regular bartenders – objected to this on the understandable grounds that the charging parties should not be allowed to continue to profit from the employer's violation of the collective bargaining agreement and have priority over them by virtue of a violation.

After the meeting, the union and Aria reached agreement on a memorandum setting forth the new, more detailed rules concerning staffing of the pool. A copy is attached. In paragraph 7, it was agreed that all seasonal pool bartenders would be terminated at the end of the season in accordance with Section 10.03. Apparently sometime in August, management informed the charging parties that they would be terminated at the end of the pool season. They filed a grievance (attached). As you can see, they relied upon "past practice", i.e., the employer's failure to terminate them as Section 10.03 requires. Lana Loebig, President of the union, refused to process the grievances because they were invalid. She informed the charging parties that past practice could not be used to change the terms of the collective bargaining agreement, only to fill in gaps where the agreement might be silent or ambiguous. She kept notes of her conversations (attached). Charging Party Steckbeck asked her repeatedly if she was refusing to represent him. She replied, as her notes show, that she was not refusing to represent him, just telling him that she would not process the grievance because it had no merit. This had nothing to do with member or non-member status and the subject of membership did not come up. In fact, Loebig did not know whether any of the three charging parties was or was not a member.

D 00017

McCRACKEN, STEMERMAN & HOLSBERRY

Michael J. Johnson
November 1, 2013
Page 3

Only today did the union look into the charging parties' membership status.  It turns out that Stephen Alba is an active member of Local 165 paid up to date in his dues.  Charging Party Steckbeck was a member from 1999 until 2011.  Charging Party Bledsoe was a member from 1999 until August 2010.

Sincerely,

Richard G. McCracken

RGM/dl
Enclosures